| | |
|---|---|
| STATE OF MAINE<br>ANDROSCOGGIN, ss | SUPERIOR COURT<br>CIVIL ACTION<br>DOCKET NO. CV-20- |

HEATHER VERRIER )
                            ) **PLAINTIFF'S COMPLAINT FOR**
    Plaintiff,        ) **DISCRIMINATION, RETALIATION**
                            )
                            )
v.                          )
                            )
NESTLE WATERS NORTH AMERICA)
INC DBA POLAND SPRINGS COMPANY)

    Defendant

NOW COMES, Plaintiff Heather Verrier ("Plaintiff" or "Verrier"), by and through her attorney of record, the Law Firm of Guy D. Loranger, and complains against Defendants as follows:

## PARTIES

1. Verrier at the relevant times resided in Norway, Maine.

2. Defendant Nestles Waters North America Inc. DBA Poland Springs Company ("Defendant") owns a water distribution facility in Poland Springs, Maine.

3. The claims arise out of incidents which took place in Androscoggin County, State of Maine.

4. Verrier requests a trial by jury.

## FACTUAL ALLEGATIONS

5. Verrier worked for Defendant for several years. At all times, Verrier satisfactorily performed her job responsibilities.

6. During her employment, Verrier has been subjected to a hostile work environment based upon her gender, and she then endured retaliation by Defendant management after reporting the harassment.

1

7. Derek Campbell ("DC"), a co-worker, created the hostile work environment. The relevant facts date back to 2018 when Verrier, DC, and another co-worker began to socialize outside the workplace. DC subsequently expressed a desire to date Verrier; Verrier had no interest in dating DC and made that clear to him. DC, unfortunately, did not accept the rejection. He, instead, commenced the hostile work environment.

8. After being rebuffed by Verrier, DC commenced to engage in demeaning conduct towards Verrier. For example, DC would sarcastically laugh at Verrier appearance. DC gave Verrier the "finger". DC intruded upon Verrier's privacy, for example demanding to know who she was dating. On one occasion, DC crudely remarked, who "are you fucking"?

9. DC also began to interfere with Verrier's job responsibilities. For example, on one occasion, Verrier asked DC to bring her some caps. In response, DC told Verrier to "grab the ass of a new worker to get it."

10. As early as March of 2019, Defendant management had notice of DC's harassment. Defendant received the notice from a co-worker of Verrier who gave notice of the harassment to Evan Hutchinson ("EH"), Verrier's supervisor. In response to the notice. EH separated Verrier and DC the for a couple of months.

11. In May of 2019, EH allowed DC to work in Verrier's vicinity. Given the opportunity, DC immediately resumed the harassment. Accordingly, Verrier gave notice of the renewed harassment to EH. EH, in turn, notified Jennifer Asquith ("JA") Poland Springs on site human resources representative.

12. In late May of 2019, JA spoke to Verrier. Verrier recounted the harassment. JA then spoke to DC. DC admitted to some of the offensive behavior. Despite DC's admission, JA simply required DC to sign a contract agreeing not to have further contact with Verrier.

13. DC did not take matter seriously. To the contrary, he told some co-workers the matter was "bullshit". He further recounted the request to simply read a packet, sign a contract and then allowed to "go on his merry way". Undeterred by the feeble remedial action, DC then went out of his way to enter Verrier's workspace and stare her down, an obvious display of defiance meant to further intimidate her. He succeeded.

14. Verrier gave notice to JA of DC's defiance. DC was suspended pending an investigation. A week later, JA and Jeff Veno ("JV") informed Verrier of the investigation's completion. The investigation allegedly concluded that DC's behavior did not warrant termination. Instead the two attempted to rationalize the hostile environment by portraying it as "too much drama existing on the B shift, and that Verrier "needed to keep her personal life out of the workplace." Defendant assigning blame to Verrier was clearly retaliatory and underscored the lack of good faith in Respondent's investigation and remedial action.

15. Upon DC's' return from suspension, Defendant further retaliated against Verrier by unconscionably assigning him to work on the line directly adjacent to Verrier, despite the availability of twelve other lines. The reckless placement only further endangered Verrier.

16. In this time frame, Verrier's boyfriend, who worked at the plant, had his car "keyed".

17. The hostile environment and retaliation took an extreme emotional toll on Verrier, causing her to experience anxiety attacks and call out due to the anxiety of being forced to again work adjacent to DC.

18. In a letter dated June 28, 2019 Verrier's present legal counsel wrote to JA. The subject letter detailed the above facts and requested that Defendant immediately take remedial steps designed to address the hostile work environment and retaliation.

19. On July 2, 2019, Defendant's corporate human resource representative Jacklyn Leung ("JL") emailed Verrier's legal counsel to acknowledge of the June 28, 2019 letter Defendant was in the process of investigating the allegations. The email, however, also inaccurately denied prior notice of many of the allegations.

20. On or about July 25, 2019, Defendant notified Verrier that it had completed its investigation and transferred DC to another shift. Verrier, however, continued to experience emotional distress and had to request intermittent FMLA.

21. After the completion of the most recent investigation, Defendant's management treated Verrier differently from other employees.

22. Prior to the Verrier's complaints about the hostile work environment, managers and supervisors would check on her equipment and get updates on sufficiency of the line or help. Managers and supervisors, however, now avoid going to Verrier's lines.

23. On one occasion, Verrier said "Hello" to a manager in an office setting, off the workspace floor; the manager did not acknowledgement or respond.

24. Verrier also received a text message from an employee on the same shift to which DC was moved that read "I heard you are causing problems at Poland Spring".

25. On or about 12/10/2019, a co-worker told Verrier that a shift leader on day shift, Paul Cox ("Cox"), said. "Heathers training Lincoln, great she's going to fuck him too". Cox said the statement in the manager's office in presence of EH and Danielle Barrett

26. Verrier subsequently reported the vile remark to the back-up shift leader, Aaron Chabot ("Chabot"). Chabot reported the incident to JA in Human Resources. JA then called Verrier who recounted to JA what she heard,

27. conduct described *supra* is violation of the Maine Human Rights Act prohibiting the existence of hostile work environment based upon gender and retaliation.

28. Verrier has complied with all administrative requirements by filing a Maine Human Rights Commission Complaint and receiving a right to sue letter.

## COUNT I: HOSTILE SEXUAL WORK ENVIRONMENT

29. Verrier incorporates by reference the allegations in the above paragraphs.

30. The Maine Human Rights Act makes it illegal for an employer to maintain a hostile sexual work environment based upon gender.

31. The above conduct created a hostile environment based upon gender for the Plaintiff.

32. Defendant had notice of the hostile environment, but it failed to take the requisite prompt remedial action to remedy the environment and, therefore, violated the Act.

33. The subject hostile environment caused the Verrier to suffer damages as alleged below in the prayer for damages.

34. Defendant's failure to remedy the environment exhibited a conscious disregard for the Maine Human Rights Act and provides a basis for punitive damages.

## COUNT I1: RETALIATION

35. Verrier incorporates by reference the allegations in the above paragraphs.

36. The Maine Human Rights Act makes it illegal for an employer to retaliate against an employee for making a complaint about condition or practice in violation of the Act or in retaliation for requesting a medical accommodation.

37. Verrier complained to Defendant about the hostile work environment.

38. After Verrier's complaints, Defendant retaliated against Verrier as described above

39. The retaliation caused the Verrier to suffer damages as alleged below in the prayer for damages.

40. Defendant's conduct exhibited a conscious disregard for the Maine Human Rights Act.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court (1) enter judgment in favor of the Plaintiff and (2) award damages sufficiently large to compensate for damages she has suffered as a result of Defendant's conduct including, but not limited to, damages for general and non-economic damages, punitive damages, economic damages, injunctive relief, pre-judgment and post-judgment interest, lost wages, costs of this suit, including reasonable attorney fees and costs, injunctive relief and such further relief the Court may deem proper.

Dated: October 21, 2020

/s/ Guy D. Loranger
Guy D. Loranger, Esq., Bar No. 9294
Attorney for Plaintiff

Law Office of Guy D. Loranger
1 Granny Smith Court, Suite 3
Old Orchard Beach, Maine 04064
(207) 937-3257
guy@lorangerlaw.com