UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| HEATHER VERRIER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:20-cv-00443-JAW |
| | ) | |
| BLUETRITON BRANDS INC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

A plaintiff filed a two-count complaint against her employer alleging the employer created a sexual harassment hostile work environment and retaliated against her for reporting the sexual harassment. The employer brings a motion for summary judgment on both counts. The Court denies the employer's motion for summary judgment on the plaintiff's sexual harassment hostile work environment claim because there are disputed issues of material fact to be resolved by a factfinder at trial and not by this Court on summary judgment but grants summary judgment on the plaintiff's retaliation and constructive discharge claims.

## I.    PROCEDURAL HISTORY

On October 21, 2020, Heather Verrier filed a two-count complaint in state of Maine superior court against Nestle Water North America Inc., d/b/a Poland Springs Company, alleging a hostile work environment and retaliation under the Maine Human Rights Act (MHRA). *State Ct. R.* (ECF No. 8), Attach. 2, *Pl.'s Compl. for Discrimination, Retaliation* at 5-6. On November 30, 2020, the Defendant removed the case from state court to federal court. *Notice of Removal* (ECF No. 1); *Procedural*

*Order* (ECF No. 3).  On December 21, 2020, the Defendant answered the complaint. *Def.'s Answer to Pl.'s Compl.* (ECF No. 9).

On May 26, 2021, Ms. Verrier filed a motion to amend her complaint.  *Pl.'s Mot. to Am. the Compl.* (ECF No. 29).  The Defendant responded in opposition to the proposed amendment on June 1, 2021, *Def.'s Opp'n to Pl.'s Mot. to Am. the Compl.* (ECF No. 33), which Ms. Verrier replied to on June 3, 2021.  *Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. to Am. Compl.* (ECF No. 35).  On June 9, 2021, the Magistrate Judge granted in part Ms. Verrier's motion to amend her complaint.  *Order* (ECF No. 40). On June 16, 2021, Ms. Verrier filed her Amended Complaint identifying the Defendant as BlueTriton Brands Inc d/b/a Poland Springs Company (BTB).[1]  *Pl.'s Am. Compl. for Discrimination, Retaliation* (ECF No. 41) (*Am. Compl.*).  The Amended Complaint is now the operative complaint in this action.  On June 30, 2021, the Defendant answered the Amended Complaint.  *Def.'s Answer to Pl.'s Am. Compl.* (ECF No. 43).

On December 10, 2021, BTB filed a notice of intent to file a motion for summary judgment and requested a Rule 56(h) conference, which the Court held on January 3, 2022.  *Min. Entry* (ECF No. 73); *Def. BlueTriton Brands Inc.'s Notice of Intent to File Mot. for Summ. J. and Need for a Pre-Filing Conference* (ECF No. 70).  On March 1, 2022, BTB filed its motion for summary judgment and statement of material facts. *Def.'s Mot. for Summ. J. and Request for Oral Arg.* (ECF No. 74) (*Def.'s Mot.*); *Def's*

---

[1]     On April 9, 2021, Nestle Waters North America Inc. changed its name to BlueTriton Brands, Inc.  *Def.'s Opp'n to Pl.'s Mot. to Am. the Compl.* (ECF No. 33), Attach. 1, *Certification of Delaware Secretary of State.*

*Statement of Material Facts* (ECF No. 75) (DSMF).  On March 25, 2022, Ms. Verrier

responded in opposition to BTB's motion for summary judgment.  *Pl.'s Opp'n to Def.'s*

*Mot. for Summ. J.* (ECF No. 83) (*Pl.'s Opp'n*).  That same day, Ms. Verrier filed her

response to BTB's statement of material facts, *Pl.'s Resp. to Def.'s Statement of*

*Material Facts* at 1-17 (ECF No. 82) (PRDSMF), and filed her own statement of

additional material facts.  *Pl.'s Statement of Material Facts* at 18-42 (ECF No. 82)

(PSAMF).  On April 22, 2022, BTB replied to Ms. Verrier's opposition, *Def.'s Reply Br.*

*in Further Supp. of Def.'s Mot. for Summ. J.* (ECF No. 88) (*Def.'s Reply*), and filed a

response and objections to Ms. Verrier's additional statements of material fact.  *Def.'s*

*Resps. & Objs. to Pl.'s Reply Statement of Material Facts* (ECF No. 89) (DRPSAMF).

The Court held oral argument by videoconference on July 14, 2022.  *Min. Entry* (ECF

No. 99).

## II.    FACTS

### A.    BlueTriton Brands' Employment Policies

BTB owns a water distribution facility in Poland Springs, Maine.  *Am. Compl.*

¶ 2.  BTB maintains a Policy Against Harassment and Discrimination (Harassment

Policy), which also addresses Sexual Harassment and Reporting, Investigation

Procedures, and prohibits retaliation.[2]  DSMF ¶ 1; PRDSAMF ¶ 1.  The Harassment

Policy states, in relevant part:

---

[2]      Ms. Verrier "[a]dmit[s] Defendant maintains the written Harassment and Discrimination Policy" but "[d]en[ies] Defendant followed the Policy with respect to [her]."  PRDSAMF ¶ 1.  The Court overrules Ms. Verrier's objection to DSMF ¶ 1 and admits BTB's statement of fact.  Ms. Verrier admits the substance of the fact, which is that BTB maintains such a Harassment and Discrimination Policy.  PRDSAMF ¶ 1.  Ms. Verrier's assertion that BTB did not follow its own policy in her case is nonresponsive and beyond the scope of BTB's fact.  To the extent that Ms. Verrier cites PSAMF ¶¶ 36-

> Harassment is any unwelcome or unwanted conduct relating to . . . race, creed, color, religion, sex (including pregnancy, childbirth or related medical conditions), national origin, immigration status, ancestry, age, marital status, protected veteran status, physical or mental disability or perceived disability, medical condition, genetic information, sexual orientation, gender identity, or any other protected status, as defined by applicable law, and if such conduct has the purpose or effect of:
> - creating an intimidating, hostile or offensive work environment;
> - unreasonably interfering with an individual's work performance; or
> - otherwise adversely affecting an individual's employment opportunities.[3]

PSAMF ¶ 1; DRPSAMF ¶ 1; DSMF, Attach. 4, *Dep. of Jennifer L. Asquith* (*Asquith Dep.*), Ex. 1 at NWNA000097, *Policy Against Harassment and Discrimination*.  The policy defines harassment to include derogatory comments, demeaning jokes, unwelcome advances, physical harassment such as assault, and impeding or blocking movements.  PSAMF ¶ 2; DRPSAMF ¶ 2.

The policy assures that "[t]he Company [BTB] will conduct a prompt, thorough, and objective investigation of any report of discrimination, harassment, or retaliation upon receipt of such report."  PSAMF ¶ 4; DRPSAMF ¶ 4.  The policy also assures that the "Company will make a determination after completing its investigation and will take prompt and effective remedial action, which will be communicated to the

---

62 and 93-162 to support her denial, Local Rule 56(f) requires that any assertion of fact "be followed by a citation to the *specific page or paragraph* of identified record material supporting the assertion."  D. ME. LOC. R. 56(f) (emphasis added).  Ms. Verrier's citation to over 180 paragraphs is not "specific" and is therefore improper to controvert BTB's fact under the Local Rules.

[3]       Ms. Verrier's fact originally read "Defendant's Harassment Policy defines harassment as 'any unwelcome or unwanted related to … sex … if such conduct has the purpose or effect of creating an intimidating, hostile, or offensive work environment."  PSAMF ¶ 1.  BTB denies this fact, arguing that "Plaintiff's quotation of Asquith Dep. Ex. 1 is inaccurate" and that "Defendant's Harassment Policy speaks for itself."  DRPSAMF ¶ 1.  The Court includes the entire relevant portion from BTB's Harassment Policy to avoid discrepancies between the parties' recitations of the policy.  The Court therefore accepts BTB's denial as a qualification and revises Ms. Verrier's fact to include the complete policy language.

complainant, and, as appropriate, any other directly concerned individuals.[4]  PSAMF ¶ 5; DRPSAMF ¶ 5.  The policy further stipulates that "[a]ny supervisor or manager who learns of any form of discrimination or harassment in the workplace is required to report harassment or discrimination immediately and consult with the appropriate Human Resources (HR) representative."[5]  PSAMF ¶ 6; DRPSAMF ¶ 6.

At BTB, harassment is considered a form of employee misconduct and sanctions will be enforced against individuals engaging in harassment and against supervisory and managerial personnel who knowingly allow such behavior to continue.  PSAMF ¶ 3; DRPSAMF ¶ 3.  The Harassment Policy provides for various forms of discipline, in varying degrees, that are applied on a case-by-case basis: counseling, a written warning, a final written warning, and termination.[6]  PSAMF ¶ 8; DRPSAMF ¶ 8.

BTB also maintains a "No Retaliation Policy."[7]  DSMF ¶ 2; PRDSAMF ¶ 2. The Policy prohibits retaliation through adverse actions against an employee who complains of harassment.  PSAMF ¶ 7; DRPSAMF ¶ 7.  Adverse actions include (1)

---

[4]    BTB interposes an objection that the Harassment Policy "speaks for itself."  DRPSAMF ¶ 5. As explained in the prior footnote, the Court includes the complete language from the policy.

[5]    BTB objects to PSAMF ¶ 6 for the same reasons discussed in the previous footnotes.  The Court accepts the denial as a qualification and includes the complete policy language.

[6]    Plaintiff's fact reads "Poland Springs' harassment policy provides various forms of discipline: counseling, written warning, final written warning, and termination."  PSAMF ¶ 8.  Defendant denies this fact and argues that "[t]he cited testimony does not support PSMF ¶ 8" because "Asquith testified that BTB takes varying degrees of corrective action on a case-by-case basis that can include up to termination."  DRPSAMF ¶ 8.  The Court accepts Defendant's denial as a qualification and revises PSAMF ¶ 8 to more accurately reflect how BTB imposes varying degrees of corrective action on a case-by-case basis.

[7]    Plaintiff admits that BTB "[m]aintains the written Retaliation Policy" but "[d]en[ies] Defendant followed the Policy with respect to Verrier."  PRDSMF ¶ 2.  In support of her denial Ms. Verrier cites PRDSMF ¶ 1.  The Court rejects Ms. Verrier's denial and includes DSMF ¶ 2 for the same reasons discussed in footnote 2.

failing to hire or consider a person for hire or promotion; (2) failing to give equal consideration in making employment decisions; (3) adversely impacting a person's working conditions or otherwise denying any employment benefits; (4) and creating a hostile or intimidating work environment. PSAMF ¶ 7; DRPSAMF ¶ 7. Ms. Verrier acknowledged her receipt and review of BTB's Harassment Policy and No Retaliation Policy. DSMF ¶ 4; PRDSMF ¶ 4. Derrick Campbell, Ms. Verrier's alleged harasser, also acknowledged his receipt and review of the Harassment Policy and No Retaliation policy at the start of his employment and thereafter. DSMF ¶ 5; PRDSMF ¶ 5.

## B.    Heather Verrier's Initial Employment at BlueTriton Brands on the D-Shift

On or about March 31, 2017, BTB hired Heather Verrier as a Production Operator on the D-Shift, one of BTB's two night shifts. DSMF ¶¶ 3, 8; PRDSMF ¶¶ 3, 8. Prior to BTB hiring Ms. Verrier, Ms. Verrier was sexually and physically assaulted on at least two separate occasions by different individuals, including by a Recruitment Officer with the United States Army, who pleaded guilty to criminal charges.[8] DSMF ¶ 6; PRDSMF ¶ 6. Ms. Verrier was also assaulted by her former

---

[8]    Plaintiff objects to the inclusion of this fact arguing that it is "not relevant to any disputed element in Defendant's motion for summary judgment." PRDSMF ¶ 6. In response, BTB argues that "DSMF ¶ 6 is relevant for the purpose of establishing an essential element of her claim—that the alleged conduct was sufficiently subjectively *and* objectively offensive such that a reasonable person would perceive the conduct as hostile and abusive." *Def.'s Resps. and Objs. to Pl.'s Reply Statement of Material Facts* ¶ 6 (ECF No. 89) (PRDSMF *Resp.*) (pages 1-28 include BTB's responses to Plaintiff's objections to DSMF; pages 28-69 include DRPSAMF). First, the Court agrees with BTB that the fact is relevant as it relates to Ms. Verrier's subjective perception of her co-workers' conduct by making it more likely that she perceived the conduct as inappropriate. Moreover, Ms. Verrier fails to properly controvert DSMF ¶ 6 as, aside from her relevancy argument, she neither denies nor qualifies the fact pursuant to Local Rule 56. Local Rule 56(f) provides that a fact "shall be deemed admitted unless properly controverted." D. ME. LOC. R. 56(f). The Court overrules Ms. Verrier's objection and includes DSMF ¶ 6.

boyfriend and the father of her child months prior to the date on which she obtained employment with BTB.[9]  DSMF ¶ 7; PRDSMF ¶ 7.

Shortly after obtaining work at BTB in March 2017, Ms. Verrier introduced her co-worker, Dick Ayala, to her mother, with whom she lived.[10]  DSMF ¶ 9; PRDSMF ¶ 9.  Ms. Verrier gave her mother's phone number to Mr. Ayala.  DSMF ¶ 9; PRDSMF ¶ 9.  Mr. Ayala became involved with Ms. Verrier's mother, who was not employed by BTB.  DSMF ¶ 10; PRDSMF ¶ 10.  In approximately July 2017 Mr. Ayala moved into the home that Ms. Verrier shared with her mother.  DSMF ¶ 10; PRDSMF ¶ 10.  Mr. Ayala and Ms. Verrier's mother were later involved in a domestic dispute.  DSMF ¶ 13: PRDSMF ¶ 13.  Mr. Ayala moved out of Ms. Verrier's mother's home and Ms. Verrier's mother obtained a protection from abuse order (PFA) against Mr. Ayala.  DSMF ¶ 14; PRDSMF ¶ 14.

While working the D-Shift, Ms. Verrier socialized with some of her D-Shift co-workers outside of work hours and was in a dating relationship with Tyler Saucier, a D-Shift co-worker.  DSMF ¶¶ 11-12; PRDSMF ¶¶ 11-12.

---

[9]      Ms. Verrier objects to the inclusion of this fact on the same grounds as DSMF ¶ 6.  BTB reiterates the same response.  *See* PRDSMF ¶ 7; PRDSMF *Resp.* ¶ 7.  The Court overrules Ms. Verrier's objection and includes DSMF ¶ 7 for the same reasons discussed in the previous footnote.

[10]     The Plaintiff objects to this fact and alleges that it "is not relevant to any disputed element in Defendant's motion for summary judgment."  PRDSMF ¶ 9.  BTB responds, arguing that "DSMF ¶ 9 is relevant for the purpose of establishing Plaintiff's level of comfort with her co-workers, her proclivity for mixing her professional and personal life, and her engagement in personal conduct at work that impacted her professional life."  PRDSMF *Resp.* ¶ 9.  The Court overrules Ms. Verrier's objection.  The Plaintiff has not properly admitted, denied, or qualified DSMF ¶ 9 and therefore the fact is admitted under Local Rule 56(f).  Furthermore, this fact is relevant to Ms. Verrier's employment background at BTB, and HR's later statements that it could not move Ms. Verrier to the D-Shift because she had already been moved off that shift.  *See* DSMF ¶ 15; PRDSMF ¶ 15.  This fact raises questions of credibility and evidentiary weight best left for a jury.  The Court includes DSMF ¶ 9.
        Ms. Verrier objects to DSMF ¶¶ 10-14 for the same reasons.  *See* PRDSMF ¶¶ 10-14.  In accordance with the Court's resolution of the parties' dispute over DSMF ¶ 9, the Court also includes DSMF ¶¶ 10-14.

### C.     The Move to the B-Shift

In May 2018, Ms. Verrier requested that BTB move her to the B-Shift because she was uncomfortable working the same shift as Mr. Ayala as a result of the domestic dispute between Mr. Ayala and her mother and the PFA.[11]   DSMF ¶ 15; PRDSMF ¶ 15.   BTB moved Ms. Verrier to the B-Shift upon her request.   DSMF ¶ 16; PRDSMF ¶ 16.  The B-Shift runs Sunday through Wednesday from 6:00 p.m. to 6:00 a.m..  DSMF ¶ 17; PRDSMF ¶ 17.  Shortly after moving to the B-Shift, Ms. Verrier began reporting to Evan Hutchinson, Shift Resource Manager.  DSMF ¶ 18; PRDSMF ¶ 18.  Ms. Verrier testified that Mr. Hutchinson was a good supervisor and that he supported her.[12]  DSMF ¶ 19; PRDSMF ¶ 19.

Derrick Campbell and Jerrod Warren also worked on the B-Shift.  DSMF ¶ 20; PRDSMF ¶ 20.  On at least two occasions in late 2018, Ms. Verrier went out for drinks and socialized with Mr. Campbell and Mr. Warren outside of work hours.[13]  DSMF ¶

---

[11]     The parties dispute the admission of this fact based on its relevance and Ms. Verrier's failure to assert a specific denial, and reiterate the same arguments set out in the prior footnotes.  In accordance with the Court's resolution of the parties' dispute over DSMF ¶¶ 9-14, the Court also includes DSMF ¶ 15.

[12]     The Plaintiff denies DSMF ¶ 19 arguing that "Hutchinson did not always perform as a good supervisor or support Verrier."  PRDSMF ¶ 19.  Ms. Verrier elaborates that in March of 2019, Mr. Hutchinson failed to treat a report from Tammy Golob, Ms. Verrier's coworker, appropriately, did not respond appropriately by scheduling Ms. Verrier and Mr. Campbell away from each other, and waited six days before reporting the May 21, 2019, incident to HR.  PRDSMF ¶ 19.

In response, BTB says that the denial should be stricken because "Plaintiff herself testified that Hutchinson was a good supervisor and that he supported her.  Plaintiff improperly purports to rely on the testimony of others to challenge the veracity of Plaintiff's own testimony."  PRDSMF *Resp.* ¶ 19.  The Court overrules the Plaintiff's denial and accepts DSMF ¶ 19.  The Plaintiff does not deny that BTB's fact accurately recounts her testimony; her additional examples of instances that she says illustrate that Mr. Hutchinson was not always a good supervisor are beyond the scope of the Defendant's stated fact.

[13]     PSAMF ¶ 9 reads: "[i]n late 2018, Verrier socialized away from work a couple of times with two coworkers, Derek Campbell . . . and Jerrod Warren."  PSAMF ¶ 9.  BTB "admit[s] that Verrier socialized with Campbell and Warren outside of work but den[ies] that the cited testimony . . . establishes the time frame or frequency of the coworkers' socialization."  DRPSAMF ¶ 9.  BTB is correct

22; PRDSMF ¶ 22; PSAMF ¶ 9; DRPSAMF ¶ 9.  Ms. Verrier was friends with Mr.

Warren, and Mr. Warren talked to Ms. Verrier and Mr. Campbell about whom he was

dating.[14], [15]   DSMF ¶¶ 21, 23; PRDSMF ¶¶ 21, 23.  Ms. Verrier, Mr. Campbell, and

Mr. Warren were also on a text thread with each other.[16]  DSMF ¶ 24; PRDSMF ¶

---

that the cited deposition testimony makes no reference to the timeframe when Ms. Verrier, Mr. Campbell, and Mr. Warren gathered outside of work, nor how frequently this occurred.  *See* DSMF, Attach. 4, *Dep. of Heather Verrier* at 52:11-18 (*Verrier Dep.*).  However, DSMF ¶ 22, which contains BTB's version of the same fact also includes a reference to "late 2018."  The Court therefore rejects BTB's denial of the timeframe stated in PSAMF ¶ 9, because BTB itself admits this occurred in "late 2018."  However, the Court accepts BTB's denial as to frequency because the record does not explain how often they met outside of work.  Instead, the Court includes the frequency of "[o]n at least two occasions" as stated in DSMF ¶ 22, which the Plaintiff admits and is supported by the record citation. *See Verrier Dep.* at 75:3-5 (responding "[m]aybe, yeah" to the question "[s]o you think you went out with Mr. Campbell and Mr. Warren twice?").

[14]   BTB's original statement of fact states that Ms. Verrier "was friends with Warren and Campbell," DSMF ¶ 21, which Ms. Verrier denies because "[i]n the cited testimony, Leah Verrier did not testify her daughter Heather was friends with Warren and Campbell."  PRDSMF ¶ 21.  The cited testimony states that Ms. Verrier "had a very good friend at work.  His name was Jared."  DSMF, Attach. 2, *Zoom Dep. of Leah Verrier* at 12:21-22 (*L. Verrier Dep.*).  The Court agrees with Ms. Verrier that Leah Verrier made no reference to her daughter being friends with Mr. Campbell; this portion of DSMF ¶ 21 is therefore not supported by the record.  However, the Court accepts BTB's assertion that Ms. Verrier was friends with Mr. Warren.  BTB's statement of fact is included but altered to accurately reflect the cited record.

[15]   In DSMF ¶ 23, BTB asserts that Ms. Verrier, Mr. Campbell, and Mr. Warren "discussed who they were dating when they went out for drinks in late 2018."  DSMF ¶ 23.  Ms. Verrier denies this statement of fact because she testified that she and Mr. Campbell did not talk about who they were dating.  PRDSMF ¶ 23 (citing *Verrier Dep.* at 80:5-17).  BTB subsequently responds that Ms. Verrier's denial should be stricken because it "inaccurately paraphrases the cited testimony" and "does not controvert the substance of DSMF ¶ 23."  PRDSMF *Resp.* ¶ 23.

The cited deposition testimony states:

Q. Did Derek Campbell ever talk about who he was dating?
A. No
Q. Did Warren ever talk about who he was dating?
A. Yeah.
. . .
Q. And did you ever talk about who you were dating?
A. No.

*Verrier Dep.* at 80:9-17.  The Court concludes that DSMF ¶ 23 is not supported by the record which clearly states that Mr. Warren shared whom he was dating but Ms. Verrier and Mr. Campbell did not. The Court therefore accepts Ms. Verrier's denial and updates DSMF ¶ 23 accordingly.

[16]   Ms. Verrier qualifies DSMF ¶ 24 because she "did participate in a group text, but never had any messages 'between her and Mr. Campbell.'"  PRDSMF ¶ 24 (citing *Verrier Dep.* at 77:19-78:1). Pursuant to Local Rule 56 the Court rejects Ms. Verrier's qualification and includes DSMF ¶ 24.  Ms. Verrier specifically admits that she was part of the text thread and the remaining qualification as to direct messages with Mr. Campbell is outside the scope of BTB's proffered fact.

24.   Leah Verrier, Ms. Verrier's mother, explained that Ms. Verrier told her, "after they had all gone out for drinks," Mr. Campbell was "kind of in her space; questioning her" and that she "didn't like" his behavior.  PSAMF ¶¶ 21-22; DRPSAMF ¶¶ 21-22. Leah Verrier explained:

> It made her uncomfortable and she doesn't like this guy, but she could tell he likes her because he's always up in her space, questioning other people.  It could be something like a guy brought her bottles or picked up her trash, and he would be over there asking him, What are you doing talking to Heather, and, um -- to the point where it made other people so uncomfortable at work, that at one point, her boss, [Mr. Hutchinson], . . . pulled her in the office to talk to her and let her know that other people at work had gone to complain to him because they didn't like [Mr. Campbell's] behavior around Heather.[17]

PSAMF ¶ 22; DRPSAMF ¶ 22.

Based on his observations of their workplace interactions, Mr. Hutchinson thought that Ms. Verrier was friends with Mr. Campbell, Mr. Warren, and other B-Shift employees.[18]  DSMF ¶ 25; PRDSMF ¶ 25.  In December 2018 Ms. Verrier told Mr. Warren, via text message, that she would not hang out with Mr. Campbell

---

[17]   BTB denies PSAMF ¶¶ 21-22 on the grounds that the cited testimony from Leah Verrier's deposition is "incomplete, inaccurate, and lacks context."  DRPSAMF ¶¶ 21-22.  BTB further argues that Plaintiff's affidavit is "self-serving."  First, because PSAMF ¶¶ 21-22 is supported by and directly quotes from Leah Verrier's deposition, the Court need not rely on Ms. Verrier's affidavit to support the statement of material fact.  However, the Court accepts BTB's denial to the extent that PSAMF ¶¶ 21-22 improperly quotes the deposition text and updates PSAMF ¶¶ 21-22 to properly reflect the testimony.  Furthermore, the Court includes the additional context that Ms. Verrier confided this in her mother after she went out for drinks with Mr. Campbell and Mr. Warren.  *See L. Verrier Dep.* at 13:3-4.

[18]   Ms. Verrier denies DSMF ¶ 25 and states that "[a]fter [she] declined to date Campbell, Campbell and [her] were not friendly in the workplace.  To the contrary . . . beginning in January of 2019, Campbell began to harass Verrier both on social media and in the workplace, harassment which Tammy Golob brought to Hutchinson's attention."  PSMF ¶ 25 (citing *Aff. of Tammy Golob* ¶¶ 7, 14 (ECF No. 79) (*Golob. Aff.*)).  Ms. Verrier's denial is non-responsive to the stated fact insofar as Ms. Verrier does not dispute that it was Hutchinson's *perception*  that she, Mr. Campbell, and Mr. Warren were friends.  Ms. Verrier's allegations that Mr. Campbell began to harass her, and that Tammy Golob brought this to Hutchinson's attention, do not contradict BTB's statement of fact and are included elsewhere on the record.  DSMF ¶ 25 is admitted.

anymore if Mr. Campbell "start[ed] seeing Courtney [Flanders]," another B-Shift employee. DSMF ¶ 26; PRDSMF ¶ 26. Ms. Verrier referred to Ms. Flanders as her "enemy." DSMF ¶ 26; PRDSMF ¶ 26. In the same string of text messages, Ms. Verrier told Mr. Warren that "[Mr. Campbell] can do what he wants of course but so can I. Trouble." DSMF ¶ 27; PRDSMF ¶ 27.

### D. March 2019: Heather Verrier's Interactions with Derrick Campbell

Mr. Campbell approached Ms. Verrier about wanting to date her.[19] PSAMF ¶ 10; DRPSAMF ¶ 10. Ms. Verrier refused. PSAMF ¶ 10; DRPSAMF ¶ 10. Mr. Campbell, who was in his early twenties, flirted with the younger, attractive female employees in the workplace, such as Ms. Verrier.[20] PSAMF ¶ 11; DRPSAMF ¶ 11.

---

[19]   PSAMF ¶ 10 originally states that "In early 2019, Campbell approached Verrier about wanting to date her. Verrier refused, saying she would rather remain just friends." PSAMF ¶ 10. BTB denies PSAMF ¶ 10 as unsupported by the cited testimony. DRPSAMF ¶ 10. The Court partially accepts BTB's denial. HR's investigation report does not reference Mr. Campbell asking Ms. Verrier on a date. DSMF, Attach. 4, *Asquith Dep.*, Ex. 3, *Investigation Rep. Mtg. Mins.* at 3 (May 27, 2019 *HR Investigation Rep.*). Furthermore, the cited portion of Ms. Verrier's deposition states: "I told Jared no, I don't want to [go out with him] and then he would – I believe he might have Snapchatted me asking me like on a formal date, like a date date and I said no and he just showed interest of dating me that way." *Verrier Dep.* at 75:25-76:4. The record therefore does not support the assertion that this occurred "[i]n early 2019" nor does it support the assertion that Ms. Verrier told Mr. Campbell that "she would rather remain just friends." The Court thus accepts BTB's denial and accordingly alters the Plaintiff's fact to eliminate references to the time frame and to Ms. Verrier's statement that she told Mr. Campbell she would prefer to just remain friends.

[20]   The Defendant denies PSAMF ¶ 11 and argues that "[t]he cited testimony . . . is the subjective opinion of Plaintiff's 'very good friend,' . . . set forth in a self-serving affidavit executed after Defendant filed its motion for summary judgment, and not a material statement of fact based upon evidence. Aside from her 'very good' friend's personal opinion, Plaintiff cannot identify evidence supporting PSAMF ¶ 11." DRPSAMF ¶ 11. In accordance with the Court's later discussion regarding the use of non-party, post-summary judgment affidavits, the Court rejects BTB's argument and admits PSAMF ¶ 11, as Ms. Golob was never deposed, and her affidavit does not contradict any prior testimony. In this particular case Ms. Golob's affidavit supplements Ms. Verrier's deposition testimony but does not contradict her assertions. *See Richardson v. Mabus*, 203 F. Supp. 3d 86, 138 n. 129 (D. Me. 2016) (concluding that a later declaration supplemented the initial testimony rather than contradicted it).

        Furthermore, Ms. Golob's statement as to Mr. Campbell's attitude and general patterns of conduct is based on personal knowledge as Ms. Golob worked alongside him and Ms. Verrier. However, the Court strikes the statement that Mr. Campbell "viewed himself as a 'lady's man'" from PSMF ¶ 11

He did not respond well to rejection.[21]  PSAMF ¶ 12; DRPSAMF ¶ 12.  Mr. Campbell persisted in asking Ms. Verrier out and Ms. Verrier repeatedly declined.[22]  PSAMF ¶ 16; DRPSAMF ¶ 16.  Ms. Verrier did not like talking about her personal life with Mr. Campbell.[23]  PSAMF ¶ 14; DRPSAMF ¶ 14.  She is a private person who tried to keep her personal life out of the workplace.[24]  PSAMF ¶ 13; DRPSAMF ¶ 13.  After Ms.

---

as this is not based on personal knowledge and there is nothing in the record to suggest why or how Ms. Golob knew this.  Finally, the fact that Ms. Golob is friends with Ms. Verrier and that the affidavit is "self-serving" speaks to bias and credibility, which are left to the factfinder; that Ms. Golob may be biased is not a sufficient basis for excluding this testimony or her affidavit.

[21]     BTB denies this fact on the same grounds as PSAMF ¶ 11.  *See* DRPSAMF ¶ 12.  The Court reject BTB's denial and admits PSAMF ¶ 12 for the same reasons discussed in the previous footnote.

[22]     BTB "object[s] to Plaintiff's characterization that Campbell 'persisted' and Plaintiff 'repeatedly' declined as unsupported by the cited testimony."  DRPSAMF ¶ 16.  Ms. Verrier stated the following in her deposition testimony: "He Snapchatted me, I know he did and then I think there was a couple times in person and he would say oh, let me take you out or something like that, let me go bring you on a date and I would say no." *Verrier Dep.* at 76:7-10.  When asked what she meant by the assertion in her Complaint that Mr. Campbell "did not accept the rejection," Ms. Verrier responded: "Because he got mad and then that's – and then the middle finger happened and then making fun of my face happened and then all the other stuff I just said, backed me in the corner."  *Id.* at 76:15-18.  Whether Mr. Campbell repeatedly asked out Ms. Verrier is a disputed material fact.  Taking the facts in the light most favorable to Ms. Verrier as the non-moving party, a reasonable juror could conclude that Mr. Campbell approached Ms. Verrier multiple times about going on a date and that Ms. Campbell had to reject him multiple times and that such conduct was "persistent" and required "repeated" rejections.  The Court includes PSAMF ¶ 16.

[23]     PSAMF ¶ 14 originally reads "Asquith also noted that Verrier refused to disclose her personal relationships to her, and Verrier did not like talking about her personal life with Campbell."  PSAMF ¶ 14.  BTB admits that Ms. Verrier told Ms. Asquith "she didn't feel comfortable taking about her personal life with Derrick" but "den[ies] that Plaintiff's cited evidence supports that 'Verrier refused to disclose her personal relationships to [Asquith].  Asquith merely noted that Plaintiff did not confirm to Asquith that she was in a relationship with anyone."  DRPSAMF ¶ 15 (alterations in original).  The Court agrees with BTB that the cited record does not support the assertion that Ms. Verrier refused to disclose her personal relationships.  The Court accepts BTB's denial and strikes this portion of PSAMF ¶ 14.

[24]     BTB denies PSAMF ¶ 13 and urges the Court to reject Ms. Verrier's fact as unsupported by the cited testimony.  DRPSAMF ¶ 13.  Ms. Verrier cites ¶ 12 of her affidavit, which BTB correctly notes does not support her statement of fact.  However, Ms. Verrier clearly intended to cite paragraph 11 of her affidavit which states "I am a private person and tried to keep m[y] personal life out of the workplace." *Verrier Aff.* ¶ 11.  The Court rejects BTB's denial and admits PSAMF ¶ 13 but has adopted the phrasing supported by paragraph 11 of Ms. Verrier's affidavit.

Verrier refused to date him, Mr. Campbell became upset with her.[25, 26]  PSAMF ¶ 17;

DRPSAMF ¶ 17.  Ms. Verrier blocked Mr. Campbell on social media.[27, 28]  PSAMF ¶

---

[25]     BTB denies this fact and states that "[t]he cited testimony . . . does not support PSAMF ¶ 17." DRPSAMF ¶ 17.  It says that "[a]side from her personal opinion, Plaintiff produced no evidence to support PSAMF ¶ 17."  DRPSAMF ¶ 17.  As discussed in the previous footnote, when asked what she meant when she said that Mr. Campbell "did not accept the rejection," Ms. Verrier responded that "he got mad," gave her the middle finger, made fun of her face, and backed her into a corner.  *Verrier Dep.* 76:13-18.  Viewing the facts in the light most favorable to Ms. Verrier, a reasonable juror could conclude from her deposition testimony that Mr. Campbell "became upset" with her after she rejected him multiple times.  The Court rejects BTB's denial and includes PSAMF ¶ 17.

[26]     PSAMF ¶ 15 states that "Campbell admits to approaching Verrier to date her, but she refused, saying she would rather remain just friends."  PSAMF ¶ 15.  BTB denies this fact as unsupported by the record citation.  DRPSAMF ¶ 15.  Ms. Verrier cites Exhibit 7 of Ms. Asquith's deposition, but also cites Page ID # 984.  *See* PSAMF ¶ 15.  Neither Exhibit 7 nor Page ID # 984 supports Plaintiff's fact and the Court is under no obligation to independently search the record for the correct supporting citation.  *See* D. ME. LOC. R. 56(f).  The Court omits PSAMF ¶ 15.

[27]     BTB "[a]dmit[s] that Plaintiff told Asquith she blocked Campbell on social media . . . but den[ies] that the cited evidence supports Plaintiff's opinion that she 'had' to block Campbell, or speaks to the reason why Plaintiff purportedly blocked Campbell."  DRPSAMF ¶ 19.  The Court agrees with BTB that the record citation for PSAMF ¶ 19 does not explain why Ms. Verrier blocked Mr. Campbell on social media, only that she did.  The Court therefore accepts BTB's denial as a qualification and removes "had to" from PSAMF ¶ 19.

[28]     Ms. Verrier asserts that "[t]hrough January and February of 2019, Campbell disparaged [her] in social media."  PSAMF ¶ 18 (citing *Verrier Aff.* ¶ 2).  BTB submits a lengthy denial primarily contesting the affidavit supporting Ms. Verrier's statement of fact.  DRPSAMF ¶ 18.  It argues:

> In support of [PSAMF] ¶ 18, Plaintiff improperly relies on her self-serving affidavit, executed after Defendant moved for summary judgment. The timing of Plaintiff's execution of her affidavit is probative of Plaintiff's intent and suggests improper motive. Further, courts require statements contained in affidavits to be factually specific and supported by the record. *See Brisbin v. Aurora Loan Servs.*, LLC, 679 F.3d 748, 754 (8th Cir. 2012) (holding "self-serving affidavit not sufficiently specific to raise genuine issue of material fact in face of uncontradicted facts in record"); *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012) (quoting *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("'[C]onclusory, self-serving affidavit[s], lacking detailed facts and any supporting evidence,' are insufficient to create a genuine issue of material fact.")).  Plaintiff's affidavit is not factually specific and is limited to generalities and conclusory statements, i.e. Plaintiff provides no details (much less, specific details) regarding the dates, number of instances, social media platform(s), alleged disparaging statement(s), or manner in which Campbell allegedly "disparaged her in social media." This statement is not supported by the record. Plaintiff's affidavit does not include the requisite specific facts sufficient to make it valid evidence, nor does it support PSMF ¶ 18.  *Malave-Torres v. Cusido*, 919 F. Supp. 2d 198, 204 (D.P.R. 2013).  Aside from her personal opinion and self-serving affidavit, Plaintiff produced no evidence in support of PSMF ¶ 18.

DRPSAMF ¶ 18.

19; DSMF ¶ 19.  Mr. Campbell admitted that in the timeframe of January-February 2019, Ms. Verrier blocked him on social media because he was "moody and she did not want to talk to him anymore."[29]  PSAMF ¶ 20; DRPSAMF ¶ 20.

---

In accordance with the Court's later discussion on Ms. Verrier's affidavit, the Court rejects BTB's argument that it should strike PSAMF ¶ 18 based on the timing of the execution of the affidavit because BTB has not demonstrated that Ms. Verrier's affidavit contradicts her prior deposition testimony.  *See Selfridge v. Jama*, 172 F. Supp. 3d 397, 413 (D. Mass. 2016) (admitting a plaintiff's affidavit that was executed after the defendants filed for summary judgment because the defendants failed to show the affidavit contradicted the plaintiff's earlier deposition testimony); *see also Escribano-Reyes v. Prof'l Hepa Certificate Corp.*, 817 F.3d 380, 387 (1st Cir. 2016) (finding suspicious timing *in addition* to a contradiction between the affidavit and deposition testimony); *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006) (same); *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994) (same). In fact, Ms. Verrier made no mention of Mr. Campbell disparaging her on social media in her deposition. Nor is the self-serving nature of the affidavit, standing alone, sufficient justification to strike PSAMF ¶ 18.  *See Cadle Co. v. Hayes*, 116 F.3d 957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which [s]he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment").

As to the specificity of the statement, BTB argues the Court should reject PSAMF ¶ 18 because the affidavit is conclusory and not factually specific.  DRPSAMF ¶ 18. The Court agrees and strikes PSAMF ¶ 18. "To the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000). Similarly, "conclusory allegations in an affidavit are insufficient to challenge a motion for summary judgment." *Tate & Lyle Ingredients Ams., Inc. v. Transp. Distrib., LLC*, 746 F. Supp. 2d 189, 198 (D. Me. 2010). "The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Instead, "the affidavit must refute some specific fact rather than make a general allegation." *Id.* (citing *Lujan*, 497 U.S. at 888-89).

Here, Ms. Verrier states that she was "disparaged" by Mr. Campbell but makes no attempt to explain how he "disparaged" her, how often this occurred, and what sort of conduct it entailed.  *See Verrier Aff.* ¶ 2; *see also Papkee v. MECAP, LLC*, No. 2:20-cv-00006-NT, 2022 U.S. Dist. LEXIS 29925, at *21 (D. Me. Feb. 18, 2022) (concluding that defendants' failure to specify the number of hours the plaintiff worked in an affidavit intended to rebut her contention that she worked more than forty hours per week was "[v]ague and conclusory"); *Madison v. Potter*, No. 07-08-P-S, 2008 U.S. Dist. LEXIS 14386, at *24 (D. Me. Feb. 25, 2008) (deeming an assertion that plaintiff's "impairment has caused 'loss of sleep'" a conclusory statement); *Farrington v. Bath Iron Works Corp.*, No. 01-274-P-H, 2003 U.S. Dist. LEXIS 1938, at *6 (D. Me. Feb. 7, 2003) (striking as conclusory a statement that the plaintiff was "subjected to a disproportionate number of practical jokes and physical assaults because other co-workers knew that he was or perceived him to be substantially limited in his intellectual functioning"). The Court accepts BTB's denial, strikes ¶ 2 of Ms. Verrier's affidavit, and omits PSAMF ¶ 18 from its recitation of the facts.

[29]    BTB "[a]dmit[s] that Campbell told Asquith that Plaintiff blocked him on Facebook because Plaintiff stated Campbell was 'moody and she did not want to talk to him anymore' but den[ies] that the cited evidence supports Plaintiff's characterization that Campbell admitted he was moody." DSAMF ¶ 20. The Court rejects BTB's denial. A reasonable jury could infer from the cited investigation report that Mr. Campbell was reciting to Ms. Asquith what Ms. Verrier told him about

14

According to Ms. Verrier's deposition testimony and her Complaint, Mr. Campbell engaged in the following conduct in March 2019: Mr. Campbell ridiculed Ms. Verrier's appearance, for example he laughed at Ms. Verrier's eyebrows; Mr. Campbell stared at Ms. Verrier from 100 feet away through a glass wall; Mr. Campbell stuck up his middle finger at Ms. Verrier while he was working on a different line far away from her; and Mr. Campbell asked Ms. Verrier "who she was fucking."[30]   DSMF ¶ 29; PRDSMF ¶ 29; PSAMF ¶¶ 32-33, 35; DRPSAMF ¶¶ 32-33, 35.   During HR's investigation into whether Mr. Campbell laughed at Ms. Verrier,

---

why she blocked him on social media, not that he was admitting Ms. Verrier's statement about him to be true.  PSAMF ¶ 20 is included.

[30]   DSMF ¶ 29 originally specified that the conduct took place "during one of their shifts in March 2019."  DSMF ¶ 29. Ms. Verrier "admit[s] that Campbell engaged in the conduct" but "den[ies] that Verrier's cited testimony establishes that the conduct took place in one shift."  PRDSMF ¶ 29.  BTB's record citation does not establish that the events occurred all on one date, nor does Ms. Verrier's record citation support the alternative conclusion that they did not.  Viewing the record in the light most favorable to Ms. Verrier, the Court omits the reference to "during one of their shifts" in including DSMF ¶ 29.

BTB qualifies PSAMF ¶ 33 as unsupported by the record cited but admits that Ms. Verrier "testified that Campbell made fun of her eyebrows" although it "denies that [her] allegation was substantiated."  DRPSAMF ¶ 33.  The Court rejects BTB's qualification and includes PSAMF ¶ 33 because it is supported by the record citation.  As previously discussed, the import of HR's inability to substantiate Ms. Verrier's allegations is an issue for a factfinder at trial, not this Court on summary judgment.

PSAMF ¶ 35 originally states that "Campbell became more vulgar.  For example, he gave Verrier the finger," but BTB qualifies this statement because the cited testimony does not support the statement that "Campbell became more vulgar."  DRPSAMF ¶ 35.  The Court agrees with BTB's qualification and omits this portion of Ms. Verrier's statement of fact as argument on how the Court should characterize Mr. Campbell's conduct.

PSAMF ¶ 32 states that "In March of 2019, Campbell asked Verrier, "who she was fucking." PSAMF ¶ 32.  BTB "[d]en[ies] that Plaintiff's cited evidence . . . supports PSMF ¶ 32 but admit[s] that Plaintiff testified that in March of 2019 Campbell asked her 'who are you dating or who are you fucking.'"  DRPSAMF ¶ 32.  Given that BTB does not object to the substance of the stated fact, and that BTB includes this same fact in its statement of material facts, *see* DSMF ¶ 36, the Court rejects BTB's denial and includes PSMF ¶ 32.

Mr. Hutchinson recalled that Mr. Campbell laughed during a pre-shift meeting, but he did not know why.[31]  PSAMF ¶ 31; DRPSAMF ¶31.

Ms. Verrier told her co-worker, Tammy Golob,[32] about Mr. Campbell's conduct; Ms. Verrier testified that this made Ms. Golob uncomfortable.[33]  DSMF ¶ 30; PRDSMF ¶ 30.  BTB employed Ms. Golob from 2017 through August of 2019.  PSAMF ¶ 24; DRPSAMF ¶ 24.  Ms. Golob is forty-seven years old and the mother of two children, and previously knew Ms. Verrier because her daughter went to pre-school through middle school with Ms. Verrier.[34]  PSAMF ¶ 25; DRPSAMF ¶ 25.  Ms. Golob worked much of the time adjacent to Ms. Verrier.  PSAMF ¶¶ 24, 26; DRPSAMF ¶¶ 24, 26.  In early 2019, Ms. Golob witnessed Mr. Campbell's conduct and comments,

---

[31]     PSAMF ¶ 31 originally states: "Hutchinson admits that he witnessed Campbell laughing at Verrier during a pre-brief meeting."  PSAMF ¶ 31.  BTB denies this fact and argues that the cited evidence does not support PSAMF ¶ 31.  The cited testimony states only that Mr. Hutchinson saw Mr. Campbell laugh but did not know why he was laughing.  *See Asquith Dep.*, Ex. 7, *June 28, 2019 Summary of Complaint Claims and Respective Investigate Findings* at NWNA000146 (June 28, 2019, *HR Investigation Rep.*).  The Court accepts BTB's denial and revises PSAMF ¶ 31 to reflect the HR report more accurately.

[32]     Ms. Verrier spells Ms. Golob's name "Golob," while BTB uses "Golub."  The Court uses the spelling of Ms. Golob's name in her affidavit.  *See Golob Aff.*

[33]     Ms. Verrier qualifies DSMF ¶ 30 with the assertion that "Golob also witnessed Campbell's harassment."  PRDSMF ¶ 30.  BTB responds stating that this qualification "should be stricken on the grounds that Plaintiff's qualification of Campbell's conduct as 'harassment' is an improper legal conclusion, and not a statement of fact."  PRDSMF *Resp.* ¶ 30.  Ms. Verrier does not contest the fact that she told Ms. Golob about Mr. Campbell's conduct and her qualification relating to Ms. Golob seeing the harassment firsthand is beyond the scope DSMF ¶ 30.  BTB's fact is included.

[34]     BTB denies this fact absent "knowledge or information sufficient to form a belief as to the truth of [PSAMF] ¶ 25" and further contends that it is "wholly irrelevant to any element of Defendant's motion for summary judgment."  DRPSAMF ¶ 25; *see also* DRPSAMF ¶ 26.  BTB further reiterates that Ms. Golob's affidavit is self-serving.  DRPSAMF ¶¶ 25-26.  As stated in previous footnotes, the Court rejects BTB's argument that the Court should not consider the affidavit because it is "self-serving."  Furthermore, Ms. Golob's affidavit statements are based on personal knowledge and may be relevant in so far as she explains the nature of her relationship with Ms. Verrier.  PSAMF ¶¶ 25-26 are included.

which Ms. Golob testified left Ms. Verrier visibly upset.[35, 36]   PSAMF ¶¶ 27-28;

DRPSAMF ¶¶ 27-28.  Ms. Golob also witnessed Mr. Campbell approach Ms. Verrier's

work area and stare at her.[37]   PSAMF ¶ 30; DRPSAMF ¶ 30.

Ms. Golob became concerned with what she perceived was Mr. Campbell's

harassment of Ms. Verrier and its impact on her, so she told Ms. Verrier to report the

harassment to management, which Ms. Verrier declined to do.[38]   PSAMF ¶ 36;

---

[35]     In PSAMF ¶ 27 Ms. Verrier states that "[i]n the early portion of 2019, Golob witnessed
Campbell frequently entering Verrier's workspace and bothering her" while PSAMF ¶ 28 states that
"Golob witnessed Campbell's unwanted presence around Verrier and its impact, leaving Verrier very
upset." PSAMF ¶¶ 27-28. In its lengthy denials, BTB again questions Ms. Verrier's use of Ms. Golob's
affidavit and argues that the affidavit fails to provide details "regarding the frequency with which
Campbell entered Plaintiff's workspace or how he 'bothered' her," or what is meant by "presence
around Verrier" or "impact." DRPSAMF ¶¶ 27-28. The Court overrules BTB's objections to the use of
Ms. Golob's affidavit, as previously discussed.
        However, in accordance with the already-articulated principles on the specificity of affidavits,
the Court accepts BTB's denial as to Ms. Verrier's failure to specify the frequency of this conduct and
how Mr. Campbell was "bothering" Ms. Verrier. Ms. Golob's affidavit does support that she witnessed
Mr. Campbell's conduct and that, according to Ms. Golob's personal observations, Ms. Verrier appeared
upset. The Court therefore strikes PSAMF ¶ 28 and includes PSAMF ¶ 27 but removes the conclusory
elements of Plaintiff's fact to more accurately reflect the record cited.
[36]     PSAMF ¶ 29 states "Verrier also told Golob that Campbell's presence and comments upset her;
Verrier just wanted Campbell to leave her alone." PSAMF ¶ 29. BTB again denies this statement
reiterating its prior challenge to Ms. Golob's affidavit and because Ms. Verrier "cannot identify
evidence supporting PSMF ¶ 29." DRPSAMF ¶ 29. Ms. Golob's affidavit states "In the early portion
of 2019, I witnessed Mr. Campbell frequently come to Ms. Verrier's workspace, and make disparaging
comments to Ms. Verrier. Mr. Campbell's presence and comments left Ms. Verrier visibly upset. She
just wanted Mr. Campbell to leave her alone." *Golob Aff.* ¶ 8.
        Ms. Golob's statement does not support the assertion that Ms. Verrier spoke to Ms. Golob and
told her Mr. Campbell's presence and comments upset her. The cited record also does not support that
Ms. Verrier just wanted Mr. Campbell to leave her alone. What Ms. Verrier wanted Mr. Campbell to
do is not within Ms. Golob's personal knowledge nor does the record citation support the assertion that
Ms. Verrier told Ms. Golob that she wanted Mr. Campbell to leave her alone. The Court accepts BTB's
denial and omits PSAMF ¶ 29 from the Court's recitation of the facts.
[37]     BTB denies PSAMF ¶ 30 by reiterating its previous arguments as to Ms. Golob's affidavit and
Ms. Verrier's failure to specify the frequency of how often Ms. Golob witnessed Mr. Campbell come
over to Ms. Verrier and stare at her. DRPSAMF ¶ 30. The Court rejects BTB's arguments as to the
specificity of the statement of fact because a reasonable juror could conclude, based on Ms. Golob's
personal knowledge, that Mr. Campbell came over to Ms. Verrier at least once and stared at her at
least once. There are other facts on the record supporting the frequency of this occurrence. PSAMF ¶
30 is included.
[38]     PSAMF ¶ 36 originally reads: "Golob became concerned with the increasing level of
harassment by Campbell and its impact upon . . . Verrier, so she told Verrier to report the harassment
to management. Verrier declined." PSAMF ¶ 36. BTB denies this fact because "Plaintiff's

17

PRDSAMF ¶ 36.  Ms. Golob later explained that as a mother with a daughter the same age as Ms. Verrier, she needed to inform Management of what she perceived was Mr. Campbell's harassment.[39]  PSAMF ¶ 37; DRPSAMF ¶ 37. In March 2019 Ms. Golob told Mr. Hutchinson that Mr. Campbell was "bothering" Ms. Verrier.[40, 41] DSMF ¶ 31; PRDSMF ¶ 31; PSAMF ¶ 38; DRPSAMF ¶ 38.  Ms. Verrier did not initially tell Mr. Hutchinson about Mr. Campbell's conduct and she testified that Ms. Golob "took it upon herself to go tell [Mr. Hutchinson] and she felt uncomfortable she thought I should have told him and I didn't want to at first and she told him, he came and told me."[42]  DSMF ¶ 32; PRDSAMF ¶ 32.  Ms. Golob stated that Mr. Hutchinson

---

[39]    classification of Campbell's conduct as 'harassment' is an improper conclusion of law and not a statement of material fact."  DRPSAMF ¶ 36.  BTB further reiterates its previous arguments regarding the self-serving nature of Ms. Golob's affidavit and the timing of its execution.  DRPSAMF ¶ 36.  The Court rejects BTB's argument regarding Ms. Golob's affidavit, as consistent with previous footnotes.
        However, the Court overrules BTB's objection to the substance of PSAMF ¶ 36.  The line between a legal conclusion and a statement of fact is sometimes gray.  *See LaBrecque v. Mabus*, No. 2:14-cv-00357, 2017 U.S. Dist. LEXIS 21815, at \*34 n.55 (D. Me. Feb. 16, 2017) (agreeing with the defendant that the plaintiff's assertion that he "continued to be subject to harassment and retaliation" was "a legal conclusion and not a statement of fact").  However, the Court does not view Ms. Golob's statement that Mr. Campbell was harassing Ms. Verrier to be a legal assertion, rather it views her use of the term as one of common usage and understanding.  The Court amends the paragraph slightly to stress that harassment is used in a lay, not legal, sense.

[39]    BTB reiterates the same arguments in its denial of PSAMF ¶ 37 that it made regarding PSAMF ¶ 36.  The Court rejects BTB's denial and includes PSAMF ¶ 37 for the same reasons and with the same revision discussed in the previous footnote.

[40]    Ms. Verrier qualifies DSMF ¶ 31 and states that "Golob told Hutchinson that Campbell was harassing Verrier."  PRDSMF ¶ 31.  BTB replies that "the qualification of Campbell's conduct as 'harassment' is an improper legal conclusion, and not a statement of fact" and that "the cited testimony does not controvert the substance of DSMF ¶ 31."  *Resp.* to PRDSMF ¶ 31.  The Court disagrees with BTB.  However, the record citation supports BTB's phrasing that Ms. Golob reported to Mr. Hutchinson that Mr. Campbell was "bothering" Ms. Verrier and the Court inserted "bothering" in place of "harassing."  *See* DSMF, Attach. 3, *Dep. of Evan Hutchinson* at 11:16 (*Hutchinson Dep.*).

[41]    BTB reiterates the same arguments in its denial of PSAMF ¶ 38 that it made regarding PSAMF ¶ 36.  The Court rejects BTB's denial and admits PSAMF ¶ 38 for the same reasons discussed in the previous footnotes.

[42]    Ms. Verrier "den[ies] that [she] did not tell Hutchinson about Campbell's harassment" but "[a]dmit[s] that Gol[u]b told Hutchinson about Campbell's harassment."  PRDSMF ¶ 32.  In response, BTB asserts that "'harassment' is an improper legal conclusion, and not a statement of fact" and that "the cited testimony does not controvert the substance of DSMF ¶ 32."  *Resp.* to PRDSAMF ¶ 32.  The

seemed put off by her report, but he did agree to speak with Ms. Verrier.[43]  PSAMF

¶ 39; DRPSAMF ¶ 39.

Mr. Hutchinson admitted that he was "made aware" of a possible situation

involving Mr. Campbell's conduct and that he had a duty to investigate harassment

regardless of whether the notice came from a third party.[44]   PSAMF ¶¶ 40-41;

DRPSAMF ¶¶ 40-41.  Mr. Hutchinson did not question Ms. Golob as to why Mr.

Campbell had been bothering Ms. Verrier, when it began, or how long Mr. Campbell

had been harassing Ms. Verrier.[45]  PSAMF ¶ 42; DRPSAMF ¶ 42.  When asked why

he did not ask Ms. Golob about the extent of Mr. Campbell bothering Ms. Verrier, Mr.

---

Court rejects Ms. Verrier's denial.  First, Ms. Verrier admits that Ms. Golob told Mr. Hutchinson about Mr. Campbell's conduct.  *See* PRDSMF ¶ 32.  Second, the Court agrees that Ms. Verrier did ultimately tell Mr. Hutchinson about Mr. Campbell's conduct, but the record supports the assertion that Ms. Verrier initially did not want to tell Mr. Hutchinson.  The Court therefore admits DSMF ¶ 32 but revises the fact to reflect that Ms. Verrier "initially" did not tell Mr. Hutchinson about Mr. Campbell's conduct.

[43]   BTB denies this fact, arguing once again that this statement is set forth in a self-serving affidavit and that the timing of Ms. Golob's "affidavit is probative of Plaintiff's intent and suggests improper motive."  DRPSAMF ¶ 39.  For the reasons set forth in the previous footnotes and below in the Court's discussion, the Court rejects the Defendant's arguments regarding the inclusion of Ms. Golob's affidavit and admits PSAMF ¶ 39.

[44]   PSAMF ¶ 40 originally reads "Hutchinson admits to Golob giving him notice of Campbell bothering Verrier."  PSAMF ¶ 40.  BTB denies this statement on the grounds that "[t]he cited testimony . . . does not support PSAMF ¶ 40 and does not refer to Campbell bothering Plaintiff."  DRPSAMF ¶ 40.  The cited testimony states:

> A. I didn't hear [that Ms. Verrier felt that Mr. Campbell was harassing her] directly from Heather, but I was made aware through a third party that there was a possible situation going on, which at the time I believed was just hearsay.
> Q. What do you mean by hearsay?
> A. Because I didn't hear it directly from the source, I can't really confirm or deny if it was actually going on.
> Q. Who was the third party?
> A. Tammy Gol[o]b

*Hutchinson Dep.* at 11:4-13.
The Court accepts BTB's qualification and revised the statement to conform to Mr. Hutchinson's exact deposition testimony.

[45]   PSAMF ¶ 42 uses the term "harassing" and the Court includes that term in a lay, not legal sense.

Hutchinson replied that "if it was serious, [he] figured [Ms. Golob] would say that it was serious."[46]  PSAMF ¶ 46; DRPSAMF ¶ 46.  Mr. Hutchinson "didn't continue the conversation" with Ms. Golob "[b]ecause [he] assume[d] that if [Ms. Verrier] was being harassed, that she would report it to [him]."[47]  PSAMF ¶ 47; DRPSAMF ¶ 47.  Mr. Hutchinson also testified that Ms. Golob "was in no position to be making reports. She was not [Ms. Verrier's] direct supervisor.  She was just a friend."[48]  PSAMF ¶ 48; DRPSAMF ¶ 48.  Mr. Hutchinson testified that he assumed the behavior between Ms. Verrier and Mr. Campbell was just an "immature working relationship," which he admitted was not based on any direct knowledge.[49]  PSAMF ¶¶ 43-44; DRPSAMF ¶¶ 43-44.  Mr. Hutchinson admitted that the easiest way to clear up his assumption

---

[46]    BTB denies PSAMF ¶ 46 because "[t]he cited quoted testimony . . . is inaccurate."  DRPSAMF ¶ 46.  The Court accepts the qualification and updates the Plaintiff's fact so that it accurately reflects Mr. Hutchinson's testimony.

[47]    BTB denies PSAMF ¶ 47 and argues that the cited record does not support the fact as written. DRPSAMF ¶ 47.  BTB further argues that the fact mischaracterizes Mr. Hutchinson's testimony and "ignores the executed and notarized errata sheet annexed to the Hutchinson Dep." DRPSAMF ¶ 47. The Court rejects BTB's denial and admits PSAMF ¶ 47.  Ms. Verrier incorrectly cites page 15 of Mr. Hutchinson's deposition to support her statement of fact instead of page 13:3-7.  The correct record citation does support Ms. Verrier's statement of fact and was not addressed by Mr. Hutchinson's deposition errata sheet.  PSAMF ¶ 47 is included.

[48]    The Defendant denies PSAMF ¶ 48 because the "cited quoted testimony . . . is inaccurate." DRPSAMF ¶ 48.  The Court accepts the denial and corrects the fact to accurately reflect the deposition testimony.  PSAMF ¶ 48 is included.

[49]    BTB denies PSAMF ¶ 44 and argues that PSMF ¶ 44 "mischaracterizes Hutchinson's testimony."  DRPSAMF ¶ 44.  It says that "Hutchinson testified that he knew from his own previous conversations with his employees that 'they were all in the same friend group' and 'they were hanging out outside of work.'"  DRPSAMF ¶ 44 (citing *Hutchinson Dep.* at 13:18-15:3).  BTB also cites Mr. Hutchinson's testimony where he says that "his assumption about the 'immature working relationship' was based on 'months and months of working with these people together and being their direct supervisor.'"  DRPSAMF ¶ 44 (citing *Hutchinson Dep.* at 16:19-23).  The Court rejects BTB's denial because it is beyond the scope of PSAMF ¶ 44.  Ms. Verrier's statement is supported by the record. Moreover, the stated fact does not speak to what Mr. Hutchinson based his assumption on, but rather that it was not based on direct knowledge.  *See Hutchinson Dep.* at 15:4-7 ("Q. So you had no direct knowledge though that this assertion of Campbell bothering Verrier was based upon an immature relationship, that was just an assumption you made, correct?  A. Yes").  PSAMF ¶ 44 is admitted.

was to simply speak to Ms. Verrier.[50]  PSAMF ¶ 45; DRPSAMF ¶ 45.  He said that if Ms. Verrier had made the report to him, "then [he] would have followed up then and there."  PSAMF ¶ 51; DRPSAMF ¶ 51.

Shortly after Ms. Golob's conversation with Mr. Hutchinson, Mr. Hutchinson spoke with Ms. Verrier about Ms. Golob's report and told Ms. Verrier he would separate her and Mr. Campbell in the facility and assign them to work in different areas.[51]  DSMF ¶ 33; PRDSMF ¶ 33; PSAMF ¶¶ 49-50, 55-56; DRPSAMF ¶¶ 49-50,

---

[50]    PSAMF ¶ 45 originally reads: "Hutchins[on] admits that the easiest way to clear up his assumption was to simply speak to Verrier, which he claims he did not do."  PSAMF ¶ 45.  BTB qualifies this statement and says that "Plaintiff ignores the executed and notarized errata sheet annexed to the Hutchinson Dep., in which Hutchinson corrects the testimony relied upon by Plaintiff . . . to 'I spoke with [Plaintiff] about [Campbell] and I don't recall the timing of our conversation or exactly when it happened.'"  DRPSAMF ¶ 45.  It also points to PSAMF ¶¶ 55-56 and says that "Plaintiff herself admits that Hutchinson spoke with her regarding Gol[o]b's report."  DRPSAMF ¶ 45.

         Federal Rule of Civil Procedure 30(e)(1) permits a deponent to "review the [deposition] transcript . . . and if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them" within 30 days of notification that a transcript is available.  FED. R. CIV. P. 30(e).  Here, Mr. Hutchinson's deposition took place on August 4, 2021, and he returned his notarized errata sheet on September 14, 2021.  *See Hutchinson Dep.* at 1, 79.  There is no contention that the errata was untimely or was submitted more than 30 days after Mr. Hutchinson was notified that the transcript of his deposition was available for review.  Nor has Ms. Verrier alleged that the errata sheet is inaccurate.  Although the original deposition statement supports PSAMF ¶ 45, the Court accepts Mr. Hutchinson's deposition errata, which is consistent with other facts in the record.  The Court accepts BTB's qualification and omits the portion of PSAMF ¶ 45 in which Ms. Verrier asserts that Mr. Hutchinson did not speak with her, especially as Ms. Verrier herself states that he did speak to her.  *See* PSAMF ¶¶ 55-56.

[51]    Ms. Verrier denies DSMF ¶ 33 and asserts that "Hutchinson testified he did not speak to Verrier about Golob's report."  PRDSMF ¶ 33 (citing *Hutchinson Dep.* at 15:20-22, 18:49).  In response to Ms. Verrier's denial, BTB again argues that she "ignores the executed and notarized errata sheet . . . in which Hutchinson corrects the testimony relied upon on by Plaintiff . . . to 'I spoke with [Plaintiff] about [Campbell] and I don't recall the timing of our conversation or exactly when it happened.'"  PRDSMF *Resp.* at 33 (citing *Hutchinson Dep.* at 67).

         In accordance with the deposition correction principles discussed in the previous footnote and in the Court's analysis below, the Court rejects Ms. Verrier's objection and includes DSMF ¶ 33.  Moreover, in the Plaintiff's own additional statement of material fact she states that Mr. Hutchinson spoke to her.  *See* PSAMF ¶ 55 ("Hutchinson did speak to Verrier").  It is befuddling that Ms. Verrier would attempt to contradict a statement of fact that she herself admits and includes repeatedly in her own statement of fact.  The Court accordingly also rejects PSAMF ¶¶ 49-50 and 53, all of which similarly reference Mr. Hutchinson not speaking to Ms. Verrier despite her contradictory admission that he did so.

55-56.   Ms. Verrier recounted for Mr. Hutchinson that she had refused to date Mr.

Campbell and that Mr. Campbell's workplace and social media harassment made her

feel upset and fearful.[52]   PSAMF ¶ 57; DRPSAMF ¶ 57.   Mr. Hutchinson said that he

would attempt "within reason" and based upon "business needs" to try and keep Mr.

Campbell away from Ms. Verrier.   PSAMF ¶ 58; DRPSAMF ¶ 58.   Ms. Verrier

believed that Mr. Hutchinson wanted to help and agreed with his proposal to separate

her and Mr. Campbell in March 2019.[53]   DSMF ¶ 34; PRDSMF ¶ 34.   Mr. Hutchinson

testified that he did not speak to Mr. Campbell.   PSAMF ¶ 52; DRPSAMF ¶ 52.

---

PSAMF ¶ 56 states that "[s]hortly after Golob left, Hutchinson spoke to Verrier about Campbell's bothering her."   PSAMF ¶ 56.   BTB qualifies this statement, admitting that Mr. Hutchinson spoke with Ms. Verrier about Mr. Campbell's conduct, but disputing that the cited record indicates the timing of when Mr. Hutchinson spoke to Ms. Verrier.   In support of PSAMF ¶ 56, Ms. Verrier cites Ms. Golob's affidavit which states that Mr. Hutchinson spoke with Ms. Verrier "[s]hortly after" he spoke with her.   *Golob Aff.* ¶ 12.   The Court admits PSAMF ¶ 56 as supported by the record.

[52]   BTB denies PSAMF ¶ 57 because Ms. Verrier relies on her own affidavit, which BTB argues is self-serving and suggesting of ill motive.   In accordance with the Court's prior discussion of Ms. Verrier's affidavit, the timing of the execution of the affidavit is, alone, insufficient to strike PSAMF ¶ 57 in the absence of evidence that the affidavit contradicts Ms. Verrier's deposition.   In her deposition Ms. Verrier explains "I was embarrassed overall not to tell anyone, I was just embarrassed and was telling [Ms. Golob] about it and she took it upon herself to go tell [Mr. Hutchinson] and she felt uncomfortable, she thought I should have told him and I didn't want to at first and she told him, he came and told me."   *Verrier Dep.* at 84:8-12.   When asked whether she felt that Mr. Hutchinson wanted to help her, Ms. Verrier responded "He said I'll separate you guys."   *Id.* at 85:4-5.

However, at no point was Ms. Verrier asked during her deposition exactly what she told Mr. Hutchinson during this conversation.   Ms. Verrier's explanation in her affidavit as to what she told Mr. Hutchinson and how she was feeling at the time therefore does not contradict any previous testimony, but rather supplements what is already on the record regarding her conversation with Mr. Hutchinson.   *See Goldman v. Steffens,* No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 201258, at *112 n.414 (D. Me. Mar. 7, 2014) (overruling an objection to an affidavit because the "affidavit does not contradict any clear answer to an unambiguous question, but rather is in the nature of additional facts"); *Hinkley v. Baker*, 122 F. Supp. 2d 57, 59 n.1 (D. Me. 2000) (concluding that "elaborat[ing] on the details surrounding the conduct" is not grounds to strike post-summary judgment affidavit testimony).   The Court therefore rejects BTB's denial and admits PSAMF ¶ 57.   The Court includes Ms. Verrier's reference to Mr. Campbell's harassment as a lay, not legal opinion.   There is record evidence of Mr. Campbell's workplace harassment and of Ms. Verrier's decision to block Mr. Campbell on social media, which is sufficient in the context of this case to support the fact, viewed in the light most favorable to Ms. Verrier, that Mr. Campbell was harassing her on social media as well.

[53]   Ms. Verrier offers the following qualification: "Agree that Hutchinson did propose to schedule Campbell away from Verrier, but the proposal was dependent on business needs, and Hutchinson testified he only scheduled Campbell away from Verrier over 50% of the time.   Further, Hutchinson

The HR Investigation Report states that Mr. Hutchinson "separated a bit where [Ms. Verrier and Mr. Campbell] were working in the factory, but they seemed like friends from [Mr. Hutchinson's] perspective."[54]  PSAMF ¶ 65; DRPSAMF ¶ 65; June 28, 2019 *HR Investigation Rep.* at NWNA000145.  Mr. Hutchinson did not document his intention to try to keep Mr. Campbell away from Ms. Verrier.  PSAMF ¶ 59; DRPSAMF ¶ 59.  When Mr. Hutchinson did not work, backup supervisors,

---

did not tell his relief supervisors, who made the schedule when he was off, of his proposal."  PRDSMF ¶ 34.  In response, BTB says that the qualification should be stricken because "Plaintiff's citation is incomplete, lacks context, and mischaracterizes Hutchinson's testimony."  PRDSMF *Resp.* ¶ 34.  BTB cites the following interchange:

> Q. And did Mr. Hutchinson seem like he was interested in helping you?
> A. Yeah.
> Q. Did you feel that Mr. Hutchinson wanted to help you?
> A. He said I'll separate you guys.
> Q. And was that -- did that seem like a good solution to you?
> A. Yeah.
> Q. And to the best of your recollection, did this happen in March of 2019?
> A. Yeah.
> Q. And it is your recollection that Mr. Hutchinson separated the two of you?
> A. Yeah.

*Verrier Dep.* at 85:1-14.

Ms. Verrier attempts to assert additional factual allegations in the guise of a qualification but does not dispute the fact asserted in DSMF ¶ 34.  Ms. Verrier does not dispute that in her deposition she stated that it was her belief that Mr. Hutchinson wanted to help.  Mr. Hutchinson's other actions related to his proposal to separate Ms. Verrier from Mr. Campbell are beyond the scope of DSMF ¶ 34 and are included elsewhere in the Court's recitation of facts.  The Court includes BTB's ¶ 34.

[54]     PSAMF ¶ 65 states: "Hutchinson claims that after he attempted to keep Campbell away from Verrier, 'they seemed like friends.'"  PSAMF ¶ 65.  BTB denies this statement of fact because the cited record "does not speak to at what point Hutchinson claimed Campbell and Plaintiff seemed like friends."  DRPSAMF ¶ 65.  The cited portion of the HR Investigation Report states:

- Around March was when Tammy Golob came to Evan and told him that Derrick seemed to be bugging Heather about not dating him
  . . .
- Evan separated a bit where Derrick and Heather were working in the factory, but they seemed like friends from Evan's perspective

June 28, 2019 *HR Investigation Rep.* at NWNA000145.  Based on the context of the record, a reasonable jury could infer that Mr. Hutchinson made the statement that Mr. Campbell and Ms. Verrier "seemed like friends" around the same time that he separated them.  This reasonable inference supports Ms. Verrier's version of the facts; however, the Court agrees that the record does not support the suggestion that it was after they were separated that they seemed like "friends."  The Court therefore includes PSAMF ¶ 65, but slightly alters the fact to accurately quote the cited report.

Aaron Chabot, and Jen Slamin, prepared the schedule.[55]  PSAMF ¶ 60; DRPSAMF ¶ 60.  Mr. Hutchinson did not inform Mr. Chabot of his attempt to keep Mr. Campbell away from Ms. Verrier.  PSAMF ¶ 61; DRPSAMF ¶ 61.  Mr. Hutchinson estimates he was able to schedule Mr. Campbell away from Ms. Verrier over 50% of the time.  PSAMF ¶ 62; DRPSAMF ¶ 62.  Mr. Hutchinson testified that he believed his actions were consistent with BTB's Sexual Harassment Policy.[56, 57]  PSAMF ¶ 54; DRPSAMF ¶ 54.  Ms. Golob testified that after she spoke with Mr. Hutchinson, she continued to

---

[55]     BTB denies this fact because the cited testimony "does not support that Aaron Chabot and Jen Slamin prepared any schedule."  DRPSMF ¶ 60.  In his deposition, Mr. Hutchinson testified:

> Q. And how was it determined whether [Ms. Verrier] would work on line one or 11?
> A. It's based on skill set of the employees that I have available for manpower staffing, who calls out, et cetera, and then it's my decision from there.
> Q. Okay.  What about when you are not working, when you are off, who makes the decision?
> A. That would be my shift backup.
> Q. And who was that?
> A. At the time, I really had two different backups.  There was Jen Slamin and Aaron Chabot.

*Hutchinson Dep.* at 19:18-20:3.
        In the light most favorable to Ms. Verrier as the nonmoving party, a reasonable factfinder could conclude that determining which lines employees work based on availability, who calls out, etc. is the equivalent of determining the "schedule" for the day.  The Court rejects BTB's denial and includes PSAMF ¶ 60.

[56]     PSAMF ¶ 54 originally states that "Hutchinson testified that his actions were consistent with Poland Spring Sexual Harassment Policy."  PSAMF ¶ 54.  BTB denies PSAMF ¶ 54 and says that "Hutchinson testified that *he believed* his actions were consistent with Poland Spring Sexual Harassment Policy."  DRPSAMF ¶ 54 (emphasis added).  The Court accepts BTB's denial as a qualification and adds "he believed" to PSAMF ¶ 54 to reflect more accurately the cited deposition testimony.

[57]     In PSAMF ¶ 23 Ms. Verrier asserts that "[t]hrough March of 2019, Campbell continued to harass Verrier in the workplace."  PSAMF ¶ 23 (citing *Golob Aff.* ¶¶ 7-13; *Verrier Aff.* ¶¶ 3-4).  BTB denies this statement of fact because it is an "improper conclusion[] of law," and further reiterates its arguments on the improper nature of Ms. Verrier's use of post-summary judgment affidavits.  *See* DRPSAMF ¶ 23.  The Court agrees that PSAMF ¶ 23 states an improper legal conclusion rather than a fact and accordingly omits the paragraph.  Moreover, many of the factual allegations Ms. Verrier points to in the affidavits to support her proposed ¶ 23 are themselves on the record.

see Mr. Campbell adjacent to or around Ms. Verrier's work area.[58]  PSAMF ¶ 63;

DRPSAMF ¶ 63.  Mr. Campbell's presence would cause Ms. Verrier to become tense.[59]

PSAMF ¶ 64; DSAMF ¶ 64.  Ms. Verrier tried to avoid Mr. Campbell as much as

possible and stated that she was never "ok with [Mr. Campbell]."[60]  PSAMF ¶ 68;

DRPSAMF ¶ 68.

### E.     The May 21, 2019, Incident and Response

#### 1.     The Interaction Between Heather Verrier and Derek Campbell

On Tuesday, May 21, 2019, Ms. Verrier and Mr. Campbell were scheduled to

work on adjacent production lines approximately fifty feet from each other.[61]  DSMF

---

[58]     BTB denies PSAMF ¶ 63 based on Ms. Verrier's usage of Ms. Golob's affidavit and further argues that the statement provides no specific details as to how often Mr. Campbell was "adjacent to or around Verrier's work area" and whether he was there for legitimate business reasons.  The Court rejects BTB's denial as Ms. Golob's statement is based on personal knowledge and, when read in the context of Ms. Golob's other more detailed statements, is more than conclusory.

[59]     BTB denies PSAMF ¶ 64 because the fact is supported by a post-summary judgment affidavit and provides no details about "when, how often, or how [Ms. Golob] was even aware that Verrier became 'tense.'"  DRPSAMF ¶ 64.  In accordance with the Court's prior resolution of this issue, the Court overrules BTB's objection to Ms. Verrier's use of Ms. Golob's affidavit.

The Court also rejects BTB's denial to the contents of PSAMF ¶ 64, which BTB made on the ground that Ms. Golob has no personal knowledge as to how Ms. Verrier was feeling.  The Court takes it as a given that human beings can tell when another person, particularly someone they know, is tense without that person expressly informing them that she is.

[60]     BTB denies this fact because Ms. Verrier relies on her affidavit.  The Court rejects this argument as BTB has not pointed to any evidence suggesting that the affidavit contradicts Ms. Verrier's prior deposition testimony.  PSAMF ¶ 68 is included.

[61]     DSMF ¶ 35 originally describes the scheduling of Ms. Verrier and Mr. Campbell as "inadvertent[]."  DSMF ¶ 35.  Ms. Verrier admits that "Hutchinson scheduled Verrier and Campbell to work adjacent to each other" but denies that "Hutchinson made the schedule inadvertently because the cited evidence does not support the fact."  PRDSMF ¶ 35.  BTB responds that this denial should be stricken because "Plaintiff did not testify, and Plaintiff does not cite testimony, regarding who scheduled Plaintiff and Campbell to work on adjacent production lines on or about May 21, 2019."  PRDSMF *Resp.* ¶ 35.  Viewing the evidence in the light most favorable to Ms. Verrier, the Court agrees that the record is silent as to whether scheduling Ms. Verrier and Mr. Campbell within fifty feet of each other was "inadvertent."  The record is also silent as to who made this schedule.  The Court accepts Ms. Verrier's denial and omits "inadvertently" from DSMF ¶ 35.

In accordance with this reasoning the Court also accepts BTB's qualification to PSAMF ¶ 69.  *See* PSAMF ¶ 69 ("On May 21, 2019, Hutchinson scheduled Campbell to work adjacent to Verrier").

¶ 35; PRDSMF ¶ 35 PSAMF ¶ 69; DRPSAMF ¶ 69.  Ms. Verrier alleges that during

the May 21, 2019, shift, Mr. Campbell came over to her workspace[62] and (1) asked

Ms. Verrier who she was dating, or "who [she was] fucking," and (2) told her to "grab

a co-worker's ass" in response to her request that he bring her bottle caps.[63]  DSMF

¶ 36; PRDSMF ¶ 36; PSAMF ¶¶ 34, 70; DRPSAMF ¶¶ 34, 70.  Ms. Verrier testified

that Mr. Campbell asked her who she was dating "because he didn't know."  DSMF ¶

37; PRDSMF ¶ 37.  Mr. Campbell physically backed Ms. Verrier into a corner into

her labeler and she testified that she couldn't "go around him [because he was] right

---

[62]     PSAMF ¶ 70 states that "[d]uring the shift, Campbell came over [to] Verrier's workplace."
PSAMF ¶ 70 (citing *Verrier Dep.* 85:15-18).  BTB denies PSAMF ¶ 70 because "[t]he cited testimony .
. . does not speak to the time or location of any interaction between Campbell and Plaintiff."
DRPSAMF ¶ 70.  The cited testimony states:

> Q. And what did he do to you in May of 2019 to resume the harassment?
> A. That is when he backed me into a corner.
> Q. Okay.  That's when he backed you into a corner and asked who you were fucking?
> A. Uh-huh.

*Verrier Dep.* at 87:3-8.
    Viewing the record in the light most favorable to Ms. Verrier, a reasonable factfinder could
conclude that this occurred during the shift on May 21.  The Court overrules BTB's denial and includes
PSAMF ¶ 70.
[63]     Ms. Verrier admits that Mr. Campbell wanted to know who she "was fucking" but denies that
Campbell told her to "grab a co-worker's ass" because she "testified she did not recall if the incident
occurred in May of 2019."  PRDSMF ¶ 36.  Ms. Asquith's report states that "Heather stated that the
same night as the comment about who she was dating was made that earlier in the night she had
asked Derrick to get her some caps around 2:30am." June 28, 2019 *HR Investigation Rep.* at
NWNA000148.  The bullet point under this statement says that the "[d]ate of the comment was
5/21/2019.  The Court reject Ms. Verrier's denial and includes DSMF ¶ 36.
    PSAMF ¶ 34 states "Verrier asked Campbell to retrieve some equipment.  In response,
Campbell told Verrier he would if she 'would go over and grab that guy's ass.'"  PSAMF ¶ 34.  BTB
admits Ms. Verrier made this statement but qualifies it on the basis that her allegation was never
substantiated by HR.  Whether Ms. Verrier's allegations are substantiated speaks to the weight and
credibility of Ms. Verrier's testimony which is an issue best left for a factfinder at trial.  The Court
rejects BTB's qualification and admits PSAMF ¶ 34.

there."[64, 65, 66]   PSAMF ¶¶ 73-75; DRPSAMF ¶ 73-75.   In response to his statement,

Ms. Verrier asked Mr. Campbell to move away from her and told Mr. Campbell that

he was "inappropriate."[67]   DSMF ¶ 38; PRDSMF ¶ 38; PSAMF ¶ 76; DRPSAMF ¶ 76.

Mr. Campbell refused to move.[68]   PSAMF ¶ 77; DRPSAMF ¶ 77.   Mr. Campbell then

demanded to know who Ms. Verrier was "fucking."[69]   PSAMF ¶ 78; DRPSAMF ¶ 78.

---

[64]     BTB objects to PSAMF ¶ 74, arguing that the cited testimony is misquoted.  The Court overrules the objection and admits PSAMF ¶ 74 as supported by Ms. Verrier's deposition testimony.
        Regarding PSAMF ¶ 75, BTB admits only that "Plaintiff testified she could not go around Campbell."  DRPSAMF ¶ 75.  The Court admits PSAMF ¶ 75 but omits the portion specifying that "Campbell was extremely close to Verrier 'like right there'" as unsupported by the record cited.

[65]     PSAMF ¶ 76 states that "Verrier asked Campbell to move away from her, complaining that he was being inappropriate."  PSAMF ¶ 76.  BTB only "[a]dmit[s] that Plaintiff testified she asked Campbell to move and told him he was being inappropriate."  DRPSAMF ¶ 76.  The Court accepts BTB's qualification and includes PSAMF ¶ 76 but replaces "complaining" with "told" to reflect more accurately the cited deposition testimony.  *See Verrier Dep.* at 204:4-9.

[66]     PSAMF ¶ 73 originally reads "Campbell physically backed Verrier into [a] corner."  PSAMF ¶ 73 (citing *Verrier Dep.* at 63:18).  BTB denies PSAMF ¶ 73 because "[t]he cited testimony . . . does not support PSAMF ¶ 73."  DRPSAMF ¶ 73.  BTB is correct that the exact deposition lines cited do not support the Plaintiff's statement, but a few lines below the cited testimony Ms. Verrier stated that "he was backing me into a corner."  *Verrier Dep.* at 63:21.  In the light most favorable to Ms. Verrier, a reasonable juror could infer that if Mr. Campbell was backing her into the corner and into her labeler and would not let her move, he was backing her into a corner "physically."  PSAMF ¶ 73 is included.

[67]     Ms. Verrier denies DSMF ¶ 38, arguing that she "told Campbell he was being inappropriate when [he] sexually harassed and 'attacked' her threateningly 'cornering her by the conveyor belt' thus not allowing her to escape while demanding to know who she was 'fucking.'"  PRDSMF ¶ 38.  In response, the Defendant states that "Plaintiff seemingly does not deny she told Campbell he was 'inappropriate' . . . but instead substitutes inflammatory commentary and conclusions of law, rather than statements of material fact."  PRDSMF *Resp.* ¶ 38.  BTB also says that "Plaintiff's denial of DSMF ¶ 38 does not controvert the substance of DSMF ¶ 38."  PRDSMF *Resp.* ¶ 38.  The Court agrees with BTB that Ms. Verrier does not dispute the statement that she told Mr. Campbell that he was being "inappropriate."  *See* D. ME. LOC. R. 56(f) ("[S]tatements of material facts . . . shall be deemed admitted unless properly controverted").  To the extent that Ms. Verrier seeks to qualify the Defendant's statement as recounting "sexual harassment" and an "attack," the Court disagrees that such statements are legal conclusions and argument rather than statements of fact.  However, they are outside the scope of the Defendant's fact under the Local Rules.  The Court rejects Ms. Verrier's denial and includes DSMF ¶ 38.

[68]     BTB argues that "the cited testimony . . . does not support PSMF ¶ 77."  DRPSAMF ¶ 77.  The portion of Ms. Verrier's deposition that she cites reads: "Q. Did he move away from you [after you asked him to move and told him he was being inappropriate]?  A. No."  *Verrier Dep.* at 204:8-9.  Viewing the record in the light most favorable to Ms. Verrier as the non-moving party, a reasonable factfinder could conclude that if Mr. Campbell did not move away from Ms. Verrier after being asked to do so, he was "refusing to move."  The Court rejects BTB's denial and includes PSAMF ¶ 77.

[69]     BTB "[a]dmit[s] that Plaintiff testified Campbell asked who she was 'fucking' . . . but den[ies] that [Ms. Verrier's testimony] at 63:19 supports PSMF ¶ 78."  DRPSAMF ¶ 78.  Because BTB admits

Mr. Campbell "basically [told Ms. Verrier she was] a piece of shit."[70]   PSAMF ¶ 79;

DRPSAMF ¶ 79.   Ms. Verrier told Mr. Campbell "I've got to go and I'm going to take

a break" and walked away, which is when Mr. Campbell moved.[71]   PSAMF ¶ 80;

DRPSAMF ¶ 80.   Ms. Verrier characterized his behavior as "threatening."   PSAMF ¶

74; DRPSAMF ¶ 74.   She testified that she felt "attacked" and "violated" and that she

"felt embarrassed because . . . there [are] very few women that work there at

nighttime or at all."[72]   PSAMF ¶¶ 71-72; DRPSAMF ¶¶ 71-72; *Verrier Dep.* at 88:5-8.

---

the substance of the fact and uses its denial merely to offer its own version of this fact, *see* DSMF ¶ 36, the Court rejects BTB's denial and includes PSAMF ¶ 78.

[70]   PSAMF ¶ 79 originally states that "Campbell told Verrier that 'she was a piece of shit.'" PSAMF ¶ 79.   BTB "[a]dmit[s] only that Plaintiff testified Campbell 'said basically you're a piece of shit.'" DRPSAMF ¶ 79.   The relevant part of Ms. Verrier's deposition testimony states: "he made me feel uncomfortable by cornering me and asking me who I'm dating and whatnot and I felt very uncomfortable by that, he was backing me into a corner and then I told him it was none of his business and he said basically you're a piece of shit." *Verrier Dep.* at 63:18-23.   In the light most favorable to Ms. Verrier, the Court accepts PSAMF ¶ 79 as supported by the record but alters the fact slightly to reflect more accurately that Mr. Campbell may not have said this exact phrase.

[71]   PSAMF ¶ 80 originally reads that "Verrier escaped Campbell by claiming that she needed to leave to go on break." PSAMF ¶ 80.   BTB admits that Ms. Verrier "testified she told Campbell she needed to take a break" but objects "to Plaintiff's use of 'escaped' as improperly inflammatory and not supported by the cited testimony." DRPSAMF ¶ 80.   The cited portions of Ms. Verrier's deposition testimony states: "I told him that I needed -- I told [Mr. Campbell] I needed to take a break and I walked out into the office . . .." and "I said I've got to go and I'm going to go take a break and walk away and that's when he moved away." *Verrier Dep.* at 87:18-19, 204:20-21.   The Court agrees that Ms. Verrier's testimony does not support the proposition that she "escaped" and her characterization is argumentative.   The Court therefore sustains BTB's objection and includes PSAMF ¶ 80 but alters the statement of fact to reflect more accurately the cited deposition testimony.

[72]   Ms. Verrier's original PSAMF ¶ 71 reads that "Campbell 'attacked' Verrier; He sexually harassed her and violated her." PSAMF ¶ 71.   BTB denies this statement arguing that "PSMF ¶ 71 improperly contains conclusions of law and not statements of material fact.   Plaintiff did not testify that Campbell 'attacked' her, but rather, Plaintiff testified that when Campbell allegedly asked Plaintiff who she was 'fucking,' that Plaintiff 'felt attacked.'   When asked whether she felt threatened, Plaintiff testified she 'felt like violated.'" DRPSAMF ¶ 71.   The Court agrees that it is more accurate to use Ms. Verrier's own language.   The Court accepts BTB's denial and revises PSAMF ¶ 71 to more accurately reflected the cited deposition testimony.

PSAMF ¶ 72 originally states that "[t]he assault occurred in the middle of the night with very few women working the shift." PSAMF ¶ 72.   BTB denies PSAMF ¶ 72 because it "improperly contains a conclusion of law and not statements of material fact.   In addition, Plaintiff testified that she told Hutchinson she 'just felt embarrassed because – and I just – there is very few women that work there at nighttime or at all and I just didn't want any attention for that so I felt embarrassed . . ." DRPSMF ¶ 72 (citing *Verrier Dep.* at 87:17-88:18).   The Court rejects BTB's legal conclusion objection but revises

Ms. Verrier walked away from Mr. Campbell when he asked whom she was dating and went to Mr. Hutchinson's office.[73]  DSMF ¶ 39; PRDSMF ¶ 39; PSAMF ¶ 81; DRPSAMF ¶ 81.  Ms. Verrier immediately reported and recounted Mr. Campbell's conduct to Mr. Hutchinson.[74]  DSMF ¶ 40; PRDSMF ¶ 40; PSAMF ¶ 82; DRPSAMF ¶ 82.  Mr. Hutchinson confirmed Ms. Verrier's complaint.[75]  PSAMF ¶ 83; DRPSAMF ¶ 83.  Mr. Hutchinson described Ms. Verrier as distressed, and she went to the bathroom to cry.[76]  PSAMF ¶¶ 84-85; DRPSAMF ¶¶ 84-85.  After Ms. Verrier left the bathroom, Mr. Hutchinson was waiting for her.  PSAMF ¶ 86; DRPSAMF ¶ 86.  Mr. Hutchinson was apologetic and told Ms. Verrier he would report Mr. Campbell's statement to HR.[77]  DSMF ¶ 41; PRDSMF ¶ 41; PSAMF ¶ 86; DRPSAMF ¶ 86.  Ms.

the statement to accurately reflect Ms. Verrier's actual testimony.  As just noted, the Court inserted Ms. Verrier's actual description of the event.

[73]    Ms. Verrier denies this statement of material fact and says that she "only escaped Campbell's assault after she feigned the need to take a break and 'that's when he (Campbell) moved away.'"  PRDSMF ¶ 39.  As in the previous footnote, BTB reiterates that Ms. Verrier offers "inflammatory commentary and conclusions of law, rather than statements of material fact" but does not dispute that "Plaintiff told Campbell she needed to take a break."  PRDSMF *Resp.* ¶ 39.  Although the Court does not agree that this statement is a conclusion of law, the Court rejects Ms. Verrier's denial in accordance with the previous footnote.  DSMF ¶ 39 is included.

[74]    PSAMF ¶ 82 originally states that "Verrier then recounted Campbell's assault," which BTB objects to as unsupported by the cited testimony and offering "improper conclusions of law."  DRPSAMF ¶ 82.  The Court rejects BTB's assertion that the statement is a conclusion of law but agrees with BTB that the cited deposition testimony nowhere states that Mr. Campbell assaulted her.  Incorporating the earlier description, the Court includes a more neutral phrase.

[75]    BTB argues that the cited deposition testimony does not support PSAMF ¶ 83.  BTB is correct that the exact record citation does not support Ms. Verrier's fact, however, the Court nonetheless includes PSAMF ¶ 83 because BTB's own statements of material fact indicate that Mr. Hutchinson confirmed that Ms. Verrier complained to him about Mr. Campbell's conduct.

[76]    BTB "[a]dmit[s] that Plaintiff testified she 'went back to the bathroom and [she] was crying in there.'"  DRPSAMF ¶ 85.  In the light most favorable to Ms. Verrier and because BTB does not dispute the remainder of the fact, the Court accepts her characterization of what happened.  PSAMF ¶ 85 is included.

[77]    BTB qualifies PSAMF ¶ 86, which reads "After Verrier left the bathroom; Hutchinson was waiting for her; he said that he would contact Human Resources," because Ms. Verrier testified that Mr. Hutchinson said, "I feel like I should tell HR about this."  PSAMF ¶ 86; DRPSAMF ¶ 86.  The Court overrules BTB's objection because in its own statement of fact BTB says that Mr. Hutchinson told Ms. Verrier he would report Mr. Campbell's conduct to HR.  *See* DSMF ¶ 41.  The Court includes PSAMF ¶ 86.

Verrier did not initially want Mr. Hutchinson to report the incident to HR but Mr. Hutchinson said that it was the right thing to do.[78]  DSMF ¶ 42; PRDSMF ¶ 42.  Ms. Verrier testified that "it wasn't [her] choice to tell [HR], it was up to [Mr. Hutchinson]" who told her he was going to tell HR.  *Verrier Dep.* 89:10-11.  Ms. Verrier was still crying so Mr. Hutchinson asked if she wanted to go home, and Ms. Verrier agreed. PSAMF ¶ 87; DRPSAMF ¶ 87.  Ms. Verrier called in sick the next day.[79]  PSAMF ¶ 88; DRPSAMF ¶ 88.  On May 25, 2019, Ms. Verrier had yet to hear from management or HR regarding her complaint about Mr. Campbell's conduct, so she called in sick

---

[78]     DSMF ¶ 42 originally reads: "Plaintiff did not want Hutchinson to report the incident to HR and she asked him not to report it."  DSMF ¶ 42.  Ms. Verrier denies this fact and states that she "testified she initially did not want Hutchinson to report the assault to human resources, but Hutchinson [said] it was the right thing [to] do, 'and I was like all right.'"  PRDSMF ¶ 42.  In response, BTB submits that "Plaintiff's denial of DSMF ¶ 42 should be stricken because Plaintiff's cited testimony does not controvert the substance of DSMF ¶ 42."  PRDSMF *Resp.* ¶ 42.  When asked in her deposition whether she wanted Mr. Hutchinson to make a report to HR she responded, "Not initially, no."  *Verrier Dep.* 89:1-2.  Upon further probing Ms. Verrier stated:

> "I didn't -- in my head at that time, I didn't want any attention for it and I was against him going to HR and he said -- he said it was the right thing to do was to tell them and I was like all right,  but I don't think it was in my -- it wasn't my choice -- to tell them, it was up to him, he says well, I'm going to so.

*Verrier Dep.* 89:6-11.
        The Court partially accepts and partially denies both DSMF ¶ 42 and PRDSMF ¶ 42.  Both parties cite the same deposition testimony which supports Ms. Verrier's assertion that she did not initially want Mr. Hutchinson to report the incident to HR, but that he thought it was the right thing to do.  However, the cited testimony also supports that it was not Ms. Verrier's decision to report the incident to HR.  The Court accordingly revises DSMF ¶ 42 to more accurately reflect Ms. Verrier's testimony.

[79]     PSAMF ¶ 88 originally states that "Verrier also had to call in sick the next day."  PSAMF ¶ 88.  BTB admits that Ms. Verrier called in sick the next day but denies that she "had" to call in sick. DRPSAMF ¶ 88.  Ms. Verrier's deposition testimony states: "then I believe I called out the next day." *Verrier Dep.* at 88:14.  The Court agrees with BTB that in her deposition Ms. Verrier does not explain why she called out of work the next day—only that she did.  The Court therefore accepts BTB's denial that she "had" to call in sick and includes PSAMF ¶ 88, altered slightly to conform with Ms. Verrier's deposition testimony.

due to the lack of response and her distress over the situation.[80]   PSAMF ¶ 91;

DRPSAMF ¶ 91.

Ms. Verrier did not work again until Monday, May 27, 2019.[81]   DSMF ¶ 43;

PRDSMF ¶ 43. On Monday, May 27, 2019, Mr. Hutchinson reported everything he

was aware of to Jennifer Asquith, HR Manager, prior to the start of Ms. Verrier's

shift, despite Ms. Verrier initially not wanting him to report the incident to HR.[82]

Ms. Asquith's Investigation Report documented her meeting with Mr. Hutchinson.[83]

PSAMF ¶¶ 93-95; DRPSAMF ¶¶ 93-95; DSMF ¶ 44; PRDSMF ¶ 44.

---

[80]   Ms. Verrier originally states that she called out because she had not heard from HR regarding "Campbell's assault." PSAMF ¶ 91. In accordance with the Court's prior resolution of contested facts, the Court replaces that language with "her complaint about Mr. Campbell's conduct." BTB generally denies this statement of fact because of Ms. Verrier's reliance on her affidavit. As previously stated, the Court rejects BTB's arguments regarding Ms. Verrier's use of her affidavit absent argument or evidence that the affidavit introduces entirely new claims or contradicts earlier testimony. In this particular case, Ms. Verrier stated in her deposition that she called out on May 25, 2019. Ms. Verrier's affidavit simply augments the record by providing additional details as to why she called out and what she was feeling at the time. *See* May 27, 2019 *HR Investigation Rep.* at 2. The Court rejects BTB's denial and includes PSAMF ¶ 91.

[81]   Ms. Verrier qualifies this statement of fact and offers her explanation for why she called in sick, as stated in PSAMF ¶ 91. PSAMF ¶ 91 is already included in the Court's recitation of fact. The Court rejects Ms. Verrier's qualification and includes DSMF ¶ 43 as the qualification is beyond the scope of the stated fact.

[82]   DSMF ¶ 44 originally reads: "On Monday, May 27, 2019, Hutchinson reported the May 21 incident to Jennifer Asquith, HR Manager, prior to the start of Plaintiff's shift, in spite of Plaintiff's request that he not make the report." DSMF ¶ 44. Ms. Verrier admits that "Hutchinson reported Campbell's assault of Verrier" but denies that he "limited his report to Campbell's assault on May 21st." PRDSMF ¶ 44. She specifically points to Mr. Hutchinson's testimony stating that he "reported everything . . . that [he] was aware of." PRDSMF ¶ 44. Ms. Verrier also denies that she "did not want the assault reported." PRDSMF ¶ 44. BTB again asserts that Ms. Verrier's denial improperly substitutes "inflammatory commentary and conclusions of law." PRDSMF *Resp.* ¶ 44. The Court accepts Ms. Verrier's qualification and revises DSMF ¶ 44 to reflect that Mr. Hutchinson said he reported everything he was aware of, and that Ms. Verrier initially did not want Mr. Hutchinson to make an HR report but accepted his assertion that the matter needed to be reported.

[83]   PSAMF ¶ 95 states: "Asquith's Investigative Report documented her meeting with Hutchinson. The Report, however, only recounts a single incident of harassment – the incident on May 21st with Campbell." PSAMF ¶ 95. BTB "[a]dmit[s] Asquith documented her meeting with Hutchinson" but "[d]en[ies] PSAMF ¶ 95 as contradictory to Plaintiff's Response to DSMF ¶ 44, in which Plaintiff expressly 'Den[ied]' that Hutchinson[] limited his report to Campbell's assault on May 21st. Hutchinson testified when he met with Asquith, "I reported everything that I – that I was aware of."'" DRPSAMF ¶ 95. The Court agrees that Ms. Verrier now seeks to admit a fact that she previously

Ms. Asquith met with Ms. Verrier to discuss Mr. Campbell's conduct on the same day that Mr. Hutchinson reported it, prior to Ms. Verrier beginning her shift.[84] DSMF ¶ 45; PRDSMF ¶ 45; PSAMF ¶ 97; DRPSAMF ¶ 97.   In the meeting Ms. Verrier recounted Mr. Campbell's request to date her, her rejection, what she believed was Mr. Campbell's harassment leading to Ms. Golob's report in March to Mr. Hutchinson, what she believed was Mr. Campbell's assault on May 21, and her need to call in sick on May 25.[85]   PSAMF ¶ 98; DRPSAMF ¶ 98.   Ms. Asquith told Ms. Verrier she was sorry it happened, and she would talk with Mr. Campbell about his conduct.   DSMF ¶ 46; PRDSMF ¶ 46.   In Ms. Asquith's Investigation Report documenting her interview with Ms. Verrier, she only references the May 21st

---

denied. The Court therefore accepts BTB's denial and strikes the portion of PSAMF ¶ 95 stating that the report only recounted a single incident but includes the remainder of PSAMF ¶ 95 as admitted by BTB and supported by the record.

[84]   Ms. Verrier qualifies this statement and says that "she met with Asquith and 'I had to tell the whole story to Jen…I was distraught when I was with her…I went through all of it…, I went way back." PRDSMF ¶ 45.  In response, BTB argues that Ms. Verrier's qualification should be stricken because it "does not controvert the substance of DSMF ¶ 45." PRDSMF *Resp.* ¶ 45.  The Court rejects Ms. Verrier's qualification and includes DSMF ¶ 45.  Ms. Verrier's qualification is nonresponsive to BTB's fact and speaks to what she told Ms. Asquith and how she felt while recounting what happened which does not controvert the Defendant's fact, which speaks only to whether Ms. Asquith met with Ms. Verrier and when.

[85]   PSAMF ¶ 98 originally references "Campbell's subsequent harassment" and "Campbell's assault . . . on May 21st.  The Court rejects BTB's assertion that harassment and assault are legal conclusions, but it has revised ¶ 98 to clarify that these words describe Ms. Verrier's perception of what had occurred.

BTB denies PSAMF ¶ 98, again arguing that the affidavit upon which Ms. Verrier relies for the substance of the fact, is impermissible.  Once again, the Court rejects BTB's position that the self-serving nature of the affidavit is alone sufficient for the Court to strike paragraph 8 of Ms. Verrier's affidavit.  BTB has not cited any part of the deposition contrary to Ms. Verrier's affidavit.  Furthermore, Ms. Verrier's affidavit clarifies a vague portion of her deposition testimony.  In her deposition, when asked what she told Ms. Asquith in her HR meeting on May 27, Ms. Verrier responds "[w]hat I just told you," *Verrier Dep.* at 90:14-15, referring to her earlier deposition testimony about the specific events.  Ms. Verrier's affidavit therefore provides additional details, context, and clarity to an ambiguous portion of her testimony.

incident with Mr. Campbell.[86]  PSAMF ¶ 99; DRPSAMF ¶ 99.  In describing the May 21 incident, Ms. Asquith wrote that Ms. Verrier "said that [Mr. Campbell] approached her and said, 'you are not talking to Nate anymore, is that because you are banging his friend?'"  PSAMF ¶ 100; DRPSAMF ¶ 100.

### 2. Management and Human Resource's Response

Ms. Asquith met with Mr. Campbell on Tuesday, June 4, 2019, his next scheduled shift.  DSMF ¶ 47; PRDSMF ¶ 47; PSAMF ¶ 104; DRPSAMF ¶ 104.  Mr. Campbell explained that he had approached Ms. Verrier to talk about why she wasn't talking with Nate anymore and if it had something to do with the fact that she was now dating Nate's friend (John Conway).[87]  PSAMF ¶ 106; DRPSAMF ¶ 106.  Mr. Campbell claimed that "[t]he conversation with Ms. Verrier had nothing to do with him and her and that there was never any intention to make her feel threatened or

---

[86]    BTB qualifies PSAMF ¶ 99 stating that "[t]he referenced document speaks for itself." DRPSAMF ¶ 99.  The Court rejects BTB's qualification as not properly controverting the Plaintiff's stated fact under Local Rule 56.

[87]    PSAMF ¶ 106 originally states: "Campbell described the incident as simply asking Verrier about no longer speaking to his friend Nate."  PSAMF ¶ 106.  BTB qualifies this fact on the ground that "[t]he referenced document speaks for itself."  DRPSAMF ¶ 106.  The cited Investigation Report pertaining to Ms. Asquith's conversation with Mr. Campbell states:

- Derrick explained that he had approached [Ms. Verrier] talking about why she wasn't talking with Nate anymore and if it had something to do with the fact that she was now dating his friend (John).
- He stated that Heather replied with it having nothing to do with him.
- Derrick replied to her with saying that it was a pretty shitty thing to do dating John while she knows that Nate liked her too and John and Nate were great friends.
- He stated that Heather replied with "Nate doesn't like me, we're just friends" and Derrick replied with "you and I know better than that and that he does".
- Derrick said that the conversation he had with her was around disagreeing with how she was treating and working between two friends and that she didn't like this.

May 27, 2019, *HR Investigation Rep.* at 4-5.  Rather than incorporate Ms. Verrier's characterization of the event, the Court includes PSAMF ¶ 106 but revises it to reflect more accurately what Mr. Campbell reported about his conversation with Ms. Verrier.

harassed on but [stated that] he underst[ood] if that was her perception of the conversation."[88]  PSAMF ¶ 107; DRPSAMF ¶ 107.  Mr. Campbell claimed that Ms. Verrier approached him to ask him whom he was dating, which Ms. Verrier denies.[89] PSAMF ¶¶ 66-67; DRPSAMF ¶¶ 66-67.

Ms. Asquith counseled Mr. Campbell on BTB's Harassment Policy and on his interactions with Ms. Verrier, explained that his actions were perceived as harassment, and instructed Mr. Campbell not to have any contact with Ms. Verrier.[90,]

---

[88]  BTB similarly denies PSAMF ¶ 107 on the grounds that the "quotation is inaccurate" and the HR report "speaks for itself."  DRPSAMF ¶ 107.  The Court accepts BTB's denial as a qualification, to the extent that the cited language is misquoted, but otherwise includes PSAMF ¶ 107.

[89]  BTB qualifies PSAMF ¶ 66 because the cited record does not support that Mr. Campbell specified a time when he claimed that Ms. Verrier asked whom he was dating.  The Court accepts this qualification and omits "in early May" from PSAMF ¶ 66.  BTB further denies PSAMF ¶ 67 because Ms. Verrier relies on her affidavit.  The Court rejects this denial as BTB has not pointed to anything in the record suggesting that Ms. Verrier's affidavit contradicts her deposition testimony.

[90]  Ms. Verrier "[d]en[ies] that management counseled Campbell" and says that Mr. Campbell "was simply 'forced to sign some kind of paper,' but he was not issued a PPR, and Asquith told him that 'it was not a big deal.'"  PRDSMF ¶ 47.  In response, BTB says that the denial should be stricken because "the evidence Plaintiff purports to cite in support of her denial fails to support such statement."  PRDSMF *Resp.* ¶ 47.  It also submits that "Plaintiff's denial (and failure to support such denial) does not controvert the substance of DSMF ¶ 47."  PRDSMF *Resp.* ¶ 47.  In support of her denial Ms. Verrier cites the HR report in which Ms. Asquith wrote on June 11, 2019, that Ms. Golob told Ms. Verrier that Mr. Campbell had "stated [to Ms. Golob] that he was forced to sign some kind of paper and wasn't even given a PPR.  He said that HR acknowledged it wasn't a big deal."  May 27, 2019, *HR Investigation Rep.* at 5.

The Court rejects Ms. Verrier's denial and includes DSMF ¶ 47 for several reasons.  First, in accordance with the Local Rules, Ms. Verrier's reference to what Ms. Golob may have heard after the meeting in question is nonresponsive to BTB's stated fact and does not controvert that Ms. Asquith met with Mr. Campbell or that she reviewed the Harassment Policy with him.

Second, Ms. Verrier's denial is not faithful to the context of Mr. Campbell's statement.  Mr. Campbell never testified directly as to HR's actions, but instead made the statement to Ms. Golob, who told Ms. Verrier, who told Ms. Asquith, who wrote it down in the report on June 11, approximately one week after the meeting with Mr. Campbell took place.  Tellingly, in Ms. Verrier's additional statement of material facts she includes this additional context and recounts that "Hutchinson then spoke to Gol[o]b.  Gol[o]b confirmed Campbell told her that he was forced to sign some kind of paper, but human resources assured him it was no big deal."  PSAMF ¶ 124.  For these same reasons, the Court also rejects PSAMF ¶ 108, which purports to offer how Mr. Campbell characterized the meeting to others, as later recounted in the HR report, as a definitive account of what took place at the meeting.  To the extent Ms. Verrier would like the record to reflect that Mr. Campbell made light of the counseling, those facts are included elsewhere in the Court's recitation of fact.

[91] DSMF ¶¶ 47-48; PRDSMF ¶¶ 47-48.  Ms. Asquith required Mr. Campbell to re-acknowledge his assent to BTB's Harassment Policy.[92]  DSMF ¶ 49; PRDSMF ¶ 49.  After counseling Mr. Campbell, Ms. Asquith sent him home for the day and placed the re-acknowledged Harassment Policy in his personnel file.[93]   DSMF ¶ 50; PRDSMF ¶ 50.  Regarding the May 21 incident, the Investigation Report states: "Derrick spoke with Heather that night asking about her dating John and she [explained] that she felt uncomfortable with having this conversation and wanted to talk to HR about it."[94]  PSAMF ¶ 96; DRPSAMF ¶ 96.  According to the Investigation Report, Ms. Asquith only spoke with Mr. Campbell about the May 21, 2019, incident.[95]  PSAMF ¶ 105; DRPSAMF ¶ 105.

---

[91]    Ms. Verrier denies DSMF ¶ 48 for the same reasons discussed in the previous footnote.  The Court rejects the denial and includes DSMF ¶ 48.

[92]    Ms. Verrier denies DSMF ¶ 49 for the same reasons discussed in the prior two footnotes.  The Court rejects the denial and includes DSMF ¶ 49 for the reasons discussed above.

[93]    Ms. Verrier denies DSMF ¶ 50 for the reasons discussed in the prior three footnotes.  The Court rejects the denial and includes DSMF ¶ 50 for the reasons discussed above.

[94]    BTB denies PSAMF ¶ 96 on the grounds that it does not accurately quote the cited material and the "Investigative Report speaks for itself."  The Court accepts BTB's qualification to the extent that PSAMF ¶ 96 misquotes the HR report and has adopted the exact language from the report.

[95]    BTB qualifies PSAMF ¶ 105 because "[t]he referenced document speaks for itself."  DRPSAMF ¶ 105.  BTB repeatedly reiterated this same qualification.  To be clear, the Court views this qualification as improper.  The point of statements of material fact is for the parties to highlight relevant portions of the record and not require the Court to comb through reams of original evidence, including deposition transcripts and documents, to rule on the dispositive motion.  If "the document speaks for itself" qualification were proper, the parties could ignore the required statements of material fact procedure and merely attach original documents to the record, thereby obviating the Local Rule 56 statement of material fact requirement.  The Court urges the Defendant's counsel to reconsider this qualified response in future filings as contrary to the spirit and letter of the rules.

Viewing Ms. Asquith's meeting notes from her June 4, 2019, meeting with Mr. Campbell, a reasonable factfinder could conclude that the only incident that Ms. Asquith discussed with Mr. Campbell was the May 21, 2019, incident.  Absent a more specific qualification with an accompanying record citation, the Court overrules BTB's objection and includes PSAMF ¶ 105.

### 3.     The Car Vandalism

Around this time Ms. Verrier had a relationship outside of work with her B-Shift co-worker, John Conway.[96]  DSMF ¶ 28; PRDSMF ¶ 28.  On May 21, 2019, Mr. Conway's car was vandalized, which he believed took place at work.[97]  PSAMF ¶ 89; DRPSAMF ¶ 89.  Mr. Conway reported the vandalism to management and his belief that Mr. Campbell vandalized his car in connection with his conduct with Ms. Verrier that same evening.[98]  PSAMF ¶ 90; DRPSAMF ¶ 90.  On May 25, 2019, Mr. Conway's car was again vandalized, which he again believed took place at work.[99]  PSAMF ¶

---

[96]    DSMF ¶ 28 originally states: "In or about early 2019, Plaintiff began dating her B-Shift co-worker, John Conway."  DSMF ¶ 28.  The Plaintiff denies the fact because "[i]n the cited testimony [she] testified 'she had a relationship outside of work,' but she testified she did not recall how long she socialized with Mr. Conway or when they began to socialize."  PRDSMF ¶ 28.  BTB responds to Ms. Verrier's denial and states that her "denial of DSMF ¶ 28 should be stricken as Plaintiff's summary of the cited testimony is inaccurate and does not controvert the substance of DSMF ¶ 28."  PRDSMF *Resp.* ¶ 28.  Ms. Verrier is correct that the cited deposition testimony does not refer to her "dating" Mr. Conway nor does the testimony identify that she began her relationship with Mr. Conway in early 2019.  The Court therefore accepts Ms. Verrier's denial as a qualification and alters DSMF ¶ 28.

[97]    PSAMF ¶ 89 originally stated that Mr. Conway "had his car vandalized."  The Court finds this phrasing odd because it implies that Mr. Conway arranged to have someone else vandalize his car, and there is no record evidence of that inference.  The Court altered the phrasing to confirm that Mr. Conway's car was vandalized, removing any implication of Mr. Conway's own agency in the damage.

BTB objects to PSAMF ¶ 89 arguing that "the alleged fact is not relevant to any disputed element in Defendant's motion for summary judgment."  DRPSAMF ¶ 89.  It also asserts that "the cited testimony . . . does not establish that John Conway was dating Plaintiff, or had his car vandalized 'while parked in the employee parking lot.'"  DRPSAMF ¶ 89.  The Court rejects BTB's argument as to the relevance of this fact.  A reasonable jury could infer that Mr. Conway's car was vandalized because he was in a relationship with Ms. Verrier who had just reported Mr. Campbell's conduct to HR.  However, the Court does accept BTB's qualification that the cited record does not support the specific details that Mr. Conway and Ms. Verrier were "dating" or that the vandalism occurred "while parked in the employee parking lot."  *See* May 27, 2019, *HR Investigation Rep.* at 2.  The Court includes PSAMF ¶ 89 but omits references to Ms. Verrier and Mr. Conway "dating" and replaces "while parked in the employee parking lot" with "which he believed took place at work."

[98]    BTB again objects to PSAMF ¶ 90 because "[t]he alleged fact is not relevant to any disputed element in [its] motion for summary judgment."  DRPSAMF ¶ 90.  For the reasons discussed in the previous footnote, the Court concludes that a reasonable jury could find this fact relevant.  The Court overrules BTB's objection and includes PSAMF ¶ 90.

[99]    The Court alters the phrasing of PSAMF ¶ 89.  *See* n.98 supra.

BTB reiterates its objection on the basis of relevance and that the record citation does not support the fact.  DRPSAMF ¶ 92.  In accordance with the previous footnotes, the Court overrules BTB's relevancy objection and admits PSAMF ¶ 92 but replaces "while parked in the employee parking lot" with "which he believed took place at work," to more accurately reflect the record cited.

92; DRPSAMF ¶ 92.  On June 3, 2019, Ms. Asquith again interviewed Mr. Conway. PSAMF ¶ 101; DRPSAMF ¶ 101.  Mr. Conway explained that he "truly believed that [Mr. Campbell] was the one" vandalizing his car because "he was dating Heather, and that [Mr. Campbell] had liked her and was jealous that they were dating," which is why he vandalized Mr. Conway's car.[100]  PSAMF ¶ 101; DRPSAMF ¶101.

Ms. Asquith asked if the vandalism could have occurred at Mr. Conway's house.  PSAMF ¶ 102; DRPSAMF ¶ 102.  Mr. Conway replied, "there was no way" because he has security cameras at his house.[101]  PSAMF ¶ 102; DRPSAMF ¶ 102. Mr. Conway then "gave . . . [a] couple [of] dates and times he wanted reviewed on the [BTB] cameras and [Ms. Asquith] said they would be looked into."  PSAMF ¶ 103; DRPSAMF ¶ 103.

### F.   The June 8, 2019, Incident and Response

Mr. Campbell was not scheduled to work again until Saturday, June 8, 2019. DSMF ¶ 51; PRDSMF ¶ 51; PSAMF ¶ 110; DRPSAMF ¶ 110.  That day, management assigned Ms. Verrier and Mr. Campbell to work adjacent to each other in the filler

---

[100]   PSAMF ¶ 101 originally reads, in part, that "Conway explained that Campbell was vandalizing his car[]."  PSAMF ¶ 101.  BTB admits that "Asquith met with Conway on June 3, 2019" but denies "that it was substantiated that Campbell vandalized Conway's car."  DRPSAMF ¶ 101.  BTB also explains that "Asquith told Conway that they 'had gone through 3 weeks of video surveillance and watched his car and everyone around it all through that time and nothing was observed besides him and Heather going to his car throughout the night every night.'"  DRPSAMF ¶ 101.  The Court rejects BTB's denial as beyond the scope of PSAMF ¶ 101.  BTB's additional fact about Ms. Asquith's response and what it did to investigate the matter does not controvert PSAMF ¶ 101.  However, the Court does accept, as a qualification, that Mr. Conway's assertion was not substantiated and that it was Mr. Conway's belief that Mr. Campbell was responsible, not that it was proven that Mr. Campbell was the person who damaged his car.  PSAMF ¶ 101 is included but with a slight alteration to more accurately reflect that it was Mr. Conway's belief that Mr. Campbell damaged his car.
[101]   BTB denies this statement of fact for the same reasons discussed in the previous footnote.  The Court rejects BTB's denial as beyond the scope of Ms. Verrier's stated fact and includes PSAMF ¶ 102.

room with Ms. Verrier on line 1 and Mr. Campbell on line 11 or 12.[102]  PSAMF ¶ 110;

DRPSAMF ¶ 110.  During the shift, Mr. Campbell went into the breakroom and Ms.

Golob asked him why he did not work on Tuesday.[103]  PSAMF ¶ 111; DRPSAMF ¶

111.  Mr. Campbell responded that "he was suspended for some bogus bullshit."[104]

PSAMF ¶ 112; DRPSAMF ¶ 112.  Ms. Golob reported that Mr. Campbell told her that

"he was forced to sign some kind of paper and wasn't even given a [Performance

Problem Resolution (PPR)]."[105]  PSAMF ¶ 113; DRPSAMF ¶ 113.  Ms. Golob also

---

[102]    PSAMF ¶ 110 reads: "On June 8, 2019, Campbell returned from work.  Management assigned Verrier and Campbell to work adjacent to each other."  PSAMF ¶ 110.  BTB denies this statement of fact and argues that "[t]he cited testimony . . . does not support PSAMF ¶ 110."  DRPSAMF ¶ 110.  In her deposition Ms. Verrier states that Mr. Campbell "was placed adjacent from [her]" on June 8, 2019, but also goes on to explain that she was placed on "line 1 filler room" and Mr. Campbell was on "line 11 or line 12, one of them" in the filler room.  *Verrier Dep.* at 105:21-22, 106:16, 107:4-9.  The Court accepts BTB's denial as a qualification and adds that Ms. Verrier was on line one and Mr. Campbell was on line eleven or twelve to explain what Ms. Verrier meant by "adjacent."

[103]    BTB "[a]dmit[s] only that Golob asked Campbell why he was not on the schedule the previous Tuesday . . . and object[s] that the cited testimony is the subjective opinion of Plaintiff's 'very good friend,' set forth in a self-serving affidavit . . . and not a material statement of fact based upon evidence."  DRPSAMF ¶ 111.  It goes on to say that "[a]side from her friend's personal opinion, Plaintiff cannot identify evidence supporting PSAMF ¶ 111."  DRPSAMF ¶ 111.  BTB also recommends that the Court reject Ms. Verrier's stated fact because it "investigated Golob's allegations" and found them unsubstantiated.

The Court rejects BTB's denial.  Ms. Asquith's investigation report states that "Tammy said that she was in the breakroom and Derrick came in and she asked him why he wasn't on the schedule last Tuesday and he said that he was suspended for some bogus bullshit."  May 27, 2019, *HR Investigation Rep.* at 5.  This statement adequately supports PSAMF ¶ 111.

To the extent that BTB says Ms. Golob's statement is unsubstantiated by HR's investigation, as the Court explained previously, this goes to the weight and credibility of the evidence, which is an issue for the factfinder.  The Court includes PSAMF ¶ 111.

[104]    BTB objects to this statement of fact for the same reasons discussed in the previous footnote.  The Court similarly rejects BTB's denial and includes PSAMF ¶ 112 as supported by the summary judgment record.

[105]    BTB makes the following denial: "The cited testimony . . . does not support PSAMF ¶ 113.  The cited testimony . . . is the subjective opinion of Plaintiff's 'very good friend' . . . , set forth in a self-serving affidavit . . . and not a material statement of fact based upon evidence.  Aside from her friend's personal opinion, Plaintiff cannot identify evidence supporting PSAMF ¶ 113.  Defendant investigated Golob's allegations and found them unsubstantiated."  DRPSAMF ¶ 113.  The Court rejects BTB's denial.  The Investigation Report that Plaintiff cites states that Mr. Campbell told Ms. Golob "that he was forced to sign some kind of paper and wasn't even given a PPR.  He said that HR acknowledged that it wasn't a big deal."  May 27, 2019, *HR Investigation Rep.* at 5.  Ms. Verrier's statement of additional material fact is therefore adequately supported by the record, regardless of her additional citation to Ms. Golob's affidavit.

reported that Mr. Campbell "said that HR acknowledged that it wasn't a big deal."[106] PSAMF ¶¶ 109, 114; DRPSAMF ¶¶ 109, 114. Mr. Campbell then left the breakroom and immediately went to Ms. Verrier's work area and stared her down.[107] PSAMF ¶ 115; DRPSAMF ¶ 115.

Ms. Golob told Ms. Verrier about Mr. Campbell's statements in the breakroom.[108] PSAMF ¶ 116; DRPSAMF ¶ 116. During the June 8, 2019, shift, Ms. Verrier asked Jen Slamin, Back-up Shift Lead, for Ms. Asquith's contact information because she wished to speak with her. DSMF ¶ 52; PRDSMF ¶ 52; PSAMF ¶ 117; DRPSAMF ¶ 117. Ms. Slamin provided Ms. Asquith's contact information and emailed Ms. Asquith on Sunday, June 9, 2019, to let her know Ms. Verrier wanted to speak with her about the June 8 shift. DSMF ¶ 53; PRDSMF ¶ 53. Ms. Slamin also told Mr. Hutchinson, Ms. Verrier's manager, about Ms. Verrier's request for HR's contact information and that she had provided this information to Ms. Verrier. DSMF ¶ 54; PRDSMF ¶ 54. Ms. Asquith immediately sent Ms. Verrier a text message on June 9, 2019, to let her know that she was available to talk with Ms. Verrier.

---

[106] BTB objects to PSAMF ¶¶ 109 and 114 for the same reasons discussed in the previous footnote. DRPSAMF ¶ 114. In accordance with the Court's prior explanation, the Court rejects BTB's denial and includes PSAMF ¶¶ 109 and 114.

[107] The Defendant denies PSAMF ¶ 115 because "Asquith did not conclude that Campbell entered Plaintiff's workspace . . . to 'stare [Plaintiff] down' or that he did this immediately after speaking with Gol[o]b." DRPSAMF ¶ 115 (alterations in original). The Court rejects BTB's denial because the cited deposition testimony supports Ms. Verrier's statement of fact. The importance of Ms. Asquith's assessment of this incident is an issue of credibility and weight for the jury and separate from Ms. Verrier's fact as to what happened, which is supported by her record citation.

[108] The Defendant denies PSAMF ¶ 116 as unsupported by the record cited and because "Defendant investigated Golob's allegations and found them unsubstantiated." DRPSAMF ¶ 116. The Court rejects the Defendant's denial and admits PSAMF ¶ 116 because the record citation supports the Plaintiff's stated fact. As previously stated, the import of Ms. Asquith's conclusion is an issue of credibility best left for the factfinder, especially as Mr. Hutchinson testified that he found Ms. Golob's report credible. See PSAMF ¶ 125.

DSMF ¶ 55; PRDSMF ¶ 55.  On June 9, 2019, Ms. Verrier called in sick because of the ongoing harassment and fearing to have to work adjacent to Mr. Campbell.[109] PSAMF ¶ 118; DRPSAMF ¶ 118.

Ms. Verrier did not respond to Ms. Asquith's text or call Ms. Asquith on Sunday, June 9, 2019, or Monday June 10, 2019.[110]  DSMF ¶ 56; PRDSMF ¶ 56.  Ms. Asquith sent Ms. Verrier additional text messages on June 11, 2019, and told Ms. Verrier that she would call her.  DSMF ¶ 57; PRDSMF ¶ 57.

On June 10, 2019, Ms. Verrier returned to work.[111]  PSAMF ¶ 119; DRPSAMF ¶ 119.  Mr. Hutchinson talked with Ms. Verrier, asked what happened on Saturday

---

[109]   BTB denies PSAMF ¶ 188 because it "is a conclusion of law and not a statement of material fact."  DRPSAMF ¶ 118.  BTB does not dispute that Ms. Verrier did not work on June 9, 2019, but it rejects the remainder of the statement because "Plaintiff purports to rely on [her] self-serving affidavit" which "was executed after Defendant filed its motion for summary judgment.  The timing of Plaintiff's execution of her affidavit is probative of Plaintiff's intent and suggests improper motive.  Aside from Plaintiff's personal opinion, Plaintiff cannot identify evidence supporting PSAMF ¶ 118." DRPSAMF ¶ 118.

        Once again, the Court rejects BTB's position that the self-serving nature of the affidavit is alone sufficient for the Court to strike ¶ 10 of Ms. Verrier's affidavit.  Ms. Verrier's affidavit does not contradict her deposition testimony and instead clarifies why she called out sick on June 9, 2019.  At her deposition, Ms. Verrier testified that in March and June of 2019 she called out of work "between five and ten times."  *Verrier Dep.* at 114:2-5.  Ms. Verrier confirmed that she called out each of those times due to anxiety or a panic attack.  *Id.* at 114:3-6, 115:4.  In her affidavit, she explains that the reason she felt anxious and experienced panic and that the reason she called out sick was her concern about Mr. Campbell and having to work adjacent to him.  The Court rejects BTB's denial and includes PSAMF ¶ 118.

[110]   Ms. Verrier qualifies this statement arguing that she "did not immediately respond to Asquith because she learned that Asquith had forced Campbell to sign some kind of paper and told [him] 'it was not a big deal.'"  PRDSMF ¶ 56.  The Court rejects Ms. Verrier's qualification as non-responsive to BTB's fact.  Ms. Verrier offers an additional explanation as to why she did not respond but does not dispute the fact that she did not respond.  The Court includes DSMF ¶ 56.

[111]   BTB denies PSAMF ¶ 119 arguing that the record citation does not support the stated fact.  Although the Court agrees that the cited record does not explicitly state that Ms. Verrier returned to work on June 10, 2019, when viewed in the light most favorable to Ms. Verrier, the Court infers from the record that she returned to work on June 10.  Ms. Asquith's investigation report states that Ms. Verrier did not work on Sunday June 9, but that on Monday Mr. Hutchinson spoke with Ms. Verrier to find out what was going on and see what help she needed following her Saturday shift.  May 27, 2019, *HR Investigative Rep.* at 5.  The Court therefore infers that if Ms. Verrier called out on Sunday June 9, and Mr. Hutchinson spoke with her on Monday, she had returned to work on June 10.  PSAMF ¶ 119 is included without qualification.

June 8 and asked if she needed assistance with anything or if she wanted to talk with him about what occurred during the June 8, 2019, shift.[112]  DSMF ¶ 58; PRDSMF ¶ 58; PSAMF ¶ 122; PRDSMF ¶ 122.  In response, Ms. Verrier relayed Ms. Golob's description of Mr. Campbell making light of his discussion with HR and the Sexual Harassment Policy.[113]  PSAMF ¶ 123; DRPSAMF ¶ 123.  Mr. Hutchinson then spoke to Ms. Golob who confirmed that Mr. Campbell told her that he was forced to sign some kind of paper, but HR assured him it was not a big deal.[114]  PSAMF ¶ 124; DRPSAMF ¶ 124.  Mr. Hutchinson testified that Ms. Golob was credible in her statement to him.  PSAMF ¶ 125; DRPSAMF ¶ 125.

---

[112]    BTB objects to Plaintiff's phrasing in PSAMF ¶ 122 because she does not accurately quote the HR report.  To the extent that the parties disagree as to the wording of this fact, the Court adopts the Defendant's wording, as Ms. Verrier admitted that statement of fact without qualification.  *See* DSMF ¶ 58; PRDSMF ¶ 58.

[113]    BTB qualifies this statement on the grounds that the "cited testimony . . . speaks for itself." DRPSAMF ¶ 123.  As noted earlier, BTB's "speaks for itself" objections are improper.  Viewing the record in the light most favorable to Ms. Verrier, and absent a more precise qualification or objection, the Court includes PSAMF ¶ 123 as supported by the cited record.

[114]    BTB denies this statement of fact as unsupported by the record citation and as a subjective opinion set forth in a self-serving affidavit.  DRPSAMF ¶ 124.  The Court overrules BTB's objections to Ms. Golob's affidavit, in accordance with the Court's resolution of other disputed facts that cite the affidavit and includes PSAMF ¶ 124 as supported by BTB's own HR reports.  *See* May 27, 2019, *HR Investigation Rep.* at 5.

During her shift on June 11, 2019,[115] Mr. Campbell was "floating" around Ms. Verrier's work area, leaving her feeling uncomfortable.[116]  PSAMF ¶ 120; DRPSAMF ¶ 120.  Mr. Hutchinson had assigned Mr. Campbell to work away from Ms. Verrier, which Mr. Hutchinson described as a "pretty far distance"—1,000 to 2,000 feet. PSAMF ¶ 129; DRPSAMF ¶ 129.  Ms. Verrier went to the office and complained to Mr. Hutchinson about Mr. Campbell "hanging around her work area for no reason" so Mr. Hutchinson went out to check and did not see him there.[117]  PSAMF ¶ 121;

---

[115]    Ms. Verrier does not include a date of when this occurred and looking at the record it is unclear whether Mr. Campbell was allegedly "floating around" Ms. Verrier's workspace on June 10, the same day that Mr. Hutchinson initially followed up with Ms. Verrier about the June 8 incident, or the next day, on June 11.  The parties do not dispute that Mr. Hutchinson called Ms. Asquith on June 11 to meet with Ms. Verrier.  *See* DSMF ¶ 59; PRDSMF ¶ 59.  Based on the record and in the absence of clear guidance from the parties, it appears as though the incident involving Mr. Campbell "floating around" occurred on June 11.

Mr. Hutchinson's report dated June 14 states:

> Monday[.] I spoke with Heather to find out what was going on and what she needed help with.  She informed me that she was uncomfortable with the fact that she overheard Derrick saying stuff in the break room about her.  I asked her who she heard that from and she said Tammy Golob.  I asked Tammy to come to the office and [make a] . . . statement . . ..

> Tuesday.  Heather was assigned [to] L10 filler and Derrick was assigned to work in Old Gen.  At some point in the night Derrick was floating around L10 multi and making Heather feel uncomfortable.  Heather came in and reported that he was just hanging out around her work area for no reason.  I went out and did not see him there. At this point I made a call to HR (Jen Asquith) and asked her to come in at 6am to talk to Heather.

*Hutchinson Dep.* at 81, *Ex. 4.*  References to "Tuesday" would be June 11, 2019.
[116]    BTB admits that "Hutchinson told Asquith that Plaintiff told Hutchinson that Campbell was 'floating' around Plaintiff's work station" but qualifies the remainder of PSAMF ¶ 120 because the "cited testimony . . . speaks for itself."  DRPSAMF ¶ 120.  Again, the "speaks for itself" objection is improper. In the light most favorable to Ms. Verrier as the nonmoving party, the Court rejects BTB's qualification and includes PSAMF ¶ 120 as supported by the Plaintiff's record citation.
[117]    PSAMF ¶ 121 does not initially reference Mr. Hutchinson checking the work area and not seeing Mr. Campbell in Ms. Verrier's area.  *See* PSAMF ¶ 121.  BTB qualifies Ms. Verrier's original fact because the cited report speaks for itself, and she omitted that Mr. Hutchinson did not see Mr. Campbell there when he followed up.  Again, the "speaks for itself" objection is improper.  The Court accepts BTB's qualification and includes PSAMF ¶ 122, altered so as to fully capture Mr. Hutchinson's cited statement.

DRPSAMF ¶ 121.  Mr. Hutchinson called Ms. Asquith and "discussed the situation up to that point" and asked her to come in and meet with Ms. Verrier at the end of her shift, at 6:00 a.m. on June 12, 2019.[118]  DSMF ¶ 59; PRDSMF ¶ 59; PSAMF ¶¶ 126-127, 131; PRDSMF ¶¶ 126-127, 131.  Later during the shift, Mr. Hutchinson saw Mr. Campbell in Ms. Verrier's work area, but he was walking away at that point.[119]  PSAMF ¶ 128; DRPSAMF ¶ 128.  Mr. Hutchinson coached Mr. Campbell to make sure that he was staying in his workstation and told him that any conversations that are not professional and important needed to happen at break time and not during work.[120]  PSAMF ¶ 130; DRPSAMF ¶ 130.

Ms. Asquith met with Ms. Verrier on June 12 to discuss Ms. Verrier's concerns about Mr. Campbell.  DSMF ¶ 60; PRDSMF ¶ 60.  Ms. Verrier told Ms. Asquith she was uncomfortable because (1) she heard that Mr. Campbell made fun of the HR

---

[118]    BTB qualifies PSAMF ¶ 126 because "[t]he cited testimony . . . speaks for itself, and does not indicate that Hutchinson ["then"] called Asquith after speaking to Gol[o]b."  DRPSAMF ¶ 126.  The "speaks for itself" objection is improper.  The Investigation Report states that "[Ms. Verrier] went to [Mr. Hutchinson] and reported that [Mr. Campbell] was hanging around her work area for no reason, so [Mr. Hutchinson] went out to check and did not see him there.  It was at that point that [Mr. Hutchinson] called [Ms. Asquith] and discussed the situation up to that point."  May 27, 2019, *HR Investigation Rep.* at 6.  The Court therefore accepts BTB's qualification and omits "then" from PSAMF ¶ 126.

[119]    PSAMF ¶ 128 states: "Later during the shift, Hutchinson saw Campbell again in Verrier's work area."  PSAMF ¶ 128.  BTB says "[t]he cited testimony . . . does not support PSMF ¶ 128" because "Hutchinson testified that he saw Campbell speaking with Courtney Flanders and walking away from Plaintiff's work area."  DRPSAMF ¶ 128.  The Court partially accepts BTB's denial as a qualification and includes PSAMF ¶ 128 but revises the statement of fact to reflect more accurately the cited record.

[120]    PSAMF ¶ 130 originally reads that "Hutchinson testified he simply 'coached' Campbell to stay in his work area," PSAMF ¶ 130, which BTB qualified as incomplete and lacking context.  DRPSAMF ¶ 130.  The cited testimony states "I believe I tried to -- I coached him making sure that he was staying in his work station and he had expressed to me that he was just talking to his friend, Courtney Flanders at the time, and I told him how unless it's a professional and important conversation, that those need to happen at break time and not during work."  *Hutchinson Dep.* at 35:10-15.  The Court accepts BTB's qualification, as Ms. Verrier's statement of fact omits important context from the record.  The Court therefore includes PSAMF ¶ 130 but adapts the language to reflect the cited testimony more fully.

counseling in the breakroom; and (2) Mr. Campbell walked over to a workstation further down Ms. Verrier's line and spoke with Ms. Flanders during their June 8-9 shift.[121]  DSMF ¶ 60; PRDSMF ¶ 60; PSAMF ¶ 132; DRPSAMF ¶ 132.  Ms. Verrier explained to Ms. Asquith that "she didn't feel comfortable" with Mr. Campbell "hanging around her multi looking at her" and that he was "being creepy."[122]  PRDSMF ¶ 60; PSAMF ¶¶ 133-134; DRPSAMF ¶ 133-134; May 27, 2019, *HR Investigation Rep.* at 6.

Pursuant to company policy, Ms. Asquith immediately called Mr. Campbell to advise he was suspended pending investigation of the two new incidents reported by Ms. Verrier on June 12; this was Mr. Campbell's first suspension.[123]  DSMF ¶ 61;

---

[121]    Ms. Verrier admits that she "complained about human resources and Campbell making light of the sexual harassment policy," but she denies that she "simply complained about Campbell speaking to Flanders."  PRDSMF ¶ 60.  She says that she "complained to Asquith about Campbell hanging around her work area, 'looking at her and she did not feel comfortable about this'" and notes that she described Mr. Campbell as "being creepy."  PRDSMF ¶ 60.  BTB responds that the denial should be stricken because the "citation provided does not support the substance of Plaintiff's denial, nor does it controvert the substance of DSMF ¶ 60."  PRDSMF *Resp.* ¶ 60.  In the light most favorable to Ms. Verrier as the non-moving party the Court adds an additional sentence to DSMF ¶ 60 to reflect Ms. Verrier's statement to Ms. Asquith that she did not feel comfortable with Mr. Campbell and that he was being creepy, both of which are supported by the record cited.

  PSAMF ¶ 132 states "Verrier complained to Asquith about Campbell making light of his discussion with human resources."  PSAMF ¶ 132.  The Court has already admitted the same fact in DSMF ¶ 60, which Ms. Verrier admitted.  *See* PRDSMF ¶ 60.  To the extent that BTB qualifies PSAMF ¶ 132, the Court overrules the objection because BTB does not object to the substance of the fact and the fact is supported by the record cited.

[122]    BTB qualifies PSAMF ¶¶ 133 and 134 because "[t]he referenced investigative report speaks for itself."  DRPSAMF ¶¶ 133-134.  In the light most favorable to Ms. Verrier, and taking into account the Court's resolution of DSMF ¶ 60 and PRDSMF ¶ 60, the Court overrules BTB's objections.

[123]    DSMF ¶ 61 reads in its original form: "Pursuant to company policy, Asquith immediately suspended Campbell's employment as a result of [Ms. Verrier's] report on June 12.  This was Campbell's first suspension ('First Suspension')."  DSMF ¶ 61.  Ms. Verrier qualifies DSMF ¶ 61 arguing that "Asquith did not suspend Campbell as punishment."  PRDSMF ¶ 61.  She cites the HR report, which says that Ms. Asquith "explained that suspension pending investigation is normal protocol in a situation such as this until we can get to the bottom of the situation and investigate the details."  PRDSMF ¶ 61.  BTB responds that the "qualification should be stricken, as the citation provided does not support the substance of Plaintiff's qualification, nor does it controvert the substance of DSMF ¶ 61 and Plaintiff's qualification that Campbell's suspension was not 'punishment' is

PRDSMF ¶ 61; PSAMF ¶ 135; DRPSAMF ¶ 135.   Ms. Asquith explained that suspension pending investigation is normal protocol in a situation such as this until HR can get to the bottom of the situation and investigate the details.   PSAMF ¶ 136; DRPSAMF ¶ 136.

Ms. Asquith and Jeff Vienneau, Operations Manager, counseled Mr. Campbell and (1) instructed him to avoid any contact with Ms. Verrier and stay away from her altogether unless absolutely necessary for business purposes, and (2) informed him that he would be terminated if he acted unprofessionally or attempted to have personal conversations with Ms. Verrier.[124]   DSMF ¶ 69; PRDSMF ¶ 69.   Ms. Asquith and Mr. Vienneau also met with Ms. Verrier and explained that (1) they counseled Mr. Campbell and instructed him to avoid all contact with her, and (2) BTB would

---

nonresponsive." PRDSMF *Resp.* ¶ 61.  The Court rejects the Plaintiff's qualification.  The HR report that Ms. Verrier cites to support her qualification states that "Jenn called and left Derrick a message letting him know that he is suspend[ed] pending investigation per 2 additional instances that were brought to her attention." May 27, 2019, *HR Investigation Rep.* at 7.  Ms. Verrier's own citation therefore directly supports BTB's proposed fact and makes no reference to suspension as "punishment."  Ms. Verrier elsewhere establishes that a suspension pending investigation is BTB's normal protocol. *See* PSAMF ¶ 136.

PSAMF ¶ 135 reads: "Asquith called Campbell to advise he was 'suspended' pending investigation of the two new incidents." PSAMF ¶ 135.  BTB qualifies this statement urging the Court to adopt the language of the HR investigation report, which states that Ms. Asquith "called and left [Campbell] a message letting him know that he [was] suspend[ed] pending investigation per 2 additional instances that were brought to her attention." DRPSMF ¶ 988 (quoting May 27, 2019, *HR Investigation Rep.* at 7).  Taking the facts in the light most favorable to Ms. Verrier, the Court accepts PSAMF ¶ 135 as supported by the record citation.

The Court includes both DSMF ¶ 61 and PSAMF ¶ 135 and adopts the Plaintiff's language in PSAMF ¶ 135 but supplements it with BTB's additional details that Ms. Asquith called Mr. Campbell pursuant to company policy and that it was Mr. Campbell's first suspension.

[124]   Ms. Verrier denies that "Defendant issued [a] Performance Problem Resolution ('PPR') counseling to Mr. Campbell" but "[a]dmit[s] Defendant simply told Campbell to stay away from Verrier or Defendant would terminate him." PRDSMF ¶ 69.  In response BTB says that "the citation relied upon by Plaintiff does not support her statement of denial nor does it controvert the substance of DSMF ¶ 69." PRDSAMF *Resp.* ¶ 69.  The Court rejects Ms. Verrier's denial and includes DSMF ¶ 69 because her denial as to the issuance of a PPR is unsupported by the record and Ms. Verrier admits the remainder of DSMF ¶ 69.

terminate Mr. Campbell or transfer him to another shift if he attempted any interaction with Ms. Verrier.[125]  DSMF ¶ 70; PRDSMF ¶ 70.

Mr. Campbell's first suspension began on Wednesday, June 12, 2019, and continued through Sunday, June 23, 2019; Mr. Campbell was not on BTB's premises during the suspension.[126]  DSMF ¶ 64; PRDSMF ¶ 64.  In a text message to Ms. Verrier on June 14, 2019, Ms. Asquith informed Ms. Verrier that Mr. Campbell was suspended pending investigation and that he would not be in the facility when Ms. Verrier reported for her next shift on Sunday, June 17, 2019.[127]  DSMF ¶ 62; PRDSMF ¶ 62.  Ms. Verrier acknowledged Mr. Campbell's first suspension by alleging in her Complaint that he was suspended after her June 11 report to HR.[128]  DSMF ¶ 63; PRDSMF ¶ 63.

---

[125]    Ms. Verrier qualifies this statement stating:

> Asquith and Vienneau conceded the investigation only looked into Verrier's complaints of Campbell making light of the sexual harassment policy, and Campbell being in Verrier's work area. . . .; Asquith and Vienneau explained away Campbell's conduct and said it did not warrant termination. . . . ; Vienneau told Verrier the company only wanted the matter to go away. . .. Vienneau also complained that the company had already moved Verrier from D shift. . . . Vienneau blamed Verrier for "drama" which was "affecting our numbers…"

PRDSMF ¶ 70.
    In response, BTB says that the cited investigation report "speaks for itself and Plaintiff's subjective commentary does not controvert the substance of DSMF ¶ 70." PRDSMF *Resp.* ¶ 70. The "speaks for itself" objection is improper.  BTB also contends that the cited testimony "lacks context and is based on Plaintiff's opinion and/or subjective beliefs, rather than credible evidence." PRDSMF *Resp.* ¶ 70.  The Court rejects Ms. Verrier's qualification and includes DSMF ¶ 70 because it is supported by the record citation and the Plaintiff's qualification goes beyond the scope of the proffered statement of fact.

[126]    Ms. Verrier qualifies this statement for the same reasons that she qualified DSMF ¶ 61.  The Court rejects the qualification and includes DSMF ¶ 64 for the reasons discussed already discussed.

[127]    Ms. Verrier qualifies this statement for the same reasons that she qualified DSMF ¶¶ 61, 64. The Court rejects the qualification and includes DSMF ¶ 62 for the same reasons already discussed.

[128]    Ms. Verrier qualifies this statement for the same reasons that she qualified DSMF ¶¶ 61-62, 64.  The Court rejects the qualification and includes DSMF ¶ 63 for the same reasons already discussed.

During Mr. Campbell's first suspension, Ms. Asquith investigated Ms. Verrier's allegations regarding the incident in the breakroom and his conversation with Ms. Flanders near Ms. Verrier's workstation. DSMF ¶ 65; PRDSMF ¶ 65. On June 13, 2019, Ms. Asquith interviewed Mr. Campbell. PSAMF ¶ 137; DRPSAMF ¶ 137. Mr. Campbell admitted to speaking with Ms. Golob, but he denied making light of the situation. PSAMF ¶ 138; DRPSAMF ¶ 138. He also admitted that he was in Ms. Verrier's work area but claimed that he was speaking to a co-worker who was having a bad day.[129] PSAMF ¶ 140; DRPSAMF ¶ 140. Mr. Campbell provided Ms. Asquith with screen shots of the December 2018 text string wherein Ms. Verrier (1) told Mr. Warren she is not going to hang out with Mr. Campbell anymore because he is spending time with Ms. Flanders, Ms. Verrier's "enemy," and (2) stated that Mr. Campbell can hang out with Ms. Flanders, but this means "trouble."[130] DSMF ¶ 66; PRDSMF ¶ 66. Ms. Asquith confirmed that Mr. Campbell spoke to Ms. Flanders at the L-10 Multi during the June 8-9 shift but did not conclude that he entered Ms.

[129]    BTB denies PSAMF ¶ 140 because "[t]he cited Investigative Report speaks for itself. Campbell stated 'he was down speaking with Courtney Flanders as he has a friendship relationship with her and she was having a bad day.'" DRPSAMF ¶ 140. The "speaks for itself" objection is improper. Taking the facts in the light most favorable to Ms. Verrier as the nonmoving party the Court rejects BTB's denial and includes PSAMF ¶ 140 as supported by the cited record.

[130]    Ms. Verrier denies DSMF ¶ 66 and say that "Asquith could not confirm that Campbell made fun of the counseling in the breakroom." PRDSMF ¶ 66. She further argues that "Hutchinson spoke to Gol[o]b. Gol[o]b recounted Campbell telling her that 'he was suspended for some bogus bullshit,' 'he was forced to sign some kind of paper but was not even given a PPR,' and 'HR acknowledged it was not a big deal.' Hutchinson testified that Golob was credible." PRDSMF ¶ 66. In response BTB says that Ms. Verrier's denial should be stricken because it is nonresponsive and does not controvert the substance of DSMF ¶ 66. The Court agrees. Ms. Verrier's denial does not contradict the statement of fact proffered by BTB in DSMF ¶ 66. Ms. Verrier's additional facts in PRDSMF ¶ 66 appear elsewhere in the Court's recitation of fact. DSMF ¶ 66 is included.

Verrier's workspace (L-10 Filler) to "stare [Ms. Verrier] down."[131]   DSMF ¶ 68; PRDSAMF ¶ 68.  Ms. Asquith also states that after interviewing Mr. Campbell, she was unable to confirm the allegation that Mr. Campbell "made fun" of the counseling in the breakroom.[132]  DSMF ¶ 67; PRDSMF ¶ 67; PSAMF ¶ 139; DRPSAMF ¶ 139. When asked if she did or did not believe Mr. Campbell when he denied making light of the harassment policy, Ms. Asquith responded, "I don't know" and elaborated that she did not "have enough information to make a determination one way or the other with that."[133]  PSAMF ¶ 139; DRPSAMF ¶ 139.

On June 14, 2019, Ms. Verrier sent a text message to Ms. Asquith advising that she was scheduled to work on Sunday and wanted to know if Mr. Campbell would

---

[131]    Ms. Verrier denies DSMF ¶ 68 arguing that "Asquith did not have information to conclude that Campbell entered Verrier's work area to stare her down."  PRDSMF ¶ 68.  Ms. Verrier then goes on to reiterate Mr. Campbell's conduct, arguing that Ms. Asquith "ignored the subject[ive] evidence, and again simply accepted Campbell's denial."  PRDSMF ¶ 68.  In response, BTB states that the investigation report cited in DSMF ¶ 68 "speaks for itself," Ms. Verrier's characterization of the evidence is inaccurate, and she does not cite evidence to support her assertion that Ms. Asquith simply accepted Mr. Campbell's denial.  PRDSMF *Resp.* ¶ 68.  The "speaks for itself" objection is improper.

The Court rejects Ms. Verrier's denial because it does not properly controvert that Ms. Asquith did not conclude that Mr. Campbell stared Ms. Verrier down.  Ms. Verrier does not deny that Ms. Asquith came to that conclusion, but instead argues that Ms. Asquith's conclusion was improper based on the evidence she had before her.  Whether Ms. Asquith's conclusion was proper is a distinct issue. The Court therefore includes DSMF ¶ 68.

[132]    Ms. Verrier says that "Asquith did not contact Golob or anyone else in the breakroom to confirm Golob's account.  Asquith simply accepted Campbell's denial."  PRDSAMF ¶ 67.  In response, BTB argues that "[f]or failure to admit, deny, or object, Plaintiff's response to DSMF ¶ 67 should be stricken."  PRDSMF *Resp.* ¶ 67.  It also submits that Ms. Verrier's statement is nonresponsive and improperly relies on Ms. Golob's self-serving affidavit.  PRDSMF *Resp.* ¶ 67.

The Court agrees that, under Local Rule 56, Ms. Verrier does not controvert the fact that Ms. Asquith stated that she could not confirm the allegations.  However, the record does not support that Ms. Asquith personally interviewed Ms. Golob and thus the Court alters DSMF ¶ 67 to reflect that Mr. Campbell was the only person Ms. Verrier personally interviewed.  In the light most favorable to Ms. Verrier, the record suggests that Mr. Hutchinson followed up with Ms. Golob but that Ms. Asquith did not personally speak with her.  *See Golob Aff.* ¶ 15; May 27, 2019, *HR Investigation Rep.* at 5.

[133]    Ms. Verrier submits that "Asquith did not know if Campbell was telling the truth," which BTB denies as "incomplete" and "lack[ing] context."  *See* PSAMF ¶ 139; DRPSAMF ¶ 139.  Rather than rely on either party's characterization of Ms. Asquith's deposition, the Court substitutes the relevant language from the cited deposition testimony.  *See Asquith Dep.* at 25:15-26:5.

be back at work, because he made her uncomfortable.[134]  PSAMF ¶ 141; DRPSAMF ¶ 141.  Ms. Asquith replied that Mr. Campbell would not be back at work by Sunday. PSAMF ¶ 141; DRPSAMF ¶ 141.

On June 21, 2019, Ms. Asquith and Mr. Vienneau called Mr. Campbell to discuss the investigation.[135]  PSAMF ¶ 142; DRPSAMF ¶ 142.  Ms. Asquith and Mr. Vienneau again instructed Mr. Campbell to stay away from Ms. Verrier and to speak with her only for business-related purposes.  PSAMF ¶ 144; DRPSAMF ¶ 144.  The HR Investigation Report makes no mention of Mr. Campbell being disciplined.[136] PSAMF ¶ 143; DRPSAMF ¶ 143.

On June 24, 2019, Ms. Asquith and Mr. Vienneau met with Ms. Verrier to discuss the investigation.  PSAMF ¶ 145; DRPSAMF ¶ 145.  Ms. Asquith and Mr. Vienneau said the investigation researched the two points Ms. Verrier had brought forward: that Mr. Campbell made light of the sexual harassment policy and was

---

[134]    In support of PSAMF ¶ 141 Ms. Verrier cites Exhibit 11 from her deposition and an investigative report located at Page ID # 668-669.  PSAMF ¶ 141.  BTB denies the fact because neither Page ID # 668-669 nor Exhibit 11 is an investigative report or an email.  The Court agrees that Page ID # 668-669 does not support Ms. Verrier's statement of fact.  However, Exhibit 11 of Ms. Verrier's testimony is a series of text messages, the content of which supports PSAMF ¶ 141.  The fact that Ms. Verrier inadvertently refers to Exhibit 11 as an "email" rather than a screenshot of text messages is not sufficient grounds on which to deny the statement of fact.  BTB's objections are overruled and PSAMF ¶ 141 is included, although the Court revises the fact to reflect that the communications were sent via text message.

[135]    BTB denies PSAMF ¶ 142 because the record citation "does not refer to Jeff Vienneau." DRPSAMF ¶ 142.  The Court overrules the objection because BTB's own Investigation Report states that "Jenn and Jeff called Derrick to discuss the investigation."  June 28, 2019, *HR Investigation Report* at NWNA000151.  The Report places the call on June 21, 2019.  *Id.*  The Court overrules BTB's denial and includes PSAMF ¶ 142.

[136]    PSAMF ¶ 143 states "Defendant did not issue any discipline to Campbell," which BTB denies because the investigation report "speaks for itself" and the statement of fact "lacks context and completeness."  DRPSAMF ¶ 143.  The "speaks for itself" objection is improper.  The HR Investigation Report that Ms. Verrier cites makes no mention of BTB disciplining Mr. Campbell.  The Court therefore accepts PSAMF ¶ 143 but revises the fact to reflect that the HR report does not mention discipline rather than stating affirmatively that BTB did not issue any discipline.  PSAMF ¶ 143.

floating around Ms. Verrier's workspace.[137]   PSAMF ¶ 146; DRPSAMF ¶ 146.  Ms.

Asquith and Mr. Vienneau explained that they concluded Mr. Campbell's conduct did

not warrant termination.[138]   PSAMF ¶ 147; DRPSAMF ¶ 147.  Viewing Ms. Asquith's

and Mr. Vienneau's response as "explaining away" Mr. Campbell's conduct, Ms.

Verrier began to cry and complained that she did not agree with that conclusion and

that Mr. Campbell intended his behavior to be intimidating.[139]   PSAMF ¶¶ 147; 155;

DRPSAMF ¶¶ 147; 155; June 28, 2019, *HR Investigation Report* at NWNA000152.

Mr. Vienneau told Ms. Verrier BTB just wanted the matter "to go away."[140]   PSAMF

---

[137]   PSAMF ¶ 146 reads: "Asquith and Vienneau said the investigation only looked into Campbell making light of the sexual harassment policy and being in Verrier's work area."   PSAMF ¶ 146.  BTB denies the fact because it lacks context and completeness.  DPRSAMF ¶ 146.  The cited record states that "[Ms. Asquith and Mr. Vienneau] went into detail explaining that through the investigation over the last week and a half they researched the 2 points [Ms. Verrier] had brought forward[,] [t]he first around the comments in the breakroom she heard were said" and the second being that Mr. Campbell was "outside of his work area" and floating around Ms. Verrier's work area.  *See* June 28, 2019, *HR Investigation Report* at NWNA000151.  The Court includes PSAMF ¶ 146 but revises the fact to more accurately reflect the cited record.

[138]   PSAMF ¶ 147 states that "Asquith and Vienneau explained away Campbell's conduct and concluded it did not warrant termination."   PSAMF ¶ 147.  BTB admits that HR concluded that Mr. Campbell's conduct did not warrant termination but states that the references to "explain[ing] away" Mr. Campbell's conduct are unsupported by the record.  The Court overrules BTB's qualification.  The Court views the explained away language of PSAMF ¶ 147 as providing context to Ms. Verrier's reaction to their explanation, not for the truth of her perception.

[139]   PSAMF ¶ 155 states: "At the meeting's conclusion, Vienneau's statements and threats left Verrier in tears, complaining she did not agree with the determination of the investigation, that Campbell[] intended his behavior to be intimidating."   PSAMF ¶ 155.  BTB denies this statement stating that the "cited testimony . . . does not support Plaintiff's allegation that Vienneau made threats" because the record simply states that "[Plaintiff] said OK and headed home for the day."  DRPSAMF ¶ 155.  The Court agrees that the record does not support the assertion that Mr. Vienneau made "threats," nor does it support the assertion that this occurred at the end of the meeting.  However, the record does support that Ms. Verrier stated she disagreed with the outcome of the investigation, and that she believed Mr. Campbell's conduct was intentional.  *See* June 28, 2019, *HR Investigation Report* at NWNA000152.  The Court includes PSAMF ¶ 155 but alters the fact in accordance with this footnote.

[140]   BTB denies Ms. Verrier's stated fact arguing it "is incomplete, inaccurate [and] lacks context."  DRPSAMF ¶ 148.  Ms. Verrier cites the following deposition testimony in support of her statement of fact:

> Q.  I am asking you what retaliation you experienced in June of 2019 before Mr. Loranger sent his letter?
> A.  Before he sent the letter?

¶ 148; DRPSAMF ¶ 148.  According to the HR Report, Mr. Vienneau spoke to Ms. Verrier "on his involvement in the investigation around how the shift is currently performing and relationships/connections in the workplace causing hardships on the shift."[141]  PSAMF ¶ 150; DRPSAMF ¶ 150.  Mr. Vienneau blamed Ms. Verrier for Mr. Campbell's harassment, told Ms. Verrier that she was "complaining" too much, and accused Ms. Verrier of bringing her personal life into the workplace.[142]   PSAMF ¶

---

Q. Yes
A. When they told me they wanted it to go away, that's retaliation, like telling me that I need to stop the drama, I would say that is retaliation, when I was sitting in the office with Jeff Veno and Jen, I would say that's retaliation, that's not taking care of me.
Q. Did they actually use the phrase drama with you?
A. Oh, yeah.
Q. And do you know why you were in the office with them?
A. Because they were telling me -- like after the contract situation, they wanted to tell me what they -- I don't know, they just said come up and we want to talk to you and they weren't going to --I don't know.
Q. Were they trying to understand what you were experiencing?
A. No, they already knew because I already told them and I'm telling them and I cried and told them how I'm feeling.
Q. Were they trying to tell you they weren't going to resolve the issue?
A. They pretty much did, didn't they, they just said we want it to go away and like you already came from D shift and you're affecting our numbers and this and that.

*Verrier Dep.* at 181:25-182:25.  Taking the testimony in the light most favorable to Ms. Verrier, a jury could reasonably conclude that Mr. Vienneau told Ms. Verrier that BTB wanted the matter to "go away."  The Court includes PSAMF ¶ 148.

[141]    PSAMF ¶ 150 reads: "Vienneau told Verrier 'how the shift is currently performing and relationships/connections in the workplace causing hardships on the shift.'"  PSAMF ¶ 150.  BTB denies Ms. Verrier's fact on the grounds that it is "incomplete and lacks context."  DRPSAMF ¶ 150.  The cited record states "Jeff spoke to Heather on his involvement in the investigation around how the shift is currently performing and relationships/connections in the workplace causing hardships on the shift."   June 28, 2019, *HR Investigation Report* at NWNA000152.   The Court accepts BTB's qualification and includes PSAMF ¶ 150 but with the full quoted language from the cited record.

[142]    PSAMF ¶ 156 reads: "In the meeting, Vienneau blamed Verrier for Campbell's harassment, accusing Verrier of bringing my personal life into the workplace."

BTB denies this fact, citing Ms. Asquith's Investigation Report and further argues that Ms. Verrier cannot rely on her affidavit in support of her statement of fact.  *See* DRPSAMF ¶ 156.  The Court overrules BTB's objection to Ms. Verrier's affidavit based on the timing of its execution alone.  However, the Court does modify slightly Ms. Verrier's proposed statement of fact.  In her deposition Ms. Verrier states that "they just said basically I'm complaining too much."  *Verrier Dep.* at 126:14-15.  In her affidavit Ms. Verrier further describes being "blamed" for Mr. Campbell's conduct.  The Court views Ms. Verrier's affidavit as consistent with her deposition testimony because she describes her reaction to Mr. Vienneau's criticisms of her.   The Court therefore alters Ms. Verrier's statement of fact to include both her initial deposition testimony and her later affidavit.

156; DRPSAMF ¶ 156.  He told her that she needed to "stop the drama" and that she was "affecting [BTB's] numbers."[143]  PSAMF ¶ 149; DRPSAMF ¶ 149.  Ms. Verrier was stunned by Mr. Vienneau's comments as she considers herself a private person who kept her personal life out of the workplace.[144]  PSAMF ¶ 157; DRPSAMF ¶ 157.

Mr. Vienneau told Ms. Verrier that "personal interactions should not be taking place between [co-workers at work and] if they need to interact then it should only be business related regarding performing their jobs."[145]  PSAMF ¶ 151; DRPSAMF ¶ 151.  Mr. Vienneau warned Ms. Verrier that "should this be violated then [BTB] would need to separate them or depending on the situation termination would take place."[146]  PSAMF ¶ 152; DRPSAMF ¶ 152.

Mr. Vienneau asked a clarifying question around the Company having already moved Ms. Verrier from the D-Shift.[147]  PSAMF ¶ 153; DRPSMF ¶ 153.  Ms. Asquith and Mr. Vienneau "expressed that continued support through this doesn't stop here and they would be overseeing the situation closely over the next weeks to ensure that

---

[143]    BTB objects to PSAMF ¶ 149 on the same grounds as PSAMF ¶ 148.  Looking at the cited testimony, which is reproduced in the prior footnote, the Court concludes that, taking the deposition testimony in the light most favorable to Ms. Verrier, a factfinder could plausibly conclude that Mr. Vienneau told Ms. Verrier that she was affecting BTB's numbers and that she was creating drama.  The Court includes PSAMF ¶ 149, but slightly alters the stated fact to more accurately conform to the cited testimony.

[144]    BTB offers the same denial to PSAMF ¶ 157 as it does to PSAMF ¶ 156.  The Court rejects the denial and includes PSAMF ¶ 157 because Ms. Verrier's statement is based on personal knowledge and supplements the testimony she gave at her deposition.

[145]    BTB denies PSAMF ¶ 151 because the testimony "is misquoted and inaccurate."  The Court includes PSAMF ¶ 151 but slightly alters the fact to ensure the record is accurately quoted.

[146]    BTB denies PSAMF ¶ 152 because the testimony "is misquoted and inaccurate."  The Court includes PSAMF ¶ 152 but slightly alters the fact to ensure the record is accurately quoted.

[147]    BTB denies PSAMF ¶ 153 because the record does not support the allegation that Mr. Vienneau "complained."  The Court includes PSAMF ¶ 153 but slightly alters the fact to reflect that Mr. Vienneau asked a "clarifying question" on this issue rather than "complained."  *See* June 28, 2019, *HR Investigation Report* at NWNA000152.

things are going smoothly."[148]  PSAMF ¶ 154; DRPSAMF ¶ 154.  Soon after, Ms. Verrier received a text message from another employee stating that they had heard Ms. Verrier was causing problems at Poland Spring, although Ms. Verrier could not remember who sent her the text message.[149]  PSAMF ¶ 158; DRPSAMF ¶ 158.

### G.   Derrick Campbell Returns to Work

Mr. Campbell returned from his first suspension and worked one shift on Monday, June 24, 2019.  DSMF ¶ 71; PRDSMF ¶ 71.  Mr. Hutchinson assigned Mr. Campbell to work on Line 11 in the Filler Room and assigned Ms. Verrier to work on Line 1 at the Labeler, positions Ms. Verrier characterized as "adjacent" to one another.[150]  DSMF ¶¶ 72-73; PRDSMF ¶¶ 72-73; PSAMF ¶ 159; DRPSAMF ¶ 159. Line 1 and Line 11 are approximately 100-200 feet from each other and separated in

---

[148]   PSAMF ¶ 154 states that "Vienneau concluded by stating that 'they would be overseeing the situation closely over the next few weeks to ensure things are going smoothly,'" which BTB says is "misquoted and inaccurate."  DRPSAMF ¶ 154.  The Court accepts BTB's denial as a qualification and revises PSAMF ¶ 154 to include the full statement from the cited record.  However, the Court does not include BTB's additional assertion that "Vienneau 'concluded that he wants everyone to feel comfortable at work and for us to be able to move forward from here with a clear understanding of expectations and upholding these" which goes beyond Ms. Verrier's stated fact.  DRPSAMF ¶ 154.

[149]   Ms. Verrier's fact originally states: "Soon after, Verrier received a text message from an employee that read 'I heard you are causing problems at Poland Spring.'"  PSAMF ¶ 158 (citing *Verrier Dep.* at 185:10-15).  BTB qualifies this statement because Ms. Verrier "could not testify from whom or when the text message was sent, did not allege that she showed the text message to anyone other than her lawyer, and did not produce the text message in response to written discovery requests in this case."  DRPSAMF ¶ 158.  The Court partially accepts BTB's qualification.  In the light most favorable to Ms. Verrier, the record reflects that she plausibly received a text message from a co-worker insinuating that she was causing trouble.  However, BTB is correct that Ms. Verrier failed to identify the specifics of the message.  The Court therefore alters PSAMF ¶ 158 to reflect this and removes any quoted language from the fact as Ms. Verrier did not cite or otherwise provide the referenced text message.

[150]   Ms. Verrier submits that "[o]n June 24, 2019, Hutchinson scheduled Campbell to work adjacent to Verrier," PSAMF ¶ 159 (citing *Verrier Dep.* 105:21-22), which BTB denies because the cited record "does not mention Hutchinson or a date."  DRPSAMF ¶ 159.  In the light most favorable to Ms. Verrier, a reasonable juror could infer, from the context of Ms. Verrier's deposition, that the incident occurred on June 24 and that it was Mr. Hutchinson who made the line assignments.  Furthermore, BTB's own fact states that it was Mr. Hutchinson who assigned Mr. Campbell and Ms. Verrier to their respective lines.  *See* DSMF ¶¶ 72-73.  The Court revises DSMF ¶¶ 72-73 to reflect that Ms. Verrier characterized the positioning as "adjacent."

part by a floor to ceiling brick wall and in part by a conveyor belt.  DSMF ¶ 74;

PRDSMF ¶ 74.  Ms. Verrier and Mr. Campbell were located more than 100 feet from

each other, possibly more than 200 feet from each other, when they worked on the

Line 1 Labeler and in the Line 11 Filler Room, respectively.  DSMF ¶ 75; PRDSMF ¶

75.  Ms. Verrier and Mr. Campbell did not interact with each other or speak to each

other when they worked on Line 1 and Line 11 on June 24, 2019.[151]  DSMF ¶ 76;

---

[151]    Ms. Verrier denies DSMF ¶ 76.  She states that "[o]n June 24, 2019, Campbell returned to
work; Hutchinson scheduled Campbell to work adjacent to Verrier . . . Campbell had to pass through
Verrier's work area when he went on break, to access the time clock, or to go to the office.  When he
did, Campbell would make eye contact with Verrier, letting her know he was still there. . . On her next
scheduled shift, Verrier called out sick because she experienced a panic attack due to Defendant
assigning Campbell to work adjacent to Verrier the previous shift."  PRDSMF ¶ 76 (citing *Verrier Dep.*
at 105:21-22, 111:2-15; *Verrier Aff.* ¶ 11).  BTB responds by arguing that the "testimony does not
controvert the substance of DSMF ¶ 76" and "Plaintiff relies on her self-serving affidavit" which BTB
contends "suggests improper motive."  PRDSMF *Resp.* ¶ 76.
       At her deposition, Ms. Verrier testified to the following:

       Q. Did you have to interact with [Mr. Campbell]?
       A. If we could go back to the diagram, you can -- in order for him to get to the office or
       get to the break room or to get to the time clock, he has to walk through my filler, so I
       had to see him every time he did that.  He literally had to go past my filler.
       Q. So he had to go past your filler to get to the break room or the office?
       A. He had to go through it, yeah.
       Q. Okay.  And that was to get to the break room or the office?
       A. Yes.
       Q. Did he do anything to you on the way to the break room or the office?
       A. No, he would look at me.

*Verrier Dep.* at 111:1-15.  Moreover, when asked "Did you make eye contact with him?," Ms. Verrier
responded "I don't know.  I looked at him. He saw me; I saw him."  *Verrier Dep.* at 110:24-25.
       However, in her affidavit, executed March 22, 2022, Ms. Verrier states that "On June 24, 2019,
Mr. Campbell returned to work; Management scheduled him to work adjacent to me.  Mr. Campbell
had to pass through my work area when he went on break, to access the time clock, or to go to the
office.  When he did, Mr. Campbell would make eye contact with me, letting her know he was still
there."  *Verrier Aff.* ¶ 12.  As previously discussed, "[w]hen an interested witness has given clear
answers to unambiguous questions, [s]he cannot create a conflict and resist summary judgment with
an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the
testimony is changed."  *Veilleaux*, 2014 U.S. Dist. LEXIS 97981, at *12 (quoting *Colantuoni*, 44 F.3d
at 4-5).  In her deposition Ms. Verrier testified that when Mr. Campbell passed by, he would "look at
[her]" but that she was not sure if they made eye contact, but in her affidavit Ms. Verrier contradicts
herself and states that he would "make eye contact with [her] letting her know he was still there."  Ms.
Verrier has not offered an explanation as to why her testimony has changed.  Given that the affidavit
was executed after BTB filed its motion for summary judgment Ms. Verrier cannot now manufacture

PRDSMF ¶ 76.  However, Mr. Campbell had to pass through Ms. Verrier's work area when he went on break, accessed the timeclock, or went to the office.[152]  PSAMF ¶ 160; DRPSAMF ¶ 160.  When he did, Mr. Campbell would look at Ms. Verrier.[153]  PSAMF ¶ 161; DRPSAMF ¶ 161.  Mr. Campbell did not approach Ms. Verrier on June 24, 2019.[154]  DSMF ¶ 77; PRDSMF ¶ 77.  Ms. Verrier testified that she did not know if they made eye contact on June 24, although she looked at him and saw Mr. Campbell look at her, from approximately 100-200 feet away.[155]  DSMF ¶ 78; PRDSMF ¶ 78.

## H.    Attorney Loranger's Letter and Response

Mr. Campbell did not work on Tuesday, June 25, 2019, and his next scheduled shift was Sunday, June 30, 2019.  DSMF ¶ 79; PRDSMF ¶ 79.  Ms. Verrier called in

---

a genuine dispute of material fact by stating a fact in her affidavit contrary to her deposition testimony. The Court rejects Ms. Verrier's denial, admits DSMF ¶ 76, and strikes the portion of ¶ 12 of Ms. Verrier's affidavit that addresses eye contact (Ms. Verrier incorrectly cites ¶ 11 of her affidavit, but from her denial it is clear that she is referring to ¶ 12).  The record elsewhere reflects that Mr. Campbell had to walk through her area at certain times.  *See* PSAMF ¶ 160.

[152]     BTB denies this statement, reciting its understanding of the facts and arguing that the Court cannot rely on Ms. Verrier's self-serving affidavit.  Ms. Verrier's deposition testimony and her affidavit support the assertion that "Campbell had to pass through Verrier's work area when he went on break, to access the time clock, or to go to the office."  *See Verrier Dep.* at 111:2-6.  The Court overrules BTB's denial and includes PSAMF ¶ 160.

[153]     PSAMF ¶ 161 states "When he did, Campbell would make eye contact with Verrier, letting her know he was still there."  PSAMF ¶ 161 (citing *Verrier Dep.* at 111:2-15; *Verrier Aff.* ¶ 12).  BTB denies the fact based on Ms. Verrier's reliance on her affidavit.  DRPSAMF ¶ 161.  In accordance with the prior footnotes, the Court does not rely on this portion of ¶ 12 of Ms. Verrier's affidavit.  However, based on Ms. Verrier's deposition testimony, which is reproduced in footnote 151, the record supports the assertions that Mr. Campbell looked at Ms. Verrier when he walked through her workspace to get to the office or breakroom.  The Court therefore includes PSAMF ¶ 161 but alters the fact to comport with Ms. Verrier's deposition testimony, rather than her affidavit.

[154]     Ms. Verrier denies DSMF ¶ 77 for the same reason she rejects DSMF ¶ 76.  *See* PRDSMF ¶ 77.  BTB replied with the same response.  *See* PRDSMF *Resp.* ¶ 77.  For the same reasons discussed in the previous footnote, and in accordance with the Court's decision to strike a portion of ¶ 12 of Ms. Verrier's affidavit, the Court rejects Ms. Verrier's denial and includes DSMF ¶ 77.

[155]     Ms. Verrier denies DSMF ¶ 78 for the same reasons she denied DSMF ¶¶ 76, 77.  *See* PRDSMF ¶ 78.  For the reasons discussed in the previous footnotes the Court rejects Ms. Verrier's denial and includes DSMF ¶ 78.

sick because she experienced a panic attack because in the previous shift BTB assigned Mr. Campbell to work in an area Ms. Verrier considered adjacent to her.[156] PSAMF ¶ 162; DRPSAMF ¶ 162.  On or about June 28, 2019, BTB received a letter from Ms. Verrier's attorney, Guy Loranger, dated June 28, 2019.  DSMF ¶ 80; PRDSMF ¶ 80; PSAMF ¶ 163; DRPSAMF ¶ 163.  The subject letter recapped what Ms. Verrier perceived to be a hostile work environment, BTB's failure to remedy the environment, and the emotional toll on Ms. Verrier.[157]  PSAMF ¶ 164; DRPSAMF ¶ 164.  The subject letter also made clear that Ms. Verrier had previously provided notice to BTB of her perception of harassment, stating "We understand that Ms. Verrier has recounted the relevant facts for you.  For purposes of this letter, we again summarize the relevant facts."[158]  PSAMF ¶ 165; DRPSAMF ¶ 165.

Upon receipt of Mr. Loranger's letter and pursuant to Company policy, Ms. Asquith immediately suspended Mr. Campbell a second time to determine whether the letter raised new allegations and to conduct additional investigation.[159]  DSMF ¶

---

[156]   BTB objects based on Ms. Verrier's reliance on her post-deposition affidavit.  However, the Court has struck only the eye-contact portion of ¶ 12 of the Verrier affidavit and therefore the Court overrules BTB's objection and includes the paragraph.

[157]   BTB denies PSAMF ¶ 164 because it "contains legal conclusions, not material assertions of fact" and the letter "speaks for itself."  DRPSAMF ¶ 164.  The speaks for itself objection is improper.  The Court accepts BTB's denial as to the legal conclusions in PSAMF ¶ 164 and includes Ms. Verrier's fact but alters it so that it states that Ms. Verrier perceived the work environment to be hostile, not that it necessarily was a hostile work environment.

[158]   BTB again rejects PSAMF ¶ 165 because it "contains legal conclusions, not material assertions of fact."  DRPSAMF ¶ 165.  The Court accepts BTB's objection and includes PSAMF ¶ 165 but alters the fact to clarify that Ms. Verrier perceived the events as harassment.

[159]   Ms. Verrier qualifies DSMF ¶ 81 stating that "Asquith did not suspend Campbell as punishment" but instead "explained that suspension pending investigation is normal protocol in a situation such as this until we can get to the bottom of the situation and investigate the details."  PRDSAMF ¶ 81.  BTB responds and argues that the qualification of the suspension as "punishment" is nonresponsive to the proposed fact and moreover does not "controvert the substance of DSMF ¶ 81."  PRDSMF *Resp.* ¶ 81.  The Court denies Ms. Verrier's qualification and admits DSMF ¶ 81.  The Court

81; PRDSMF ¶ 81; PSAMF ¶ 166; DRPSAMF ¶ 166.  During Mr. Campbell's second suspension, BTB reviewed the allegations set forth in Mr. Loranger's letter and Ms. Asquith contacted Ms. Verrier, Mr. Campbell, and Mr. Hutchinson to conduct additional investigation.  DSMF ¶ 82; PRDSMF ¶ 82.

Ms. Asquith again interviewed Ms. Verrier regarding the allegations in Mr. Loranger's letter.[160]  DSMF ¶ 84; PRDSMF ¶ 84.  On or about July 19, 2019, Ms. Asquith spoke with Ms. Verrier by phone.  PSAMF ¶ 170; DRPSAMF ¶ 170.  In the interview Ms. Verrier again recounted what she perceived as Mr. Campbell's harassment.[161]  PSAMF ¶ 170; DRPSAMF ¶ 170.  Toward the end of the interview Ms. Asquith thanked Ms. Verrier stating, "those were big things that I just needed to get little more clarification on, so I appreciate you being able to tell me these things…I

_____

agrees with BTB that Ms. Verrier's qualifications go beyond the scope of the Defendant's proffered fact.  Moreover, Ms. Verrier cites an HR investigation report from June 13, 2019, to support her argument, however, the June 13, 2019 report refers to Mr. Campbell's first suspension rather than his second.  *See* June 13, 2019 *HR Investigation Rep.* at NWNA000140.  The Court includes DSMF ¶ 81.
[160]     Ms. Verrier admits that Ms. Asquith "did speak to Verrier by phone" but qualifies DSMF ¶ 84 because "[i]n the interview, Verrier again recounted Campbell's harassment.  Towards the end of the interview, Asquith thanked Verrier, stating, 'those were big things that I just needed to get little more clarification on, so I appreciate you being able to tell me these things…I can take this information and go from here, okay.'  Verrier responded, 'Yeah, I just do not understand because I told you guys this.  I am not trying to be rude, but I told all of this to you guys.'"  PRDSMF ¶ 84.  BTB responds that the Court should reject the qualification because it is nonresponsive and "relies on her self-serving affidavit."  PRDSMF *Resp.* ¶ 84.  The Court rejects Ms. Verrier's qualification and includes DSMF ¶ 84 as written because Ms. Verrier's additional details fall outside the scope of the proposed fact.  Moreover, Ms. Verrier admits that Ms. Asquith interviewed her again, which is the substance of DSMF ¶ 84.  Ms. Verrier's additional statement of fact is located elsewhere in the Court's recitation of the facts.
[161]     BTB denies PSAMF ¶ 170 because it "contains legal conclusions, not material assertions of fact" and objects to Ms. Verrier relying on her post-summary judgment affidavit.  In accordance with the previous footnotes, the Court overrules objections to Ms. Verrier's use of portions of her affidavit that are supplementary to, and not inconsistent with, her prior deposition testimony.  Regarding BTB's legal conclusion objection, the Court therefore admits PSAMF ¶ 170 but alters the statement to clarify that Ms. Verrier was recounting what she perceived was Mr. Campbell's harassment.  The Court includes PSAMF ¶ 170 as revised.

can take this information and go from here, okay."[162]  PSAMF ¶ 171; DRPSAMF ¶ 171.  Ms. Verrier responded, "Yeah, I just do not understand because I told you guys this.  I am not trying to be rude, but I told all of this to you guys."[163]  PSAMF ¶ 172; DRPSAMF ¶ 172.

On July 22, 2019, Ms. Asquith emailed Mr. Hutchinson to ask if (1) he "had ever had an instance reported to [him] from earlier the same night that [Mr. Campbell] first approached [Ms. Verrier] and made the comment about if she was seeing [Mr. Conway]"; and (2) "if [Ms. Verrier] spoke to [him] about [Mr. Campbell] making the . . . comment" about Ms. Verrier "grab[bing] the ass of a new worker" in response to her request for caps.[164]  DSMF ¶ 83; PRDSMF ¶ 83; PSAMF ¶¶ 173-174; DRPSAMF ¶¶ 173-174; DSMF, Attach. 12, *Ex. L: ESI*, at 6.  Ms. Asquith stated, "Any help you can offer on if you heard anything about [Mr. Campbell] hindering her job

---

[162]    BTB denies this fact because it is supported by Ms. Verrier's affidavit and reiterates its previous arguments regarding the use of a post-summary judgment affidavit.  The Court rejects the denial and admits PSAMF ¶ 171 as BTB has not demonstrated that ¶ 15 of Ms. Verrier's affidavit contradicts her deposition testimony.

[163]    BTB denies this statement on the same grounds as PSAMF ¶ 171.  The Court rejects BTB's denial in accordance with the previous footnote.

[164]    DSMF ¶ 83 states "Asquith spoke with Hutchinson via email and telephone regarding the allegations in Loranger's letter, which included the incidents that occurred on the March 2019 shift, as set forth in [DSMF] No. 29."  DSMF ¶ 83.  Ms. Verrier denies this statement because "[t]he evidence cited by Defendant only references Asquith sending Hutchinson an email on July 22, 2019, and asking only one question – whether Hutchinson heard of Campbell telling Verrier to 'grab the ass' of a co-worker. . .. In response, Hutchinson claimed, I never heard that exact quote…"  PRDSMF ¶ 83.
        PSAMF ¶¶ 173 and 174 reiterate Ms. Verrier's denial of DSMF ¶ 83.  BTB denies PSAMF ¶¶ 173 and 174 because they are "incomplete and taken out of context."  BTB explains that in the email Ms. Asquith "also asked for information regarding 'anything about [Campbell] hindering [Plaintiff's] job responsibilities."  DRPSAMF ¶ 173.  It also contends that when Mr. Hutchinson stated that he "never heard the exact quote" he also added that "[Plaintiff] was very hesitant to bring any exact details forward."  DRPSAMF ¶ 174.  Although the Court is obligated to view the record in the light most favorable to Ms. Verrier as the non-moving party, the Court agrees with BTB that Ms. Verrier's characterization of the facts does not faithfully reflect the record.  Rather than rely on either party's characterization of this exchange, the Court includes the complete quoted language from the emails between Ms. Asquith and Mr. Hutchinson.

responsibilities or if she brought this comment to your attention would be greatly appreciated." DSMF ¶ 83; PRDSMF ¶ 83; PSAMF ¶¶ 173-174; DRPSAMF ¶¶ 173-174; *Ex. L: ESI*, at 6. Mr. Hutchinson responded that he "never heard that exact quote, [Ms. Verrier] was very hesitant to bring any exact details forward." DSMF ¶ 83; PRDSMF ¶ 83; PSAMF ¶¶ 173-174; DRPSAMF ¶¶ 173-174; *Ex. L: ESI*, at 6. Ms. Asquith interviewed Mr. Campbell regarding the allegations in Mr. Loranger's letter.[165] DSMF ¶ 85; PRDSMF ¶ 85. Ms. Asquith worked with Joseph Walco, Regional HR Manager, and gave him an update regarding her discussion with Mr. Campbell.[166] DSMF ¶ 86; PSAMF ¶ 86.

---

[165]    Ms. Verrier denies DSMF ¶ 85 because "[i]n the cited evidence, Asquith and Campbell only referenced the incident when Campbell told Verrier to 'grab the ass' of a co-worker. In the balance of the interviews, Asquith simply gave Campbell updates." PRDSMF ¶ 85. BTB rejects Ms. Verrier's denial stating that the interview between Ms. Asquith and Mr. Campbell referred to more than just the incident with the caps, and further argues that the cited evidence does not support Ms. Verrier's argument. PRDSMF *Resp*. ¶ 85.

On June 28, 2019, Ms. Asquith sent Mr. Campbell a text message stating "Hey Derrick. When you have a moment can I call you real quick," to which Mr. Campbell responded "Sorry, yes call whenever." *Asquith Texts* at 6. On July 3, 2019, Ms. Asquith texted Mr. Campbell again stating "Hey Derrick, do you have a moment for me to talk with you about a question I have? I'm also looking for who those text messages came from that you sent me and the exact date of them (you said around December 2018)." *Id.* at 7. Mr. Campbell responded "Yeah, I'm around now if you want to call, and the messages came from Jerrod warren who used to work with us. I'll have to check back on the date." After Ms. Asquith and Mr. Campbell spoke on the phone, Mr. Campbell sent Ms. Asquith a text message saying "The details heather brought forward…why were they not brought up in the initial investigation. Why is she bringing them up now? Just to try and get me fired? and if so how many more times is she gonna do it before she gets investigated? Meant to bring that up on the phone sorry." *Id.*

The Court rejects PRDSMF ¶ 85 and admits DSMF ¶ 85 as supported by the record. Ms. Verrier's denial does not support her assertion that Ms. Asquith and Mr. Campbell only discussed the incident where Mr. Campbell told Ms. Verrier to "grab the ass" of her co-worker. Furthermore, the text message exchange does not support the assertion that Ms. Verrier only gave Mr. Campbell updates.

[166]    DSMF ¶ 86 originally reads: "Asquith worked with Joseph Walco, Regional HR Manager, to review her investigation and confirm that Defendant took appropriate and proportional action in response to Plaintiff's complaints about Campbell." DSMF ¶ 86. Ms. Verrier denies this fact and says that "[i]n the cited evidence, Asquith simply gave Walko a recap of her phone call with Campbell advising [him] of his transfer." PRDSAMF ¶ 86. In response, BTB asserts that the denial should be stricken because it does not "controvert the substance of DSMF ¶ 86." PRDSMF *Resp*. ¶ 86. In the

To ensure that Ms. Verrier and Mr. Campbell had no further contact—intentional, perceived or otherwise—BTB re-assigned Mr. Campbell to the D-Shift. DSMF ¶ 87; PRDSMF ¶ 87.  On July 23, 2019, BTB prepared a Final Written Warning for "violation of the Harassment Policy" and planned to issue it upon Mr. Campbell's return from his second suspension.[167]  DSMF ¶ 88; PRDSMF ¶ 88; PSAMF ¶ 175; DRPSAMF ¶ 175.  Mr. Hutchinson was not aware that BTB had issued any other Performance Problem Resolutions (PPRs) to Mr. Campbell.[168]  PSAMF ¶

---

light most favorable to Ms. Verrier as the nonmoving party the Court agrees that the cited record does not fully support DSMF ¶ 86 and that the message between Ms. Asquith and Mr. Walko appears to be a mere "update" on Ms. Asquith's conversation with Mr. Campbell.  See *Ex. L: ESI*, at 5.  The Court accepts Ms. Verrier's denial and alters DSMF ¶ 86 to more accurately reflect the record cited.

[167]    PSAMF ¶ 175 states "On July 23, 2019, Asquith and Vienneau spoke to Campbell by phone and issued him a Performance Problem Resolution ("PPR") – a final Written Warning for 'violation of the Harassment Policy.'"  PSAMF ¶ 175.  BTB denies this fact and states:

> The cited exhibit (Investigative Report, PageID #1005), does not support PSMF ¶ 175, including that Asquith and/or Vienneau spoke to Campbell on July 23, 2019.  To ensure that Plaintiff and Campbell had no further contact—intentional, perceived, or otherwise—Defendant re-assigned Campbell to the D-Shift. (Hutchinson Dep. 38:22-39:15; Exh. F at ¶ 15).  Defendant prepared a Final Written Warning and planned to issue it upon Campbell's return from the Second Suspension. (Hutchinson Dep. 53:23-54:21; Exh. F at ¶ 15).  Campbell returned to the facility to collect his belongings and resigned from employment on August 1, 2019, prior to working on the D-Shift. (Hutchinson Dep. 54:13-21; Exh. K, July 2019 Email Re: Campbell Resignation)  The Final Written Warning was not issued to Campbell because he resigned prior to the start of his first shift post-Second Suspension. (Defendant's Ex. F, Declaration of Jennifer Asquith).

DRPSAMF ¶ 175.  The Court agrees that Ms. Verrier's assertion that Ms. Asquith and Mr. Vienneau spoke with Mr. Campbell by phone on July 23, 2019, is unsupported by the record cited.  However, the cited record does support that the Final Written Warning was drafted July 23, 2019, and that it was due to Mr. Campbell's "violation of the Harassment Policy."  *See* DSMF, Attach. 4, *Ex. 8: Report of Performance Problem Resolution*.  The Court therefore accepts PSAMF ¶ 175 but omits references to Mr. Vienneau and Ms. Asquith speaking with Mr. Campbell by phone and issuing him a PPR.  Other facts relating to Mr. Campbell's resignation are admitted as part of BTB's statement of materials fact.  *See* DSMF ¶¶ 87, 89.

[168]    PSAMF ¶ 176 states that "Defendant had not previously issued Campbell any PPRs during his employment."  PSAMF ¶ 176.  BTB denies this statement because the cited testimony states only that Mr. Hutchinson "was not aware of any other PPRs issued to Campbell as a result of the allegations of harassment."  DRPSAMF ¶ 176.  The cited testimony states:

176; DRPSAMF ¶ 176.  On or about July 23, 2019, Ms. Asquith spoke to Ms. Verrier and explained that the investigation confirmed Ms. Campbell violated BTB's sexual harassment policy.[169]  PSAMF ¶ 177; DRPSAMF ¶ 177.  Mr. Campbell returned to the facility to collect his belongings and resigned from employment on August 1, 2019, prior to working on the D-Shift.  DSMF ¶ 89; PRDSMF ¶ 89.

## I.    The Text Messages

On June 30, 2019, a co-worker forwarded to Ms. Verrier a string of text messages with Mr. Warren.[170]  PSAMF ¶ 167; DRPSAMF ¶ 167.  The text messages reference Mr. Campbell's suspension (his "nights off"), and to ask Ms. Verrier about

---

Q. Are you aware of any other PPRs issued to Campbell as a result of the allegations of harassment?
A. Not that I'm aware of.
Q. Okay.  At this time, were you Campbell's supervisor?
A. Yes.

*Hutchinson Dep.* at 38:9-14.  The Court accepts BTB's denial as a qualification and revises PSAMF ¶ 176 to reflect more accurately Mr. Hutchinson's deposition testimony.

[169]    BTB denies this statement of fact as "unsupported hearsay" and impermissibly reliant on Ms. Verrier's affidavit.  The Court rejects BTB's hearsay and affidavit objections but strikes the portion of PSAMF ¶ 177 relating to Ms. Asquith informing Ms. Verrier that Ms. Campbell would be transferred to a different shift because the affidavit statement on which this fact is based is contradictory to Ms. Verrier's deposition testimony.

In her deposition, when asked about the call with HR and whether they told her that Mr. Campbell was moved to the D-shift, Ms. Verrier stated "They never told me anything.  They never told he was moved, he was suspended, nothing, nothing.  She told me she was going to have a talk with him and then she told me she was going to have him sign a contract, that was the only communication she told me.  Then she said oh, he's suspended, I'm seeing that on the text that you just showed me." *Verrier Dep.* at 143:25-144:6.  Having testified to this effect, Ms. Verrier cannot now change her testimony to say that Ms. Asquith informed her that Mr. Campbell was being transferred.

[170]    In addition to generally objecting to PSAMF ¶¶ 167-169 because Ms. Verrier relies on her affidavit, which it urges the Court to reject, BTB also argues that "the cited exhibit . . . is undated and unauthenticated, it is not a 'group text,' it was not produced in response to discovery requests, and the identity of the individual to whom the text is directed is unknown."  DRPSAMF ¶ 167; *see also* DRPSAMF ¶¶ 168-169.  The Court overrules BTB's discovery objections because "[a] motion for summary judgment is not an appropriate vehicle to resolve a discovery dispute, and in any event [BTB] failed to demonstrate any unfair prejudice from the non-disclosure."  *Goldenson v. Steffens*, No. 2:10-cv-00440-JAW, 2014 U.S. Dist. LEXIS 201258, at *13 n.29 (D. Me. Mar. 7, 2014).  The Court similarly overrules BTB's authentication challenges as Ms. Verrier testified to the authenticity of the text message, which was included in her affidavit, by swearing to the truth of her affidavit under penalty of perjury.  The Court includes PSAMF ¶¶ 167-169.

it.  PSAMF ¶ 168; DRPSAMF ¶ 168.  A text then states that "[Ms.] Verrier is a little cunt."  PSAMF ¶ 169; DRPSAMF ¶ 169.

### J.   Heather Verrier's MHRA Complaint

On August 12, 2019, Ms. Verrier submitted FMLA paperwork.[171]  PSAMF ¶ 178; DRPSAMF ¶ 178.  On September 25, 2019, Ms. Verrier filed a Maine Human Rights Commission (MHRC) complaint against BTB alleging discrimination and retaliation.  PSAMF ¶ 179; DRPSAMF ¶ 179.  Ms. Verrier says that after this, her managers and supervisors no longer checked on her machines or checked to see how she was doing, and how her work was going, which she says made her work more difficult.[172]  After Ms. Verrier's complaints about Mr. Campbell's harassment and her filing of the MHRA complaint, Ms. Verrier perceived that management began to treat her differently.[173]  PSAMF ¶ 181; DRPSAMF ¶ 181.  She also says that management began denying her requests for overtime, which cost her extra earnings and they would stop going to her lines.[174]  PSAMF ¶¶ 182-183; DRPSAMF ¶¶ 182-183.

---

[171]   PSAMF ¶ 178 originally specifies that Ms. Verrier submitted her FMLA paperwork for "emotional distress," which BTB denies as a legal conclusion.  DRPSAMF ¶ 178.  However, BTB admits that Ms. Verrier "submitted FMLA paperwork on or about August 12, 2019 and also that Defendant approved Plaintiff's request for leave."  DRPSAMF ¶ 178.  The Court includes PSAMF ¶ 178 but omits references to "emotional distress" as the record does not explain why Ms. Verrier submitted FMLA paperwork, only that she did.  *See Verrier Dep.* at 144:10-145:2.

[172]   BTB denies PSAMF ¶ 181 because Ms. Verrier relies on her own affidavit to support her statement of fact.  DRPSAMF ¶ 181.  BTB also points to the fact that Ms. Verrier "received positive performance evaluations and annual merit pay increases from 2018 to 2020, even after her complaints and the filing of her MHRC complaint."  DRPSAMF ¶ 181.  In accordance with the Court's prior rulings, the Court denies BTB's general objection to Ms. Verrier's affidavit.  As to BTB's additional assertion of fact regarding Ms. Verrier's merit increases, that is a factual allegation beyond the scope of Ms. Verrier's asserted fact.  The Court includes PSAMF ¶ 181.

[173]   BTB denied PSAMF ¶ 180, arguing that it contains legal conclusions and immaterial assertions of fact.  DRPSAMF ¶ 180.  The Court rejects BTB's denial, but it has altered PSAMF ¶ 180 to clarify that this was Ms. Verrier's perception of what happened.

[174]   BTB denies these statements of fact because of Ms. Verrier's reliance on her affidavit and again reiterates that Ms. Verrier received positive reviews and merit pay increases between 2018 and 2020.

Management started to complain about Ms. Verrier clocking in or out a few minutes too early, which Ms. Verrier submits everyone did, but Management only complained about Ms. Verrier.[175]  PSAMF ¶ 184; DRPSAMF ¶ 184.  Finally, management denied Ms. Verrier's request for a forklift license, which she contends hurt her chances for advancement in the company.[176]  PSAMF ¶ 185; DRPSAMF ¶ 185.  Ms. Verrier also testified that in 2020 she read BTB's submission to the MHRC in response to her

---

DRPSAMF ¶¶ 182-183.  BTB also states that Ms. Verrier "stipulated to the absence of any lost wages or claim for economic damages."  DRPSAMF ¶ 183.  The Court overrules BTB's objection to Ms. Verrier's use of her affidavit, especially as BTB has not pointed to anything in Ms. Verrier's deposition that contradicts the affidavit statement at issue.  In fact, paragraphs 18 and 19 of Ms. Verrier's affidavit are consistent with her deposition testimony which states:

> "They weren't giving me any overtime, I know that, I hadn't work overtime in – since it happened, since the harassment happened, I didn't get any overtime after that.  I kept putting in for overtime and then I would drive in to work, it would be a 30-minute drive and I would be on the way and they would call me and say we don't need you today and it would happen every time and then other people would be able to go to work and get their overtime but me."

*Verrier Dep.* at 165:17-24.  The Court rejects BTB's denials and includes PSAMF ¶¶ 182-183 as supported by the records cited.

[175]   The Court once again rejects BTB's denial based on Ms. Verrier's reliance on her affidavit and that her proposed fact is not specific enough to warrant inclusion in the summary judgment record.  *See* DRPSAMF ¶ 184.  BTB additionally reiterates that Ms. Verrier still received positive performance evaluations and none of those evaluations reflected concern about her clock-in times.  The Court rejects this additional statement of fact as beyond the scope of PSAMF ¶ 184 and thus an improper denial under Local Rule 56.  Finally, to the extent that BTB says that Ms. Verrier was "never disciplined regarding this issue," the weight of Ms. Verrier's allegations about how management treated her and BTB's decision not to formally discipline Ms. Verrier is an issue of credibility and evidentiary weight best reserved for a factfinder.  PSAMF ¶ 184 is included.

[176]   In addition to denying this fact because Ms. Verrier relies on her affidavit and because she received positive performance evaluations, which the Court rejects consistent with the above footnotes, BTB points to Mr. Hutchinson's deposition testimony where he states that "[Plaintiff] was at a skill set that was beyond the need for forklift training.  It didn't impact her job at all.  She was – she at this point had been assigned to line one filler, which was our most advanced line, so her skill set – she just didn't need it and it didn't make sense for the business needs at that point."  DRPSAMF ¶ 185 (citing *Hutchinson Dep.* at 46:1-11).  Whether denial of the forklift license opportunity hurt Ms. Verrier's advancement at BTB is a question of fact to be resolved by the jury.  Because the Court is obligated to view the record in the light most favorable to Ms. Verrier as the nonmoving party, the Court rejects BTB's denial and includes PSAMF ¶ 185.

complaint and that it contained misstatements and falsely accused her of wrongdoing.[177] [178]  PSAMF ¶ 203; DRPSAMF ¶ 203.

### K.   October 2019 Communication with Counsel

In an email dated October 8, 2019, BTB's in-house counsel notified Ms. Verrier's attorney that BTB had "investigated Ms. Verrier's harassment allegations and were not able to substantiate any of her allegations."[179]   PSAMF ¶ 186; DRPSAMF ¶ 186.  BTB stated that it "did not find Ms. Verrier's allegations to be credible, in part due to several witnesses who informed [BTB] that Ms. Verrier was out to get Mr. Campbell because he was no[] longer showing romantic interest in her."[180]  PSAMF ¶ 187; DRPSAMF ¶ 187.  Ms. Verrier learned of the statements by

---

[177]      BTB objects to this statement of fact because Ms. Verrier relies on her affidavit.  DRPSAMF ¶ 203.  The Court overrules the objection and includes PSAMF ¶ 203.

[178]      Ms. Verrier also asserts that "[a]fter [she] filed the present lawsuit, the company obviously spent much time digging into her personal life, yet when she had filed complaints to the company about Campbell's harassment, the company did little [to] investigate.  The contrast was extremely distressing to Verrier."  PSAMF ¶ 204.  BTB objects to this statement as "self-serving," which the Court rejects.  The Court nonetheless excludes PSAMF ¶ 204, which based on this record is essentially argument, not fact.

[179]      BTB interposes a denial and objection stating that the "cited evidence . . . is a confidential settlement communication made in response to [Ms. Verrier's] demand for settlement and is wholly irrelevant to the material elements of Defendant's motion for summary judgment.  Pursuant to FRE 408, statements made during compromise negotiations about the claim are not admissible either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction."  DRPSAMF ¶ 186.

     First, the Court rejects BTB's relevancy objection as a reasonable factfinder could conclude that BTB's resolution of its investigation is probative of the appropriateness of its response to Ms. Verrier's allegations.  Second, the Court rejects BTB's Rule 408 objection.  As this Court has previously noted, Rule 408 is not "a complete prohibition on the admissibility of settlement offers."  *Mason v. Intercoast Career Inst.*, No. 2:14-cv-00377-JAW, 2017 U.S. Dist. LEXIS 7305, at *25 n.18 (D. Me. Jan. 19, 2017) (quoting *Stanley v. Peabody*, No. 1:10-cv-345-JHR, 2012 U.S. Dist. LEXIS 75993, at *2-3 (D. Me. May 30, 2012)).  "The Rule 'does not exclude use of compromise evidence when it is offered to prove something other than liability for, or invalidity of, a claim or its amount.'"  *Id.* (quoting *United States v. J.R. LaPointe & Sons, Inc.*, 950 F. Supp. 21, 33 (D. Me. 1996)).  Because, at trial, Ms. Verrier could introduce this evidence for other purposes, the Court includes PSAMF ¶ 186.

[180]      BTB denies and objects to PSAMF ¶ 187 for the same reasons it objected to PSAMF ¶ 186.  The Court accordingly overrules its objections.  To the extent that BTB argues that PSAMF ¶ 187 inaccurately quotes the cited exhibit, the Court revises PSAMF ¶ 187 to reflect more accurately the cited record.

the Company's corporate attorney claiming the investigation could not substantiate any of her allegations and that her allegations were not credible but made in retaliation for Ms. Campbell not having any romantic interest in her.[181]  PSAMF ¶ 188; DRPSAMF ¶ 188.  The statements stunned Ms. Verrier because Ms. Asquith told her the investigation showed Mr. Campbell violated BTB's sexual harassment policy.[182]  PSAMF ¶ 189; DRPSAMF ¶ 189.

**L.    Heather Verrier's Transfer Application**

On October 27, 2019, Ms. Verrier completed an application for a Production Technician position at BTB's Charlotte, North Carolina, facility.  DSMF ¶ 90; PRDSMF ¶ 90.  Ms. Verrier's brother lives in Charlotte, North Carolina.[183]  PSAMF ¶ 190; DRPSAMF ¶ 190.  On or about October 29, 2019, Ms. Verrier told Ms. Asquith she was interested in moving and inquired about positions available in North Carolina.  DSMF ¶ 91; PRDSMF ¶ 91.  Ms. Asquith reviewed BTB's operations and locations and determined that the McBee facility (McBee) in South Carolina was similar to the Poland Spring facility and also employed production operators.  DSMF ¶ 92; PRDSMF ¶ 92.  Ms. Asquith contacted HR and management at McBee on October 29 and recommended Ms. Verrier for a position.  DSMF ¶ 93; PRDSMF ¶ 93.

---

[181]    BTB interpose a denial and objection and reiterates its prior arguments regarding Ms. Verrier's affidavit and Rule 408 of the Federal Rules of Evidence.  In accordance with the Court's prior resolution of both issues, it rejects BTB's denial and admits PSAMF ¶ 188.

[182]    BTB denies this fact and objects to its inclusion because it relies on Ms. Verrier's affidavit and violates and Rule 408.  DRPSAMF ¶ 189.  The Court overrules those objections in accordance with its resolution of prior factual disputes.

[183]    BTB admits that Ms. Verrier applied to the position on October 27, 2019, but objects that it is irrelevant that Ms. Verrier's brother resides in Charlotte.  DRPSAMF ¶ 190.  The Court rejects BTB's relevancy objection because the fact that Ms. Verrier's brother lives in Charlotte, North Carolina, gives context as to why Ms. Verrier wanted to transfer facilities, why she chose North Carolina, and why she did not apply to the South Carolina facility, as Ms. Asquith suggested.  *See* DSMF ¶ 92.

Ms. Verrier did not apply for a position at the McBee facility.  DSMF ¶ 94; PRDSMF ¶ 94.  Mr. Hutchinson recalls writing a letter of recommendation for Ms. Verrier and giving this to her.[184]  DSMF ¶ 95; PRDSMF ¶ 95.

BTB filled the Charlotte position for which Plaintiff applied, prior to BTB's receipt of her October 27, 2019, application.[185]  DSMF ¶ 96; PRDSAMF ¶ 96.  On October 15, 2019, BTB hired Terrance Lee, an individual who had worked at the Charlotte facility through a placement agency for approximately one year prior to applying for the Charlotte position in or about October 2019.  DSMF ¶ 96; PRDSMF ¶ 96.  BTB rejected Ms. Verrier's application for the Charlotte position because it already offered the position to Mr. Lee on October 15, 2019, prior to receipt of Ms.

---

[184]    Ms. Verrier denies DSMF ¶ 95 because she "requested a copy of the letter, but Defendant has been unable to produce the letter."  PRDSMF ¶ 95.  BTB responds that the Court should reject the denial because Ms. Verrier does not controvert the substance of the asserted fact nor does her citation support the denial.  The Court rejects Ms. Verrier's denial and includes DSMF ¶ 95.  Ms. Verrier does not refute that Mr. Hutchinson wrote her a letter of recommendation, which is what DSMF ¶ 95 contends, only that she has not received a copy of it.  Moreover, the Court agrees that Ms. Verrier's denial is not supported by the record and neither of the two Loranger Affidavits, upon which she bases her objection, refers to a letter of recommendation.  *See Aff. of Guy D. Loranger* (ECF No. 78); *Aff of Guy D. Loranger* (ECF No. 81).

[185]    Ms. Verrier denies DSMF ¶ 96 and states that "Defendant rejected [her] request to transfer to the North Carolina plant."  PRDSMF ¶ 96.  She explains: "Asquith testified Defendant rejected Verrier's request to transfer because 'ultimately what ended up happening is the factory down there ended up shutting down…that was in the fall of when she (Verrier) had the inquiry, so I think that was the fall of 2019."  PRDSMF ¶ 96.  Ms. Verrier asserts that "The North Carolina [facility] did not close.  It is open to this day" and that her "application lists her status as 'Rejected' and identified the 'Source' as 'Give "other" Explanation.'  The Source is 'where the applicant applied from.'"  PRDSMF ¶ 96.  In response BTB says that Jared Lyman, its designated corporate representative, "testified that Asquith mistakenly testified that the Charlotte plant closed."  PRDSMF *Resp.* ¶ 96.  Moreover, BTB says that "Plaintiff's cited evidence is inaccurate and mischaracterized, as Plaintiff's counsel, and not Mr. Lyman, testified as to the contents of Verrier's application, and which Plaintiff's counsel did not show to Lyman."  PRDSMF *Resp.* ¶ 96.  The Court rejects Ms. Verrier's denial as nonresponsive to DSMF ¶ 96.  Ms. Verrier does not deny that BTB filled the position in Charlotte on October 15, 2019, by hiring Terrance Lee.  *See* DSMF, Attach. 5, *Ex. E: Dep. of Jared Lyman* at 8:1-9:16.  Moreover, Ms. Verrier admitted that she completed her application for the Charlotte facility on October 27, 2019.  *See* PRDSMF ¶ 90.  Thus, there is no dispute that BTB filled the position before Ms. Verrier applied.  Moreover, to the extent that Ms. Verrier would like the record to reflect that Ms. Asquith said the Charlotte facility closed, that fact is included elsewhere in the Court's recitation of the facts.

Verrier's October 27 application.[186]  DSMF ¶ 97; PRDSMF ¶ 97.  BTB notified Ms.

Verrier on November 12, 2019, and rejected her request to transfer to the North

Carolina plant.[187]  DSMF ¶ 97; PRDSMF ¶ 97; PSAMF ¶ 191; DRPSAMF ¶ 191.  Ms.

Asquith testified that BTB rejected Ms. Verrier's request to transfer because

"ultimately what ended up happening is the factory down there ended up shutting

down" which she believed happened in the fall of 2019.[188]  PSAMF ¶ 192; DRPSAMF

¶ 192.  Jared Lyman, BTB's Northeast Regional HR Director testified that he thought

"there was some confusion with Ms. Asquith" because "[t]here was a plant in North

Carolina that had been closed in Red Boiling Springs" but the "Charlotte plant still

remains open."[189]  PSAMF ¶ 193; DRPSAMF ¶ 193; *Lyman Dep.* at 18:10-13.  Ms.

Verrier's application lists her status as "Rejected" and identified the "Source" as "Give

'other' Explanation."  PSAMF ¶ 194; DRPSAMF ¶ 194.  Mr. Lyman's understanding

---

[186]    Both parties offer the same denials and responses to DSMF ¶ 97 as they did to DSMF ¶ 96.  For the same reasons discussed in the previous footnote, the Court rejects Ms. Verrier's denial and admits DSMF ¶ 97.

[187]    BTB qualifies Ms. Verrier's characterization that BTB "rejected" her request to transfer to North Carolina and recites its facts related to BTB hiring Terrance Lee, and the timing of Ms. Verrier's application.  DRPSAMF ¶ 191.  The Court rejects BTB's qualification and includes PSAMF ¶ 191 as supported by the record and because BTB's additional context has already been included elsewhere in the Court's recitation of facts.  Moreover, BTB itself characterizes its actions as a "reject[ion]" of Ms. Verrier's application.  *See* DSMF ¶ 97.

[188]    BTB denies this fact and explains that the testimony is misquoted.  DRPSAMF ¶ 192.  The Defendant then reiterates facts related to the hiring of Terrance Lee.  DRPSAMF ¶ 192.  The Court rejects BTB's qualification because the fact BTB seeks to have admitted is already on the record and PSAMF ¶ 192 is supported by the record citation.

[189]    PSAMF ¶ 193 originally states that "[t]he North Carolina did not close.  It is open to this day," which BTB qualifies.  DRPSAMF ¶ 193.  BTB cites Jared Lyman's testimony in which he stated, "I think there was some confusion with Ms. Asquith.  There was a plant in North Carolina that had been closed in Red Boiling Springs.  The Charlotte plant still remains open."  *Lyman Dep.* at 18:10-13.  The Court accepts BTB's qualification and includes PSAMF ¶ 193 but adds Mr. Lyman's full statement and the context for the statement.

was that "source" would potentially be where the applicant applied from.[190]  PSAMF ¶ 195; DRPSAMF ¶ 195.

Ms. Verrier did not apply for any other positions with BTB, in Charlotte or elsewhere, after submitting the October 27 application.  DSMF ¶ 98; PRDSMF ¶ 98.

### M.    December 2019 Incident and Response.

In December of 2019, management assigned Ms. Verrier to cross-train a co-worker, Lincoln Skelton.  PSAMF ¶ 196; DRPSAMF ¶ 196.  On December 15, 2019, Ms. Verrier told Aaron Chabot, a back-up shift supervisor, that Danielle Barrett, a D-Shift production technician employee who was friends with Ms. Verrier, that Paul Cox, a shift supervisor, said to Ms. Barrett: "Oh Heather is training Lincoln, she must

---

[190]    PSAMF ¶ 195 originally states that "[t]he Source is 'where the applicant applied from.'"  PSAMF ¶ 195.  BTB qualifies this statement because "Plaintiff's cited evidence is inaccurate and mischaracterized.  Plaintiff's counsel testified as to the contents of Verrier's application, which Lyman did not recall, and which Plaintiff's counsel did not show to Lyman."  DRPSAMF ¶ 195.  In the light most favorable to Ms. Verrier, the Court accepts PSAMF ¶ 195 as supported by the record cited but alters the fact to reflect that it was Mr. Lyman's understanding that "source" would potentially refer to where the applicant was from.  *See Lyman Dep.* at 26:15-27:15

be fucking him too."[191, 192, 193]  DSMF ¶¶ 99-100; PRDSMF ¶¶ 99-100; PSAMF ¶¶ 197-198; DRPSAMF ¶¶ 197-198.  Mr. Cox worked on the A-shift, from 5:30 a.m. to 6:30 p.m.; he did not work on the same shift as Ms. Verrier.[194]  DSMF ¶ 101; PRDSMF ¶ 101.

---

[191]    DSMF ¶ 100 originally reads: "On December 15, 2019, Plaintiff told Aaron Chabot, a back-up shift supervisor, that Barrett told her that during a conversation between Barrett and employee Paul Cox, Cox told Barrett that Plaintiff 'was probably sleeping [with the new guy] too.'"  DSMF ¶ 100.  Ms. Verrier denies this fact and says that "Barrett told Verrier that in a pre-shift meeting, supervisor Paul Cox said, 'Oh, Heather is training Lincoln, she must be fucking him too.'"  PRDSMF ¶ 100.  BTB responds that the denial does not controvert the substance of the stated fact and that the Plaintiff's citation does not support the denial.  Viewing the record in the light most favorable to Ms. Verrier the Court accepts her denial and updates DSMF ¶ 100 to be consistent with Ms. Verrier's quoted language, which is supported by the cited HR investigation report.  *See Asquith Dep.*, Ex. 10, *Dec. 16, 2019, Investigation Report Mgt. Mins.* at 2 (Dec. 16, 2019 *HR Investigation Rep.*).  However, the Court excludes references to the comment being made at a pre-shift meeting as unsupported by the record.

[192]    PSAMF ¶ 197 states: "In a pre-shift meeting, supervisor Paul Cox said, 'Oh, Heather is training Lincoln, she must be fucking him too.'"  PSAMF ¶ 197.  BTB denies this fact because the testimony "speaks for itself."  DRPSAMF ¶ 197.  This is not a proper objection.
    BTB then reiterates its version of the facts, as submitted in DSMF ¶ 100.  In accordance with the Court's resolution of the parties' dispute over DSMF ¶¶ 99-100, the Court includes the Plaintiff's version of Mr. Cox's statement as supported by the HR report.  The fact that Ms. Barrett could not recall when or where the comment was made is reflected elsewhere in the Court's recitation of fact and the Court omitted Ms. Verrier's specific reference to a pre-shift meeting.

[193]    PSAMF ¶ 198 states that "Danielle Barrett, a production technician present at the meeting, told Verrier of the comment."  PSAMF ¶ 198.  BTB denies this fact and states that "On December 16, 2019, Danielle Barret told Asquith 'that she was speaking with Paul made an off-side comment about how 'she is probably sleeping with Lincoln now.'. . . Barrett could not recall when or where she heard the comment. . . . Hutchinson testified that this did not take place during a meeting and instead was a conversation he overheard between Cox and Plaintiff's friend, Barrett."  DRPSAMF ¶ 198.  The Court overrules BTB's denial to the extent that BTB does not properly controvert that Danielle Barrett was a production technician and that she told Ms. Verrier about Mr. Cox's comment.  However, the Court does accept BTB's denial that Ms. Barrett was "present at the meeting" as unsupported by the record, as Ms. Asquith's Investigation Report makes no reference to where she heard the comment.

[194]    Ms. Verrier denies this statement stating that Mr. Cox's shift did overlap, at the beginning and end of her shift, which was from 6:00 p.m. to 6:00 a.m..  PRDSMF ¶ 101.  BTB responds that the denial does not controvert the substance of its fact and that "[i]t is undisputed that Cox worked on the A-Shift and Verrier worked on the B-Shift."  PRDSMF ¶ 101 *Resp.*  The Court rejects Ms. Verrier's denial as beyond the scope of DSMF ¶ 101 because Ms. Verrier does not contest the basic timing that Mr. Cox worked from 5:30 a.m. to 6:30 p.m., or that she was not assigned to the same shift.  Furthermore, the record already reflects that Ms. Verrier worked the 6:00 p.m. to 6:00 a.m. shift.  *See* DSMF ¶¶ 16-17.

Ms. Verrier reported the incident to Mr. Chabot who told Ms. Verrier to call HR.[195] PSAMF ¶ 199; DRPSAMF ¶ 199.  Ms. Verrier did not want Mr. Chabot to report Mr. Cox's alleged statement to HR or anyone else at Poland Spring.[196]  DSMF ¶ 102; PRDSMF ¶ 102.  Mr. Chabot reported Mr. Cox's alleged statement to Mr. Hutchinson, Ms. Verrier's supervisor.  DSMF ¶ 103; PRDSMF ¶ 103.  Mr. Hutchinson then reported the allegation to Ms. Asquith.  DSMF ¶ 104; PRDSMF ¶ 104.  Ms. Asquith interviewed Ms. Verrier and Ms. Barrett regarding Mr. Cox's alleged statement.  DSMF ¶¶ 105-106; PRDSMF ¶¶ 105-106.  Ms. Barrett confirmed that Mr. Cox made a comment about "how [Ms. Verrier] is probably sleeping with Lincoln now."[197]  PSAMF ¶ 200; DRPSAMF ¶ 200.  When asked what day the comment

---

[195]     PSAMF ¶ 199 states that "[t]he comment upset Verrier so much, she reported it to supervisor Aaron Chabot who reported Verrier's complaint to Asquith."  PSAMF ¶ 199.  BTB denies this fact because "Plaintiff spoke with Aaron Chabot, who told Plaintiff to call HR.  Plaintiff subsequently called Asquith."  DRPSAMF ¶ 199 (internal citations omitted).  The cited portion of the Investigation Report states:

- Jennifer received a phone call from the factory at 10:20pm from Heather Verrier
- Heather said that she was told to call HR from Aaron Chabot, Backup Shift Lead
  B Shift, to speak with HR about what she had told him.

Dec. 16, 2019, *HR Investigation Rep.* at 2.  The Court agrees with BTB that the record does not support Ms. Verrier's statement that Mr. Chabot reported the complaint to Ms. Asquith.  The Court therefore accepts BTB's denial as to this detail and includes PSAMF ¶ 199 but revises the statement of fact to reflect more accurately the record cited.

[196]     Ms. Verrier denies this statement and asserts that "[t]he comment upset [her] so much, she reported it to supervisor Aaron Chabot who reported Verrier's complaint to Asquith."  PRDSMF ¶ 102 (citing Dec. 16, 2019, *HR Investigation Rep.* at 2-3).  Ms. Verrier's record citation does not support her denial of DSMF ¶ 102.  The report states that "Heather said that she was told to call HR from Aaron Chabot, Backup Shift Lead B Shift, to speak with HR about what she had told him."  Dec. 16, 2019, *HR Investigation Rep.* at 2.  The record states that "Heather was hesitant [about an investigation] but understood," *id.*, but makes no reference to Ms. Verrier being so upset that she reported it to Mr. Chabot.  Furthermore, DSMF ¶ 102 is supported by BTB's record citation because Ms. Verrier testified that she confided in Mr. Chabot without realizing that he was the shift leader and later told Mr. Chabot that she was upset that he called Ms. Asquith.  *Verrier Dep.* at 187:24-188:10.

[197]     BTB "[a]dmit[s] that Asquith spoke with Barrett" but says that "Barrett could not recall when or where she heard the comment."  DRPSAMF ¶ 200.  In the light most favorable to Ms. Verrier, the Court accepts PSAMF ¶ 200.  The fact that Ms. Barrett did not know when or where the comment occurred is included elsewhere in the Court's recitation of the facts.

occurred, where it occurred, and if anyone else heard the comment, Ms. Barrett responded that she did not know when she heard the comment or if anyone else was present and said that it may have occurred in the resource office.[198]   DSMF ¶ 107; PRDSMF ¶ 107.

Ms. Asquith also interviewed Mr. Cox regarding the alleged statement, which Mr. Cox denied making.   DSMF ¶¶ 108-109; PRDSMF ¶¶ 108-109; PSAMF ¶ 201; DRPSAMF ¶ 201.   Ms. Asquith informed Mr. Cox that the alleged statement was inappropriate and unprofessional, and Mr. Cox assured her that he understood this, although Ms. Asquith did not document this counseling.[199]   DSMF ¶ 110; PRDSMF ¶

---

[198]   DSMF ¶ 107 states: "Barrett would not provide details about when or where the statement was made."   DSMF ¶ 107.   Ms. Verrier denies this statement and asserts that "Barrett told Asquith that while in the 'resource office' Cox said 'she (Heather) is probably sleeping with Lincoln now.'"   DRPSAMF ¶ 107 (citing Dec. 16, 2019, *HR Investigation Rep.* at 3).   In response BTB says that "[e]ven as set forth in Plaintiff's cited evidence, '[Barrett] said she doesn't know when she heard it' and Barrett said it was 'maybe in the resource office.'"   PRDSMF *Resp.* ¶ 107 (quoting Dec. 16, 2019, *HR Investigation Rep.* at 3).

The cited HR Investigation Report states:

- Jennifer asked what day that she heard the comment as Heather thought that it was last Tuesday 12/10.   Danielle said she doesn't know when she heard it.
- Jennifer asked where the comment was said and if it was in the lobby or in the resource office.   Danielle said it was maybe in the resource office.
- Jennifer asked if anyone else was in the resource office at the time that the comment was made.   Daniel said I don't know.

Dec. 16, 2019, *HR Investigation Rep.* at 3.   The Court partially accepts both DSMF ¶ 107 and Ms. Verrier's denial and includes DSMF ¶ 107 but with a more accurate characterization of Ms. Barrett's responses to Ms. Asquith's investigation.

[199]   Ms. Verrier denies DSMF ¶ 110 because "[i]n Asquith's investigative summary of her interview with Cox, Asquith did not document informing Cox the alleged statement was inappropriate and [un]professional, and Cox assured that he understood."   PRDSMF ¶ 110.   In response to the denial BTB points to Ms. Asquith's deposition as support for its statement of fact.   PRDSMF *Resp.* ¶ 110.   DSMF ¶ 110 is adequately supported by BTB's record citation although Ms. Verrier is correct, based on her record citation, that Ms. Asquith did not document BTB's counseling with Mr. Cox.   In the light most favorable to Ms. Verrier, the Court notes that the counseling was not documented.

110. According to the Investigation Report, HR did not take any additional action against Mr. Cox.[200]  PSAMF ¶ 202; DRPSAMF ¶ 202.

### N.  Bottle Contamination

In late 2020, Mr. Vienneau falsely accused Ms. Verrier of not cleaning her line, causing contamination in the bottled water.[201]  PSAMF ¶ 205; DRPSAMF ¶ 205.  Mr. Vienneau came to take photographs of her work area, which was highly unusual for the plant manager to do.  PSAMF ¶ 205; DRPSAMF ¶ 205.

### O.  Heather Verrier's Resignation

Ms. Verrier continued to work at BTB until she suddenly resigned from employment on March 15, 2021.[202]  DSMF ¶ 111; PRDSMF ¶ 111. Ms. Verrier's Annual Performance Evaluations from her hire date through her resignation reflect that she performed well in her role and Ms. Verrier testified that Mr. Hutchinson was always pleased with her performance."  DSMF ¶ 112; PRDSMF ¶ 112.

---

[200]     BTB denies PSAMF ¶ 202 because the cited testimony speaks for itself and Ms. Asquith "explained the importance of a comment like this being investigated" and testified "that obviously comments like that have no place in the workplace and that we don't have a tolerance for them." DRPSAMF ¶ 202 (first citing Dec. 16, 2019, *HR Investigation Rep.* at 4-5, then *Asquith Dep.* at 40:10-19).  The speaks for itself objection is improper.  BTB's assertion related to Ms. Asquith counseling Mr. Cox appears elsewhere on the record.  The Court includes PSAMF ¶ 202 but revises the fact to reflect that there is no indication that BTB administered additional discipline to Mr. Cox based on the Investigation Report.

[201]     BTB objects to PSAMF ¶ 205 because of Ms. Verrier's reliance on her affidavit and because she never received any counseling for the incident and was never written up.  DRPSAMF ¶ 205. Taking the facts in the light most favorable to Ms. Verrier, the Court includes PSAMF ¶ 205 as supported by the record.  The importance of the fact that Ms. Verrier was never written up or disciplined is an issue of credibility and weight of the evidence for the factfinder at trial.

[202]     Ms. Verrier contests the statement that she "continue[d] to work without incident" and states that she was treated differently after she filed her MHRC complaint, she stopped getting overtime, and managers complained about her clocking in or out early.  *See* PRDSMF ¶ 111.  In the light most favorable to Ms. Verrier as the nonmoving party, the Court accepts Ms. Verrier's denial because whether there were additional "incidents" contributing to a hostile work environment is an issue for a factfinder.  Furthermore, the Court rejects BTB's assertion that it should not credit Ms. Verrier's denial just because she relies on her post-summary judgment affidavit.  *See* PRDSMF *Resp.* ¶ 111.

By early 2021, Ms. Verrier knew she could not continue to work at Poland Springs.[203] PSAMF ¶ 206.  She testified that she hated to go to work each day because of the work environment, the stress and what she had experienced and that she believed the company was trying to create a reason to fire her.  PSAMF ¶ 206.  She says that the overall conditions, past and present, forced her to resign.  PRDSMF ¶ 206.  Ms. Verrier decided to leave her shift and resign on the spur of the "moment."[204] DSMF ¶ 113; PRDSMF ¶ 113.  Ms. Verrier's friend, Ms. Barrett, resigned on or about March 14, 2021, one day before Ms. Verrier resigned, to take a job at Abbott Laboratories.  DSMF ¶ 114; PRDSMF ¶ 114.

Ms. Verrier is a Certified Nursing Assistant (CNA), and she began working as a CNA after resigning from employment at BTB.  DSMF ¶ 115; PRDSMF ¶ 115.  Ms. Verrier testified that she is working as a CNA because she missed working as a nurse's aid.[205]   DSMF ¶ 116; PRDSMF ¶ 116.   Ms. Verrier testified that Mr. Hutchinson was a good boss, he was sorry she resigned, and he did not want her to

---

[203]     BTB denies PSAMF ¶ 206 because Ms. Verrier relies on her affidavit.  The Court overrules BTB's objection and includes PSAMF ¶ 206.

[204]     Ms. Verrier denies this statement and says that she "resigned because she 'was anxious about being there …upset to be at work most of the time every day…because Poland Spring had let me know…they should have taken of when I was being harassed.'"  PRDSMF ¶ 113 (citing *Verrier Dep.* at 58:15-15).  The Court rejects Ms. Verrier's denial and includes DSMF ¶ 113 as Ms. Verrier's denial does not properly controvert the fact that she decided to resign on the spur the moment, regardless of the underlying reason for her resignation.  BTB's fact is included.

[205]     Ms. Verrier denies this statement and says that she "is working as a CNA because she enjoys the work, and Defendant forced her to resign from Poland Springs because of the environment."  PRDSMF ¶ 116 (citing *Verrier Aff.* ¶ 26).  BTB reject this denial because it contains an improper conclusion of law and does not properly controvert DSMF ¶ 116.  The Court rejects Ms. Verrier's denial and admits DSMF ¶ 116.  Ms. Verrier's denial is beyond the scope of the stated fact and BTB's fact is supported by Ms. Verrier's own deposition testimony.  *Verrier Dep.* at 28:22 ("Q. And what caused you start working for We Get Staffed [as a CNA]?  A. Because I missed working as a nurse aide").

leave. [206]  DSMF ¶ 117; PRDSMF ¶ 117.  Ms. Verrier did not see Mr. Campbell again at the Poland Spring facility after July 2, 2019, and she did not resign from employment with Poland Spring until March 15, 2021. [207]  DSMF ¶ 118; PRDSMF ¶ 118.

## III.  THE PARTIES' POSITIONS

### A.  BlueTriton Brands' Motion for Summary Judgment

#### 1.  Hostile Work Environment Claim

BTB first argues that Ms. Verrier "cannot establish a prima facie case of hostile work environment sexual harassment." *Def.'s Mot.* at 10.  Recounting the six-pronged standard for proving a prima facie case, it submits that "[t]he alleged harassment

---

[206]    Ms. Verrier qualifies DSMF ¶ 117 because "Hutchinson did not properly handle the notice from Golob and Verrier about Campbell's harassment." PRDSMF ¶ 117 (citing PSAMF ¶¶ 38-64).  BTB responds that the Court should strike the qualification because the statement does not controvert DSMF ¶ 117, it states improper conclusions of law, and "incorporate[s] over twenty-five allegations and corresponding citations, which are not expressly referenced, in support of her nonresponsive qualification." PRDSMF *Resp.* ¶ 117.

The Court rejects Ms. Verrier's qualification and includes DSMF ¶ 117. First, Ms. Verrier does not properly support her qualified response as she cites twenty-six of her additional statements of material fact, which is not a "specific" citation under Local Rule 56(f). *See* D. ME. LOC. R. 56(f). Second, Ms. Verrier's qualified response is not responsive to whether she testified as alleged.

[207]    PSAMF ¶ 207 states "Kaitlin Bean worked at Defendant's plant in 2019. Bean subsequently filed an application for a Temporary Restraining Order against Derrick Campbell. The Court granted the TRO." PSAMF ¶ 207. BTB objects to the inclusion of this fact because the supporting "affidavit and exhibits are wholly unrelated to the material elements of Defendant's motion for summary judgment and are filed in bad faith." DRPSAMF ¶ 207. BTB further points out that Ms. Verrier violates Federal Rule of Civil Procedure 5.2(a) by "improperly publicly fil[ing] a document containing the full name and birth date of a minor child, as well as the full birth date and address of nonparties, including Derrick Campbell, who appears to be the father of the minor child." DRPSAMF ¶ 207. The Court agrees with BTB as to the relevance of this fact and omits PSAMF ¶ 207. Although Ms. Bean worked for BTB in 2019, she did not file for a protection from abuse order against Mr. Campbell until February 19, 2021, more than one year after Mr. Campbell resigned from BTB in August 2019. *See Aff. of Guy D. Loranger*, Attach 1., *Compl. for Protection from Abuse* at 1 (ECF No. 81). Absent additional explanation as to the relevance of this fact, Ms. Bean's protection from abuse complaint and order in 2021 does not make it more or less probable that Mr. Campbell harassed Ms. Verrier one year prior in May-July 2019. *See* FED. R. EVID. R. 401 and 402.

was neither severe nor pervasive, nor did it alter the conditions of [Ms. Verrier's] employment and create an abusive work environment." *Id.* at 11.

BTB submits that even though "pervasiveness and severity are sometimes questions of fact, these standards are subject to thresholds and summary judgment is appropriate in order to 'polic[e] the baseline for hostile work environment claims.'" *Id.* at 12 (alteration in BTB's motion) (quoting *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 84 (1st Cir. 2006)). It argues that the alleged harassing conduct was not severe or pervasive and characterizes it as "four (4) distinct occasions spanning a ten (10) month period" where "[inappropriate and offensive] incidents amount[ing] to no more than childish and unprofessional behavior" occurred. *Id.* at 14. The comments at issue in this case are, BTB alleges, "precisely the type of isolated, meddlesome comments the First Circuit already has deemed insufficient to constitute actionable sexual harassment." *Id.*

BTB contends that although Mr. Campbell's conduct in June 2019 (making light of being counseled by HR and talking with another co-worker in Ms. Verrier's vicinity) demonstrates his "apparent disregard for BTB's Policy Against Harassment and Discrimination, this conduct resulted in his suspension and subsequent resignation from employment." *Id.* Furthermore, it argues that Mr. Cox's "one-time, unprofessional remark to . . . [Ms.] Barrett, was isolated and unrelated to [Mr.] Campbell's conduct and does not rise to the level of actionable harassment." *Id.* BTB says that "the conduct about which [Ms. Verrier] complains does not move beyond the realm of 'merely offensive' into the realm of unlawful conduct." *Id.* It emphasizes

that although Ms. Verrier did not work the day after the incident with Mr. Campbell, she "continued working at BTB for nearly two full years after Campbell's resignation" and failed to "identify a single instance of harassing conduct between June 8, 2019 and her March 15, 2021 impromptu resignation." *Id.* at 14-15.

BTB further submits that "[t]he alleged harassing conduct did not alter the conditions of [Ms. Verrier's] employment and create an abusive work environment. In particular, BTB highlights that Ms. Verrier's "performance evaluations reflect BTB's opinion that she performed well and was a valued employee" and that "[Mr.] Hutchinson commented that he was sorry to lose her when she resigned." *Id.* at 15. In sum, BTB argues that "[t]here is not one iota of evidence in the record supporting that [Ms. Verrier's] work environment was abusive, much less that it was abusive at any time from June 8, 2019 through her March 2021 resignation." *Id.* at 15.

Second, BTB argues that Ms. Verrier "cannot establish the fifth element of her hostile work environment sexual harassment claim" because "[t]here is no evidence that the sexually objectionable conduct was both objectively and subjectively offensive such that a reasonable person would find it hostile or abusive and the victim did in fact perceive it to be so." *Id.* It recites that "[i]n determining whether an environment [is] objectively hostile or abusive, courts look to all of the attendant circumstances" including the conduct's severity and frequency, whether the conduct is threatening or humiliating or merely offensive, and whether the conduct unreasonably interferes with work performance. *Id.* at 15-16. Under these factors BTB argues that the conduct was not frequent because there were only four isolated

incidents and because no reasonable person would consider a co-worker laughing at Ms. Verrier's eyebrows, giving her the middle finger, staring at her from a distance or making light of being counseled to "objectively rise to the level of severity required for an actionable hostile work environment sexual harassment claim." *Id.* at 16.

As to Ms. Verrier's subjective perception that Mr. Campbell's conduct was offensive, BTB acknowledges that Ms. Verrier "suffered several traumatic experiences unrelated to BTB that subjectively may have impacted her reaction to the behavior about which she complains." *Id.* at 16 n.1. It submits that, despite these experiences, Ms. Verrier's "subjective views alone are immaterial in order to establish a prima facie case" as the conduct must also be objectively offensive. *Id.*

Third, BTB contends that "[t]here is no basis for employer liability" because "BTB took prompt and appropriate remedial action." *Id.* at 17. Recounting BTB's responsive actions following the alleged offensive conduct, it says that it was "required to take only those remedial steps that are 'reasonably calculated to end the harassment,'" *id.* at 17-18 (quoting *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001)), but that BTB was "not required to be perfect." *Id.* at 18.

## 2. Retaliation Claim

Applying the three-pronged prima facie standard for a retaliation claim, BTB argues that Ms. Verrier's "retaliation claim fails as a matter of law because she was not subjected to any adverse employment action." *Id.* at 19. Moreover, it argues that Ms. Verrier's "'protected activity' cannot possibly be deemed the 'but for' cause of any alleged adverse employment action." *Id.* In particular, BTB contends that "[m]inor disruptions in the workplace, including 'petty slights, minor annoyances, and simple

lack of good manners,' fail to qualify" as adverse actions. *Id.* (quoting *Morales-Vallellanes v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010)). "To the extent [Ms. Verrier] argues the denial of a transfer to BTB's North Carolina facility constitutes a 'materially adverse' employment action," BTB submits that "this would not support a prima facie case" because she "cannot demonstrate that the North Carolina position involved a favorable change in salary or responsibility and lateral transfers are not necessarily actionable." *Id.* at 20. Furthermore, BTB points to the timing of Ms. Verrier's application and contends that "even if the failure to hire [her] for the North Carolina position was actionable, [she] cannot establish *any* causal connection between her protected conduct and the alleged adverse action" because she "sought the transfer months after the alleged harasser resigned and she applied for the position after it was filled." *Id.* Finally, BTB argues that Ms. Verrier "has not disputed that the employee who was hired was more qualified than she for the position." *Id.*

### B.   Heather Verrier's Opposition

#### 1.   Hostile Work Environment

In opposition, Ms. Verrier first argues that there is "[a] triable issue of fact . . . as to whether the harassment by [Mr.] Campbell and [BTB] was severe or pervasive to alter conditions of employment." *Pl.'s Opp'n* at 12. She submits that "there is no requirement that harassment occur more than one time to be actionable," *id.* (quoting *Nadeau v. Rainbow Rugs*, 675 A.2d 973, 1996 Me. LEXIS 271, at *6 (Me. 1996)), and that because there is no "mathematically precise test" for determining whether conduct is threatening or humiliating "these are questions best left for the jury." *Id.*

(first quoting *Chunghi Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 40 (1st Cir. 2003), then *Ricci v. Applebee's Ne., Inc.*, 301 F. Supp. 2d 51, 53-54 (D. Me. 2004)).

Setting out a timeline of conduct between January and December 2019, Ms. Verrier says that "[t]he totality of the relevant record allows a trier of fact to reasonably infer that Campbell's harassment flowed from Verrier's rejection of his advances; that Campbell harassed Verrier to retaliate and intimidate her because she would not go out with him." *Id.* at 14-15. She also contends that "[a] trier of fact could further reasonably infer that Defendant ignored and enabled Campbell's harassment; that Defendant further enabled . . . Campbell's harassment by making light of it, continually scheduling Campbell to work adjacent to Verrier, unconsciously blaming Verrier for the harassment[,] and threatening her with termination." *Id.* at 15.

Second, Ms. Verrier points to the same arguments discussed above to show that "a trier of fact could also reasonably . . . infer that the hostile environment was objectively offensive and [she] subjectively perceived it so." *Id.*

Third, Ms. Verrier argues that "[a] jury could reasonably infer that [BTB] knew or should have known about the harassment, yet it failed to take prompt and appropriate remedial action." *Id.* She says that "[a]n employer who receives notice of possible sexual harassment, has a duty to take steps reasonably designed to remedy the environment." *Id.* Ms. Verrier says the record "contains much evidence from which a trier of fact could reasonably conclude that Defendant failed miserably in complying with its duty." *Id.* Specifically she says that "Golob and Verrier gave

Hutchinson notice of Campbell's harassment, yet Hutchinson took no action whatsoever to investigate the harassment" but instead "simply made a narrow and unsuccessful attempt to keep Campbell away from Verrier." *Id.* at 15-16. Ms. Verrier also says that Ms. Asquith "intentionally downplayed and then made light of [the May 21, 2019] incident by simply having Campbell sign off on the sexual harassment policy, assuring him it was no big deal, and taking no action pursuant to [BTB's] PDP Policy, then scheduling Campbell to work adjacent to Verrier in his first shift back in the work place." *Id.* at 16. Ms. Verrier argues that Ms. Asquith "again limited the scope of her [second] investigation, she did not speak to the witness Golob or any other employees, she unreasonably believed Campbell's denials, she did not take any disciplinary action against Campbell, and management unconsciously blamed Verrier for the harassment." *Id.*

## 2. Retaliation Claim

As to her retaliation claim, Ms. Verrier submits that "[a] trier of fact could reasonably infer that [she] has established the prima facie case of retaliation based on [BTB's] denial of her request to transfer" to the North Carolina plant. *Id.* at 17. In particular she characterizes BTB's arguments that she cannot meet the second and third elements of her prima facie retaliation claim as "misplaced." *Id.* "Regarding the second element," Ms. Verrier argues that she "sought to transfer to the North Carolina plant for a fresh start, to escape the hostile work environment at [BTB's] plant in Maine." *Id.* In essence, she says that "[t]he transfer would provide [her] a much more favorable work environment by not having to deal with the fallout and retaliation from her complaints of sexual harassment." *Id.*

80

As to the third element, Ms. Verrier submits she "engaged in protected activity under the MHRA by making her complaints of harassment in May and June of 2019 and [with] the filing of her MHRC complaint in September of 2019." *Id.* at 18.  She says that it was "[s]hortly thereafter, in late October/early November of 2019, that [BTB] denied the transfer."  *Id.*  Ms. Verrier proffers that "the short temporal relationship between the protected activity and the adverse action is sufficient to satisfy the causal link at the prima facie stage."  *Id.*

Finally, Ms. Verrier contends that she "also asserts additional retaliatory adverse employment actions."  *Id.*  She identifies the following "actionable retaliatory adverse actions: The hostile environment created by Campbell, Defendant's enabling of Campbell's workplace harassment, Vienneau's threat to terminate Verrier, management's rudeness and ostracism towards Verrier, management's increased criticism of Verrier, Verrier's constructive discharge, denying Verrier overtime, and denying Verrier the opportunity to obtain her forklift license."  *Id.* at 20.

### C.   BlueTriton Brands' Reply

#### 1.   Hostile Work Environment

In reply BTB argues that Ms. Verrier's opposition "relies on immaterial facts, unsupported conclusory statements, and blatant misstatements of undisputed record evidence."  *Def.'s Reply* at 1.  In particular, BTB submits that many of the facts that Ms. Verrier contends are disputed are clearly not in dispute based on the parties' statements of material fact.  *See id.* at 2.

BTB goes on to reiterate that there is "no evidence of severe or pervasive conduct" in this case based on the "totality of the circumstances."  *Id.* at 3.  It says

that even assuming that "Campbell 'pestered' [Ms. Verrier], 'disparaged' her on social media, laughed at her, and 'gave her the finger,' between January-March 2019, [she] cites no authority supporting an argument that such conduct can be considered severe or pervasive." *Id.* It further submits that Ms. Verrier "presents no evidence regarding how many times Campbell allegedly asked her out or what she said in response" and instead "admits to voluntarily socializing with Campbell and other coworkers outside of work." *Id.* BTB argues that "[t]he undisputed facts show that Campbell's alleged 'vulgar' comment, as well as that of Paul Cox, were few and isolated" and that BTB "promptly addressed each comment, as well as [Ms. Verrier's] report of Campbell's 'floating' or 'hanging around' her work area, first by counseling Campbell, then by suspending him twice and warning he would be terminated if he approached [her] again." *Id.* at 3-4. Moreover, BTB says that Ms. Verrier "provides absolutely no evidentiary support for her contention that Campbell vandalized another employee's vehicle (not [her's]), or that this was related to [her]." *Id.* at 4.

Furthermore, BTB repeats that there is "no evidence of altered employment conditions creating [an] abusive work environment" and argues that Ms. Verrier "has not identified any evidence (much less 'specific facts') demonstrating that any alleged conduct 'altered' her employment or negatively affected her ability to work as a Production Operator." *Id.* at 4. It further submits that although Ms. Verrier "asserts she was absent a few times due to alleged 'panic,' she provides no evidence reflecting that this affected her work performance or altered her job conditions, nor does she identify when or how often this occurred." *Id.* It says instead that "the record

82

establishes that [BTB] gave [Ms. Verrier] overwhelmingly positive performance evaluations; Hutchinson thought she was a great employee . . . [and] provided her with a positive letter of recommendation . . . ; and Asquith provided a positive recommendation without reservation when [Ms. Verrier] expressed interest in working at another facility." *Id.* Ultimately, BTB proffers that "[e]ven viewing the facts in a light most favorable to [Ms. Verrier], the work environment was not objectively hostile or abusive" and she "cites no case law supporting her claim that a reasonable person would find the alleged conduct as hostile and abusive." *Id.* at 4.

Finally, BTB reiterates that there is "no basis for employer liability" here and that Ms. Verrier "acknowledges [BTB] took prompt remedial action in response to the reported complaints, but she ignores well-settled law and claims [its] actions were inadequate." *Id.* at 4-5.

### 2.     Retaliation Claim

Regarding Ms. Verrier's retaliation claim, BTB argues that her "reliance on *Gu v. Boston Police Department*, 312 F.3d 6 (1st Cir. 2002) is inapposite." *Id.* It says that in *Gu* the "court found that even though the plaintiffs lost some supervisory authority, were excluded from office meetings and suffered diminished communication regarding office matters, those actions were not adverse" nor did the "protected activity of filing a sex discrimination claim . . . cause these changes." *Id.* at 5-6.

BTB reiterates that there is "no evidence of a materially adverse employment action" because it filled the North Carolina position on October 15, prior to receiving Ms. Verrier's application on October 27. *Id.* at 6. It contends that Ms. Verrier's other

"vague and entirely unsubstantiated references to other allegedly adverse employment actions . . . are neither supported by record evidence nor materially adverse under applicable law." *Id.* BTB argues that "[t]hese are precisely the type of conclusory allegations lacking factual record support the First Circuit deemed insufficient to ward off summary judgment." *Id.*

Again, BTB argues that there is "no causal connection" and that the First Circuit has made clear that "[e]ven in retaliation cases, where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Id.* (quoting *Vives v. Fajardo*, 472 F.3d 19, 21 (1st Cir. 2007)). It says that even if the Court were to find BTB's rejection of Ms. Verrier's application to the North Carolina facility materially adverse, there is no but-for causal relationship because "it hired a long-term temporary worker from the Charlotte facility on October 15, prior to receiving Plaintiff's application." *Id.* at 7 (emphasis omitted).

BTB also argues that the other alleged conduct that Ms. Verrier claims is "materially adverse" is not causally connected to her June 2019 protected activity. *Id.* It says that Ms. Verrier's "skill set was well beyond the need for forklift training" because "[s]he worked on the most advanced line; it did not make sense to train her on a forklift, it did not impact her job; a forklift license would not have increased her pay, nor facilitated promotion." *Id.* It also says that Ms. Verrier's "position required

more training and more adherence to good manufacturing practices than required of those in inferior positions driving forklifts." *Id.*

Finally, BTB argues that Ms. Verrier "presents no evidence establishing that [it] inappropriately disciplined her at any time during her employment" and that her "subjective beliefs are insufficient to establish her retaliation claim as a matter of law." *Id.*

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'"  *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'"  *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  Then, a court "views the facts and draws all reasonable

inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)).   "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

### A.   Post-Deposition Affidavits in Opposition to Summary Judgment

Preliminarily the Court considers Ms. Verrier's use of post-deposition and post-summary judgment affidavits to oppose BTB's motion for summary judgment, which BTB objects to throughout its response to Ms. Verrier's statement of additional material facts.  *See* DRPSAMF.  First, BTB asserts that Ms. Verrier's own affidavit is "self-serving" because it was "executed after [BTB] moved for summary judgment," the timing of which is "probative of Plaintiff's intent and suggests improper motive." *See, e.g.*, DRPSAMF ¶ 18.  Second, BTB argues that parts of the affidavit are "not factually specific and . . . limited to generalities and conclusory statements." *See, e.g.*, DRPSAMF ¶ 18.

To begin, Rule 56 of the Federal Rules of Civil Procedure states that a party may use an affidavit to "support or oppose a motion [for summary judgment]" if the affidavit is "made on personal knowledge, set[s] out facts that would be admissible in

evidence, and show[s] that the affiant . . . is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). However, under limited circumstances, a party's use of an affidavit to oppose summary judgment may be restricted. First, "[w]hen an interested witness has given clear answers to unambiguous questions, [s]he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." *Colantuoni v. Alfred Calcagni & Sons*, 44 F.3d 1, 4-5 (1st Cir. 1994). In other words, the Court may not consider an affidavit that is nothing more than "an attempt to manufacture an issue of fact in order to survive summary judgment." *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006).

To determine whether an affidavit is an attempt to manufacture an issue of material fact "courts consider the timing of the affidavit, the party's explanation for the discrepancies, and also the number of times the party was deposed." *Sanchez-Estrada v. Mapfre Praico Ins., Co.*, 84 F. Supp. 3d 90, 93 (D.P.R. 2015) (citing *Orta-Castro*, 447 F.3d at 110). As to timing, execution of an affidavit "after the moving party moves for summary judgment suggests ill motive." *Id.* (citing *Colantuonio*, 44 F.3d at 5; *Torres v. E.I. Dupont De Nemours & Co.*, 219 F.3d 13, 20-21 (1st Cir. 2000)); *see also Orta-Castro*, 447 F.3d at 110. Moreover, a post-deposition affidavit may also be suggestive of ill-motive if the affiant was represented by an attorney during the deposition and the attorney had an opportunity to ask clarifying questions or raise additional issues during questioning. *Sanchez-Estrada*, 84 F. Supp. 3d at 93.

Second, an affidavit is insufficient to oppose a motion for summary judgment where it "merely reiterate[s] allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000); *see also Garmon v. AMTRAK*, 844 F.3d 307, 315 (1st Cir. 2016) (concluding that "unsupported, speculative assertions about the way overtime was determined and administered" were insufficient to present a disputed issue of material fact).

On the other hand, however, "[a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment." *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 26 (1st Cir. 2002).  In determining whether an affidavit supplements or contradicts prior deposition testimony, the Court looks at whether an incident is described with more specificity in the affidavit or whether it is a new incident described for the first time in the affidavit.  *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 55 (1st Cir. 2000); *see also Daroczi v. Vt. Ctr. for the Deaf & Hard of Hearing, Inc.*, No. 02-440-JM, 2004 U.S. Dist. LEXIS 1029, at *5 (D.N.H Jan. 28, 2004), *overruled in part on other grounds by Brodeur v. Claremont Sch. Dist.*, 626 F. Supp. 2d 195 (D.N.H. 2009); *Hinkley v. Baker*, 122 F. Supp. 2d 57, 59 n.1 (D. Me. 2000) (concluding that the answer "yes" to a deposition question asking whether the deponent disclosed all bad or offensive conduct did not prohibit the deponent from providing additional details in a subsequent affidavit). This rule still applies even if the affidavit is clearly self-serving.  *See Cadle Co. v. Hayes*, 116 F.3d

957, 961 n.5 (1st Cir. 1997) ("A party's own affidavit, containing relevant information of which [s]he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment").

In *Orta-Castro*, the First Circuit affirmed the district court's decision to disregard a plaintiff's Sworn Statement Under Penalty of Perjury and affidavit in support of her filing in opposition to summary judgment because she did not give "a satisfactory explanation for the subsequent change in her testimony." 447 F.3d at 110. The First Circuit rejected the plaintiff's argument that she was having difficulty with her memory and her excuse that it was only after her deposition that she was able to recall certain events upon reviewing certain documents. *Id.* In doing so, the First Circuit noted that the plaintiff's sworn statement was "executed only after [the defendant] filed its motion for summary judgment" the chronology of which the court found probative of "merely attempting to create an issue of fact." *Id.*; *see also Colantuoni*, 44 F.3d at 5 (finding "it significant that the affidavit was offered only after defendants had filed motions for summary judgment"). The First Circuit further noted that the plaintiff's "memory problems seem to have developed only after [the defendant] filed its summary judgment motion" because when she was deposed on two separate occasions, accompanied by her attorney, she at no point indicated that she was having memory difficulties. *Orta-Castro*, 447 F.3d at 110.

Although the First Circuit has found the timing of the execution of a post-deposition affidavit probative of ill motive, it has not held that a district court may strike a post-summary judgment affidavit solely based on when the affidavit was

filed, without evidence of a contradiction between the testimony. *See, e.g.*, *Escribano-Reyes v. Prof'l Hepa Certificate Corp.*, 817 F.3d 380, 387 (1st Cir. 2016) (finding suspicious timing *in addition* to a contradiction between the affidavit and deposition testimony); *Orta-Castro*, 447 F.3d at 110 (same); *Colantuoni*, 44 F.3d at 4-5 (same).

In *Selfridge v. Jama*, the United States District Court for the District of Massachusetts denied a defendant's motion to strike a plaintiff's post-summary judgment affidavit despite the plaintiff's "last-ditch survival tactic[s]" because "the defendants [did] not adequately identif[y] the determinative feature that would merit [the court's] disregard of the affidavit: direct conflict between the earlier and supplemental testimony." 172 F. Supp. 3d at 413. In *Selfridge* the affidavit was executed four days before the plaintiff filed her opposition to the defendant's motion for summary judgment and without explanation. *Id.* The district court noted that "[t]he defendants point[ed] to only two paragraphs of the affidavit that they consider[ed] to be directly at odds with [the plaintiff's] deposition testimony," and although the affidavit was "perplexing," there was not a "direct contradiction to [the deposition] testimony" that warranted striking the affidavit on that basis. *Id.*; *see also Gammon*, 762 F. Supp. 2d at 168 (stating that not all post-deposition affidavits are barred).

In light of Rule 56(c)'s express allowance of affidavits in support of summary judgment and the First Circuit's position on suspect timing as an additional justification for striking a contradictory subsequent affidavit, the Court adopts the district court's reasoning in *Selfridge*. Thus, the Court rejects BTB's contention that

the Court should strike portions of Ms. Verrier's affidavit solely because the timing of its execution can be probative of ill motive. Here, Ms. Verrier executed her affidavit on March 22, 2022, *see Verrier Aff.*, after BTB filed its motion for summary judgment on March 1, 2022, and before she filed her opposition to BTB's motion for summary judgment on March 25, 2022. As the *Selfridge* Court explained, the timing of Ms. Verrier's affidavit is suggestive of an attempt to manufacture issues of fact to defeat summary judgment. However, this alone is not a sufficient basis for striking the entirety of Ms. Verrier's affidavit. BTB must do more by showing that Ms. Verrier's affidavit contradicts her deposition testimony. *See Torres v. E.I. Dupont de Nemours & Co.*, 219 F.3d 13, 20-21 (1st Cir. 2000) (finding probative the parties' failure to provide any explanation as to why the deponent was changing his testimony in a post-summary judgment affidavit). Given BTB's failure to allege contradictions or discrepancies between Ms. Verrier's deposition and her affidavit, the Court will consider Ms. Verrier's affidavit in resolving this motion for summary judgment.

In addition to challenging Ms. Verrier's use of her own affidavit, BTB also objects to Ms. Verrier's reliance on Tammy Golob's post-summary judgment affidavit. The First Circuit has not expressly spoken on whether the "sham affidavit" doctrine applies to non-party affidavits, however, courts in this Circuit have hesitated to extend the doctrine. For example, in *Mahan v. Boston Water & Sewer Commission*, 179 F.R.D. 49 (D. Mass. 1998), the United States District Court for the District of Massachusetts held that a post-deposition affidavit of a non-party may be used to establish a genuine issue of material fact to defeat summary judgment because "[t]he

judge is not to invade the province of the trier of fact by making credibility determinations or weighing the evidence." *Id.* at 56.

Although Ms. Golob's testimony may be biased in favor of her friend Ms. Verrier, bias is not a sufficient justification to strike an affidavit in the absence of contradictory testimony. In light of *Mahan*, and in light of the long-standing general rule in this Circuit that a self-serving affidavit may be considered as part of the summary judgment record as long as it is based on personal knowledge, the Court rejects BTB's contention that it should strike Ms. Golob's affidavit because it is self-serving and was executed after it filed its motion for summary judgment. *See Cadle Co.*, 116 F.3d at 961 n.5 ("A party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment. The difficulty with Hayes' affidavits is not that they are self-serving but that they neither contain enough specifics nor speak meaningfully to matters within Hayes' personal knowledge" (citation omitted)).

Finally, the Court addresses Mr. Hutchinson's post-deposition errata correction to his deposition testimony. This District has determined that the rules applying to post-deposition affidavits also apply to post-deposition testimonial corrections made pursuant to Federal Rule of Civil Procedure 30(e)(1)(B). *See McDonough v. City of Portland*, No. 2:15-cv-00153-JDL, 2016 U.S. Dist. LEXIS 85192, at *16 (D. Me. June 30, 2016). In this particular case, Mr. Hutchinson executed an

erratum following his deposition. *Hutchinson Dep.* at 80.  His originally testimony reads:

> Q. Okay.  Just to finish on this topic, just to be clear, Gol[o]b goes to you, said that Derrick Campbell is bothering Heather Verrier, she says that he's been asking her questions, and you don't do anything further to investigate the situation; am I correct?
> A. Yes, sir.

*Id.* at 18:4-9.  After the deposition Mr. Hutchinson corrected his answer of "Yes, sir" to "No. I spoke with Heather about Derrick and I don't recall the timing of our conversation or exactly when it happened."  *Id.* at 80.  He states that his reason for changing his testimony: "I cannot recall exactly when I spoke with Heather about Derrick, but I recall that I spoke with her once these issues were brought to my attention and this was not clear from my testimony."  *Id.*  Mr. Hutchinson arguably does not offer a good explanation for changing his testimony because he initially gave a clear response to a clear question and did not indicate at the time of the deposition that he was having any issues with his memory.  Even so, the Court permits Mr. Hutchinson's corrected deposition testimony because Ms. Verrier states in her own deposition that Mr. Hutchinson did speak with her, which is consistent with Mr. Hutchinson's correction.  *See* PSAMF ¶¶ 55-56.  However, even incorporating Mr. Hutchinson's corrected deposition testimony in the record, summary judgment is not appropriate on Ms. Verrier's hostile work environment claim.

### B.      Hostile Work Environment Claim[208]

The Court turns to Ms. Verrier's substantive claims.  The MHRA states that

"[i]t is unlawful employment discrimination, in violation of this Act, . . . [f]or any

employer to . . . discharge an employee or discriminate with respect to . . . terms,

conditions . . . or any other matter directly or indirectly related to employment . . .

because of [the employee's] . . . sex.  *Johnson v. York Hosp.*, 2019 ME 176, ¶ 17, 222

A.3d 624.  A hostile work environment created by sexual harassment requires proof

of the following elements:

> (1) That [the plaintiff] is a member of a protected class; (2) that [the
> plaintiff] was subject to unwelcome sexual harassment; (3) that the
> harassment was based upon sex; (4) that the harassment was
> sufficiently severe and pervasive so as to alter the conditions of
> plaintiff's employment and create an abusive work environment; (5) that
> sexually objectionable conduct was both objectively and subjectively
> offensive, such that a reasonable person would find it hostile or abusive
> and the victim in fact did perceive it to be so; and (6) that some basis for
> employer liability has been established.

*Id.* (alterations in *Johnson*) (quoting *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 22, 969

A.2d 897).   BTB does not dispute that Ms. Verrier has satisfied the first three

elements of the hostile work environment sexual harassment claim.  *See Def.'s Mot.*

at 10-18 (arguing the final three prongs of the prima facie sexual harassment hostile

work environment claim); *Pl.'s Opp'n* at 12 ("Defendant's motion challenges the

fourth, fifth and sixth elements").  Thus, summary judgment on Ms. Verrier's hostile

---

[208]      Although Ms. Verrier brings a state claim pursuant to the MHRA rather than a federal claim
under Title VII, the Maine Law Court has consistently stated that "[i]t is appropriate to look to
analogous federal case law for guidance in the interpretation of the Maine Human Rights Act." *Watt
v. UniFirst Corp.*, 2009 ME 47, ¶ 22 n.4, 969 A.2d 897.  In keeping with this principle, the Court draws
on both Maine law and First Circuit caselaw.

work environment claim turns on whether the alleged harassment was severe and pervasive enough to alter Ms. Verrier's conditions of employment, whether it was objectively offensive, and whether BTB responded promptly and appropriately once it became aware of the allegations.

### 1.   Whether the Harassment was Sufficiently Severe and Pervasive so as to Alter the Conditions of Employment and Create a Hostile Working Environment

To withstand summary judgment Ms. Verrier must allege conduct that is sufficiently severe or pervasive to alter the conditions of her employment.[209]  This requires examining "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Watt*, 2009 ME 47, ¶ 23, 969 A.2d 897; *see also Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013).

"Although '[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins,' the 'accumulated effect' of repeated verbal attacks and physical intimidation in the workplace may reasonably be found to constitute sexual harassment."  *Rosario v. Dep't of the Army*, 607 F.3d 241, 247 (1st Cir. 2010) (quoting *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 54 (1st Cir. 2000)); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (stating that the hostile work environment standard is "sufficiently demanding to ensure that Title VII does

---

[209]   In *Nieves-Borges v. El Conquistador Partnership. L.P.*, 936 F.3d 1 (1st Cir. 2019), the First Circuit emphasized that "severity and pervasiveness are alternative criteria for evaluating whether a plaintiff has been subjected to an 'abusive work environment.'"  *Id.* at 10.  Thus, to withstand summary judgment, Ms. Verrier does not need to allege both severity and pervasiveness.

not become a 'general civility code'" (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998))).

The First Circuit has distinguished "ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing," from "'sexual remarks, innuendos, ridicule, and intimidation' which 'may be sufficient to support a jury verdict for a hostile work environment.'" *Vera v. McHugh*, 622 F.3d 17, 26 (1st Cir. 2010) (first quoting *Faragher*, 624 U.S. at 788, then *O'Rourke v. City of Providence*, 235 F.3d 713, 729 (1st Cir. 2001)).  However, "'[s]ubject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Rosario*, 607 F.3d at 247.

The First Circuit and this District have concluded that summary judgment is appropriate where the alleged conduct is "episodic," and the alleged harassment does not amount to more than "the ordinary tribulations of the workplace."  For example, in *Paquin v. MBNA Marketing Systems*, 233 F. Supp. 2d 58 (D. Me. 2002), another judge in this District granted summary judgment upon concluding that no reasonable jury could conclude the conduct underlying the alleged hostile environment was severe or pervasive.  In that case, the plaintiff alleged the following harassing conduct: her supervisor "asked if she would perform 'personal care' on him; responded to another representative's comment about eating by saying 'I'd eat you'; showed [the plaintiff] a picture of a naked man; made references to a customer named 'Harry Dick'; and jokingly told [the plaintiff] that her husband had called and wanted her to

96

come watch pornographic movies with him." *Id.* at 61.  In rejecting the contention that this conduct was "severe," the district court explained that "such behavior cannot be considered so physically threatening or humiliating as to unreasonably interfere with Plaintiff's job performance." *Id.* at 64 (comparing *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (finding conduct over a four-month period insufficiently severe or pervasive where conduct involved, *inter alia*, repeated sexual jokes; sexual comments made to plaintiff while looking at her in a sexually suggestive manner; laughing at plaintiff when she mentioned the name Dr. Paul Busam (pronounced 'bosom'); and telling plaintiff she was 'paid great money for a woman'), *with Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1012 (8th Cir. 1988) (sexual harassment established with evidence that female employees were held down so that other employees could touch their breasts and legs)).  The *Paquin* Court concluded that "five separate incidents of inappropriate behavior . . . over a span of approximately four months" fell "well short of the frequency required to amount to an abusive working environment."  233 F. Supp. 2d at 63-64; *see also Posteraro v. RBS Citizens, N.A.*, 159 F. Supp. 3d 277, 287 (D.P.R. 2016) (concluding that "sporadic" comments and conduct was not enough to constitute a hostile work environment).

Similarly, in *Lee-Crespo v. Schering-Plough Del Caribe, Inc.*, 354 F.3d 34 (1st Cir. 2003), the First Circuit affirmed the district court's grant of summary judgment. There, the plaintiff alleged harassment by her supervisor where the supervisor "made comments . . . regarding the private lives and sexual preferences of" employees, told stories about co-workers, "bothered [the plaintiff] with meddlesome and prying

questions about her personal life and made comments about her appearance and behavior," asked questions in a "disgusting way," and hugged the plaintiff from behind. *Id.* at 39-40.

The First Circuit concluded that "the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to [the Plaintiff's] work performance." *Id.* at 46. The *Lee-Crespo* Court reasoned that "[t]he record establishes that [the supervisor] was an inexperienced manager who had trouble navigating the boundary between the personal and the professional" and "displayed a disregard for professional courtesy and a penchant for inquiring about the personal affairs of other workers" but that such conduct "was not so severe or pervasive that it altered the terms and conditions of [the plaintiff's] employment." *Id.* at 46-47; *see also Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 780, 783 (1st Cir. 1990) (inferring that five incidents over a four to five week period were not sufficient to establish the element of pervasiveness in a sexual harassment hostile work environment claim).

In contrast, however, the First Circuit has concluded that summary judgment on a hostile work environment claim is inappropriate where the conduct occurs on a near-constant basis. For example, in *Vera v. McHugh*, 622 F.3d 17 (1st Cir. 2010), the First Circuit concluded that the plaintiff properly met her burden of alleging severe and pervasive conduct where she was required to share an office with the alleged harasser for three months. *Id.* at 21. During that time the plaintiff alleged

98

"a constant invading [of] her space," in that the harasser would sit and stare at her, block the door when she tried to leave, move his chair so that their legs were touching, and stand so close behind her so that she could feel his breath. *Id.* In determining that this conduct was severe, the First Circuit noted that it continued for three months and was nearly "constant" because the harasser was in their shared office "most of the time." *Id.* at 27-28. The *Vera* Court noted that "[a]lthough [the harasser] did not overtly threaten [the plaintiff], the allegation that he blocked her from leaving the office on at least one occasion suggests a physically threatening environment" and "the facts and attendant circumstances suggest[ed] that [the harasser] went out of his way to violate [the plaintiff's] privacy and the integrity of her personal space." *Id.* at 28; *see also Rosario*, 607 F.3d at 249 (rejecting summary judgment where the record supported the plaintiff's claims that the harassing conduct occurred "on a daily basis" "throughout a two-year period"); *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19(1st Cir. 2002) ("It bears emphasis that the harassment here was more or less constant from Marrero's first day of work in April of 1995 until she left in November of 1996"); *White v. N.H. Dep't of Corrections*, 221 F.3d 254, 260 (1st Cir. 2000) (concluding that the plaintiff established pervasive conduct where the record showed that "disgusting comments" were "continuing," "consistent" and "occurred 'everyday'").

Even where the conduct is not continuous, pervasive, or constant, plaintiffs have nonetheless withstood summary judgment on sexual harassment hostile work environment claims where the conduct is sufficiently severe. In *Gerald v. University*

*of Puerto Rico*, 707 F.3d 7 (1st Cir. 2013), the First Circuit discussed a "three-incident blip" involving the harasser grabbing the plaintiff's breasts, making "sexually suggestive noises," propositioning her, and "crassly ask[ing] in front of others why she would not have sex with him." *Id.* at 18. The *Gerald* Court concluded that this type of conduct was precisely the type of "fondling, come-ons, and lewd remarks [that] is often the stuff of hostile work environment claims." *Id.* (quoting *Billings v. Town of Grafton*, 515 F.3d 39, 48 (1st Cir. 2008)).

### a.    Pervasiveness

Viewing the record in the light most favorable to Ms. Verrier, no reasonable jury could conclude that the alleged harassment is sufficiently pervasive so as to alter Ms. Verrier's conditions of employment. The record shows that in March 2019 Mr. Campbell "bothered" Ms. Verrier and laughed at her eyebrows, stared at her from 100 feet away through a glass wall, gave her the middle finger, and asked her who she was "fucking." DSMF ¶ 29; PSAMF ¶¶ 32-33, 35. Ms. Golob testified that she continued to see Mr. Campbell in Ms. Verrier's area after she reported the March 2019 conduct to Mr. Hutchinson, but the record is silent as to how frequently. Then, on May 21, 2019, Mr. Campbell came over to Ms. Verrier's workspace, backed her into a corner, told her to "grab her coworker's ass," asked who she was dating or "fucking," and "basically told her she was a piece of shit." DSMF ¶ 36; PSAMF ¶¶ 34, 70, 79.

Next, on June 8, 2019, Mr. Campbell made light of his conduct and HR's counseling in the break room and subsequently went to stare Ms. Verrier down. PSAMF ¶¶ 113-115. On June 11, 2019, Mr. Campbell was "floating" around Ms. Verrier's workspace, and on June 24, 2019, Mr. Campbell had to pass through Ms.

Verrier's area and would look at her but did not approach her.  DSMF ¶ 77; PSAMF ¶¶ 120, 128.  Then, after Mr. Campbell resigned on August 1, 2019, Mr. Cox made the reference to Ms. Verrier "fucking" a co-worker in December 2019, and Ms. Verrier was admonished for bottle contamination in December 2020.  PSAMF ¶¶ 197, 205.

With respect to timing, Ms. Verrier has described a series of five discrete episodes of alleged harassing conduct by Mr. Campbell: March 2019; May 21, 2019; June 8, 2019; June 11, 2019; and June 24, 2019.  Unlike the plaintiffs in *Rosario*, *Marrero*, and *White*, Ms. Verrier has not alleged conduct occurring on an almost daily basis.  Instead, she alleged inappropriate conduct occurring on five identifiable days over the course of five months.  Consistent with *Paquin*, *Lee-Crespo*, and *Chamberlain*, this type of sporadic conduct simply does not rise to the level of pervasiveness necessary to sustain a hostile work environment claim.

While the Court focuses on the period from March to July 2019, Ms. Verrier alleges that Mr. Campbell's conduct began in late 2018 and early 2019 without providing details as to what that conduct was and how often it occurred that would allow a factfinder to conclude that Mr. Campbell's conduct was so continuous as to be pervasive.  Although Ms. Verrier contends that that Mr. Campbell's conduct began in the "early portion of 2019," that he "often approached" her, and that she blocked him on social media, these unspecified allegations do not raise a genuine dispute as to whether Mr. Campbell's conduct was severe or pervasive.  *See, e.g.*, *Burns v. States Police Ass'n*, 230 F.3d 8, 9 (1st Cir. 2000) ("The opposing party may not rely on conclusory allegations and unsupported speculation . . . [instead] [t]he opposing party

must offer 'definite, competent evidence' to defeat a properly supported motion for summary judgment" (quoting *Torres v. E.I. Dupont de Nemours & Co.*, 219 F.3d 13, 18 (1st Cir. 2000))).  Even accepting as true that Mr. Campbell acted inappropriately as early as late 2018, Ms. Verrier has still not alleged that the conduct occurred on a "daily" or "continuous" basis such that it would transform the five discrete instances of harassment into "pervasive" conduct.

### b.    Severity

Although the Court concludes that the conduct is not pervasive, Ms. Verrier need only show that the conduct is pervasive or severe to withstand summary judgment.  The Court concludes that there is a material question of fact as to whether the alleged conduct was severe enough to alter the terms and conditions of Ms. Verrier's employment.

First, the Court notes that in many ways, the conduct at issue in this case appears to be nothing more than the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," rather than the ridicule, intimidation, and humiliation characteristic of the cases where courts have deemed the alleged harassment sufficiently severe. *Faragher*, 624 U.S. at 788; *see Marrero*, 304 F.3d at 18-19.  Although Mr. Campbell asked Ms. Verrier who she was "fucking" and said that she should "grab the ass" of her co-worker, these three comments (two of which occurred on the same day), while undoubtedly offensive and unacceptable in the workplace, are more akin to "sporadic use of abusive language" rather than outright humiliation.  *See Lee-Crespo*, 354 F.3d at 39-40 (concluding that prying inquiries about one's personal life and asking

102

questions in a "disgusting way" is not sufficiently severe). Similarly, Mr. Campbell's other conduct of giving Ms. Verrier the middle finger and laughing at her eyebrows cannot be equated with the type of severe conduct at issue in *Vera* and *Gerald*. The United States Supreme Court has expressly cautioned against courts interpreting employment statutes such that they become a "general civility code for the American workplace," *Oncale*, 523 U.S. at 80, and has expressly stated that "the alleged conduct must be more than 'merely offensive.'" *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 72 (D.D.C. 2013) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)).

However, there is a question of fact as to whether Ms. Verrier experienced physically threatening conduct that, when viewed alongside the harasser's abusive and offensive language discussed above, would reasonably lead a jury to conclude that the conduct was severe enough to change Ms. Verrier's conditions of employment.

In *Lee-Crespo* and *Paquin*, the courts granted or upheld summary judgment primarily due to the distinct absence of physically threatening conduct and because there were no altered conditions of employment. *See Lee-Crespo*, 354 F.3d at 46 ("[T]he complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never, according to the record, an impediment to Lee-Crespo's work performance"); *Paquin*, 233 F. Supp. 2d at 64 ("Even construing the evidence in the light most favorable to Plaintiff, such behavior cannot be considered so physically threatening or humiliating as to unreasonably interfere with Plaintiff's job performance").

Here, Ms. Verrier alleged that Mr. Campbell backed her into a corner and that she could not move because he was "right there" and that he refused to move when asked to do so.  Although Ms. Verrier, unlike the *Gerald* plaintiff, has not alleged that Mr. Campbell touched her in any way and the record is silent as to how close Mr. Campbell was to Ms. Verrier when he backed her into a corner, *see Smith v. County of Humboldt*, 240 F. Supp. 2d 1109, 1118 (N.D. Cal. 2003) ("The handful of incidents alleged by [the plaintiff], many of which do not involve any touching, but simply involve being spoken to or approached, are insufficient to establish that the harassment was objectively so severe or pervasive that it is actionable"), a reasonable factfinder could nonetheless conclude that Mr. Campbell acted in a physically threatening manner when he backed Ms. Verrier into the corner.

In *Vera*, the First Circuit concluded that "[a]lthough [the harasser] did not overtly threaten [the plaintiff], the allegation that he blocked her from leaving the office on at least one occasion suggests a physically threatening environment." *Vera*, 622 F.3d at 28.  Although the record in *Vera* was replete with other instances of physically intimidating conduct *id.* at 23, the First Circuit has clarified that prior hostile work environment cases present "instructive examples of actionable sexual harassment, [but] they do not suggest that harassing conduct of a different kind or lesser degree will necessarily fall short of that standard." *Billings*, 515 F.3d at 49. The Court therefore takes into account the *Vera* Court's conclusion that physically blocking a plaintiff could be considered severe.

Although the conduct in *Vera* is arguably more severe than what is at issue here, a jury could nonetheless reasonably conclude that a single incident of being "backed into a corner" is physically threatening conduct that allows a plaintiff to prevail on a sexual harassment hostile work environment claim occurring over a short duration.  The Court further finds this conclusion appropriate in light of Ms. Verrier's other allegations that Mr. Campbell was "floating around" her area and walking through her space on multiple occasions, and when cumulatively viewed with Mr. Campbell's crass language, his inappropriate probing questions,  and his making light of Ms. Verrier's discomfort and reports to HR.  Although the Court finds it a close call,[210] the Court concludes that a reasonable jury could conclude that, cumulatively, Ms. Verrier alleges severe conduct.

### c.    Alterations to Conditions of Employment

Furthermore, the Court concludes that a jury could find that the alleged harassment was severe enough to alter Ms. Verrier's conditions of employment.  On this element, Ms. Verrier must show that the conduct "'unreasonably interfered with

---

[210]    This case is unusual in that Ms. Verrier continued to work at BTB for more than year after the bulk of the alleged harassment and after BTB effectively forced Mr. Campbell to resign in August 2019.  Causation and timing are not elements of a hostile work environment claim in the same way that they are for retaliation and constructive discharge, and BTB has not pointed to any caselaw suggesting that an employee's decision to remain employed even after the harasser is forced to resign counsels against a finding of severe or pervasive conduct sufficient to alter the terms and conditions of employment.  Furthermore, given that the standard for a constructive discharge claim, "is more onerous than the hostile work environment standard," *Bodman v. Maine, Dep't of Health and Human Servs.*, 720 F. Supp. 2d 115, 123 (D. Me. 2010), the Court sees no reason a plaintiff may not bring a claim for a hostile work environment for a specific period of time even if the employee continues to remain employed after that period.  Although a reasonable jury could conclude that Mr. Verrier's continued employment is evidence that the conduct was neither severe nor pervasive, a reasonable jury could also conclude that the brief period of alleged harassment from May to July 2019 was sufficiently severe to allege a hostile work environment claim even if Ms. Verrier cannot demonstrate constructive discharge.

an employee's work performance,' and 'the effect of the conduct on the employee's psychological well-being.'"  *Vera*, 622 F.3d at 26 (quoting *Che v. Mass. Bay Transp. Auth.*, 342 F.3d 31, 40 (1st Cir. 2003)).  Generally, "[i]t is the jury's job to 'weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Id.* (quoting *Marrero*, 304 F.3d at 19).

In this particular case, "a jury could find that the intensity and frequency of the contact between [Ms. Verrier] and [Mr. Campbell] altered the conditions of her employment despite the relatively short duration of [the incidents]." *Id.* at 29.  First, courts have held that a plaintiff may experience changed conditions in employment where they have to relocate or change where and how they are working to avoid the alleged conduct.  *See Vera*, 622 F.3d at 28 (concluding that a plaintiff having to relocate offices to avoid her harasser could reasonably be viewed as an alteration to her conditions of employment).  The record shows that Ms. Verrier was so upset by Mr. Campbell's conduct on May 21, 2019, that she was crying and took Mr. Hutchinson up on his offer that she leave work early.  PSAMF ¶ 87; DRPSAMF ¶ 87. The record further reflects that Ms. Verrier called out of work the next day and that she testified she called out of work on several occasions because she was feeling anxious.  PSAMF ¶¶ 88, 91.  As a result, a reasonable jury could conclude that Ms. Verrier's having to leave work early and call out of work at subsequent points due to her anxiety over the situation is an alteration of a condition of employment sufficient to withstand summary judgment.

106

Second, a reasonable jury could also conclude that Mr. Campbell's conduct further altered Ms. Verrier's conditions of employment by limiting which lines she could be assigned to. After Ms. Golub reported Mr. Campbell's conduct to Mr. Hutchinson, Mr. Hutchinson stated that he would attempt to separate Ms. Verrier and Mr. Campbell. On at least on occasion Mr. Hutchinson subsequently stationed Ms. Verrier on Line 1 and Mr. Campbell on Line 11. *See* PSAMF ¶ 110; DRPSAMF ¶ 110. In other words, Mr. Campbell's conduct limited which lines Ms. Verrier could be assigned during her shift, which a reasonable jury could conclude altered her conditions of employment as she could no longer work on certain lines to ensure distance from Mr. Campbell. Other courts that have held that a necessary physical separation from a co-worker may constitute altered conditions of employment. *See Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000) ("Scoggins unreasonably interfered with Smith's work performance by making her unable to continue working near Scoggins"); *see also Billings*, 515 F.3d at 48 (citing *Smith* with approval).

At oral argument, counsel for BTB stated that Ms. Verrier spent most of her employment on Lines 11 and 12, that Mr. Campbell was a "utility" trained to work on all lines, and that at no point was Ms. Verrier restricted to Line 1 or any other line. However, a reasonable factfinder could conclude that even if BTB did not expressly state that Ms. Verrier was limited to certain lines, Mr. Hutchinson's decision to keep Ms. Verrier and Mr. Campbell away from each other necessitated

restricting her to certain lines to increase the distance between Ms. Verrier and Mr. Campbell.

Third, as mentioned previously, the record shows that Mr. Campbell's conduct had a psychological impact on Ms. Verrier, which can, in turn, indicate an alteration in the terms and conditions of employment. *See Vera*, 622 F.3d at 28. Ms. Verrier testified to the anxiety that she felt as a result of Mr. Campbell's conduct, and that she called out of work and was anxious about returning if Mr. Campbell was going to be there. PSAMF ¶¶ 110, 118. Furthermore, Ms. Golob stated that she could visibly see that Ms. Verrier was tense and "upset." *See Vera*, 622 F.3d at 28 n.15 (describing a coworker's testimony that the plaintiff experienced "outbursts of crying" and "despair and disbelief" as evidence that the plaintiff was experiencing psychological harm that altered the conditions of employment).

Fourth, BTB's reaction to Ms. Verrier's complaints about Mr. Campbell placed her own job at BTB in apparent jeopardy. Specifically, Mr. Vienneau blamed Ms. Verrier for Mr. Campbell's harassment. He told her that she was complaining too much and accused her of bringing her personal life into the workplace. He told her she needed to stop the drama and that she was affecting BTB's numbers. Mr. Vienneau informed her that personal interactions should not be taking place between co-workers at the workplace and that if they needed to interact, it should be on business matters only. Mr. Vienneau warned Ms. Verrier that if she violated BTB policy, BTB would be required to separate them or might terminate them. By then, HR's investigation had demonstrated that Mr. Campbell was harassing Ms. Verrier

and Ms. Verrier was not harassing Mr. Campbell.  A jury would be entitled to find that Mr. Vienneau's lecture and warning against Ms. Verrier not only amounted to victim-blaming but altered her conditions of employment by placing her in the vulnerable position of being subject to discipline should Mr. Campbell resume his harassment.

Finally, BTB argues that the conduct did not alter Ms. Verrier's conditions of employment because she "performed well and was a valued employee" and believed herself to be a good employee.  *Def.'s Mot.* at 15.  However, it is not fatal to Ms. Verrier's hostile work environment claim that she managed to get her work done and received positive performance evaluations.  *Gerald*, 707 F.3d at 18 (citing *Tuli v. Brigham & Women's Hosp.*, 656 F.3d 33, 40 (1st Cir. 2012) (holding that a jury's hostile work environment liability finding was not precluded just because the plaintiff neurosurgeon managed to get her work done despite being harassed by her supervisor)); *Vera*, 622 F.3d at 28 ("[P]roof of . . . interference [with a plaintiff's ability to do her job] is not necessary to maintain a successful claim of a hostile work environment" (citing *Che*, 342 F.3d at 40)).

Even though the record does not reflect that Ms. Verrier was disciplined in any way for calling out of work or received negative feedback in her official employee reviews, this is immaterial, as a plaintiff's job performance need not suffer for her to allege that the underlying conduct altered her conditions of employment.  Although Ms. Verrier alleges that she was admonished for bottle contamination, she did not present evidence that she was officially disciplined in any way. As the above cited

cases demonstrate, courts have not so narrowly defined altered conditions of employment that a plaintiff must prove she performed her job poorly, received adverse feedback from her employer, or was disciplined in any way for her performance. Ultimately, "it is for the jury to . . . decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." *Gerald*, 707 F.3d at 19 (quoting *Marrero*, 304 F.3d at 19).

### d.    Heather Verrier's Allegations Post-Dating Derek Campbell's Resignation

Finally, to the extent that Ms. Verrier alleges additional incidents of harassment in December 2019 (Mr. Cox's crude comment) and in late 2020 (Mr. Vienneau's bottle contamination accusation), these events occurred several months— if not more than a year—after Mr. Campbell resigned from employment at BTB on August 1, 2019. Ms. Verrier has not demonstrated any connection between Mr. Campbell's harassment and the events occurring in December 2019 and December 2020 that would allow a reasonable factfinder to conclude that there was a more sustained pattern of harassment occurring after Mr. Campbell resigned on August 1, 2019. The record reveals no connection between Mr. Campbell and Mr. Cox. As Mr. Vienneau, the operations manager, lectured and admonished Ms. Verrier about her interactions with Mr. Campbell, Mr. Vienneau is a common denominator in these two incidents. But without some evidence of ongoing harassment by Mr. Vienneau between June 2019 and December 2020, a jury would be hard pressed to find that his

actions in December 2020 were somehow related to his lecture about eighteen months earlier.

Moreover, even if the December 2019 and 2020 events were somehow connected to Ms. Verrier's initial harassment allegations against Mr. Campbell, several months passed between the June 24, 2019, and December 2019 incidents and between the December 2019 and December 2020 incidents, such that a reasonable fact finder could not help but conclude that the events were "episodic." Moreover, no reasonable jury could conclude that Mr. Cox's inappropriate comment regarding Ms. Verrier's relationship with another co-worker or Mr. Vienneau's bottle contamination accusation rises to the level of severity required to constitute a hostile work environment. Ms. Verrier also fails to allege that the terms and conditions of her employment were in any way altered by Mr. Cox's comment or her being admonished for bottle contamination. In fact, the record shows that any potential changes in Ms. Verrier's conditions of employment—being limited to certain lines, calling out work to avoid Mr. Campbell—ceased as of August 1, 2019, when Mr. Campbell resigned. What is more, HR immediately responded to Ms. Verrier's complaint against Mr. Cox and counseled him regarding his inappropriate comment. PSAMF ¶¶ 199-202; DSMF ¶¶ 103-110.

Thus, although a reasonable jury could conclude that Mr. Campbell's conduct was severe enough to alter Ms. Verrier's conditions of employment during the brief period of alleged harassment from May to July 2019, the Court also concludes that no reasonable jury could find that the severe or pervasive conduct changing Ms.

Verrier's conditions of employment continued after Mr. Campbell's resignation.  The Court therefore limits Ms. Verrier's claim to conduct occurring before August 1, 2019.

> ### 2. Whether a Reasonable Person would Find the Sexually Objectionable Conduct Objectively Offensive and Whether Heather Verrier Subjectively Perceived it to be so

"In addition to being severe or pervasive, actionable hostile work environment sexual harassment must be both subjectively and objectively offensive." *Crowley v. L.L. Bean, Inc.*, 143 F. Supp. 2d 38, 57 (D. Me. 2001).  In other words, it must be "conduct or language that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so." *Id.*

### a. Subjectively Offensive Conduct

First, BTB does not dispute that Ms. Verrier has established that the alleged conduct was subjectively offensive.  The record shows that Ms. Verrier "did not like" Mr. Campbell's behavior, PSAMF ¶¶ 21-22, she was visibly upset after Mr. Campbell made comments about her appearance, stared at her, and gave her the middle finger, PSAMF ¶¶ 27-28, and she told Mr. Hutchinson that Mr. Campbell's conduct made her fearful.  PSAMF ¶ 57.  After Mr. Campbell backed her into the labeler Ms. Verrier said she felt "attacked," "violated," and "embarrassed" and Mr. Hutchinson testified that she appeared distressed.  PSAMF ¶¶ 71-72, 74, 84-85.  She called in sick the day after because she was distressed over the situation, PSAMF ¶¶ 88, 91, and when Mr. Campbell was "floating around" upon her return to work she told Mr. Hutchinson she

felt uncomfortable.  PSAMF ¶ 120.  Based on these facts, a reasonable jury would be able to conclude that Ms. Verrier found the conduct subjectively offensive.[211]

To the extent that the record shows that Ms. Verrier went out for drinks with Mr. Campbell and Mr. Warren, which BTB attempts to characterize as evidence that Ms. Verrier was friends with Mr. Campbell, *see Def.'s Reply* at 3, that does not negate Ms. Verrier's perception that Mr. Campbell's conduct was subjectively offensive.  *See Horney v. Westfield Gage Co.*, 77 F. App'x 24, 29 (1st Cir. 2003) (concluding that a jury would be able to differentiate between conduct engaged in by the plaintiff and unwelcome alleged harassment).

### b.   Objectively Offensive Conduct

As to whether the conduct is objectively offensive, BTB argues that

> [n]o objective person would consider a co-worker laughing at Plaintiff's eyebrows "severe."  Likewise, the use of foul language, staring at Plaintiff on one occasion from a distance, giving Plaintiff the middle finger from far away, making light of being counseled, or talking with another co-worker does not, under any circumstances, objectively rise to the level of severity required for an actionable hostile work environment sexual harassment claim.

*Def.'s Mot.* at 16.  Although a co-worker laughing at the plaintiff's eyebrows and giving her the middle finger may be insufficient, a reasonable jury viewing the entire record in its totality could conclude that this conduct is objectively offensive when viewed alongside Mr. Campbell physical backing Ms. Verrier into her labeler, his intimidating staring on at least two occasions, and his crass comments to her.  This

---

[211]   The record shows that Ms. Verrier experienced sexual and physical assault prior to her employment at BTB.  *See* DSMF ¶¶ 6-7.  These facts in no way diminish Ms. Verrier's subjective perception that Mr. Campbell's conduct was threatening, and do not impact the Court's conclusion that a reasonable jury could conclude that Mr. Campbell's conduct was objectively offensive.

113

conclusion is further consistent with Ms. Verrier's testimony that there were few women who worked at BTB, especially on the night shift, which further supports a conclusion that Mr. Campbell's conduct was objectively offensive and heightened her anxiety and discomfort. Testimony from Leah Verrier stating that other co-workers had noticed and reported Mr. Campbell's conduct, PSAMF ¶ 22; DRPSAMF ¶ 22, and that Ms. Golob was made uncomfortable by Mr. Campbell's actions suggests that bystanders may have viewed the conduct as objectively offensive and bolsters the Court's conclusion. DSMF ¶ 30; PRDSMF ¶ 30.

On balance, there is enough on the record for a reasonable factfinder to conclude that the alleged conduct is objectively offensive, and therefore enough for Ms. Verrier to withstand summary judgment.

### 3. Employer Liability

"If the harassment is caused by a co-employee, the employer is liable if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *White*, 221 F.3d at 261 (quoting *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir. 1997)). Notice to the employer is, alone, not enough. "Liability only attaches if the employer, after receiving notice, fails to take prompt and appropriate ameliorative action." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 8 (1st Cir. 2011). "[T]he imposition of employee discipline is not a rote exercise, and an employer must be accorded some flexibility in selecting . . . sanctions for particular instances of employee misconduct." *Id.* The employer's "disciplinary decision must be evaluated in real time; it cannot be evaluated in hindsight." *Id.* This analysis requires "a case-by-case assessment" and

"summary judgment will lie when the undisputed facts show that a reasonable jury could not help but conclude that the employer's response was both timely and appropriate." *Id.*

Taking the facts in the light most favorable to Ms. Verrier as the nonmoving party, there is a triable issue of fact as to whether BTB responded promptly and appropriately to Ms. Verrier's various complaints. To begin, BTB's harassment policy states that harassment based on sex is any "unwelcome or unwanted conduct" that "has the purpose or effect of creating an intimidating, hostile, or offensive work environment; unreasonably interfering with an individual's work performance; or otherwise adversely affecting an individual's employment opportunities." PSAMF ¶ 1; DRPSAMF ¶ 1. Moreover, harassment includes derogatory comments, demeaning jokes, unwelcome advances, physical harassment such as assault, and impeding or blocking movements. PSAMF ¶ 2; DRPSAMF ¶ 2. The policy further provides that any supervisor that learns of any form of harassment must report the harassment immediately and consult with HR. PSAMF ¶ 6.

### a.    The March 2019 Report to Hutchinson

Here, there is a disputed fact as to the reasonableness of BTB's response to Ms. Golob's March 2019 report. In March 2019 Ms. Golob told Mr. Hutchinson that Mr. Campbell was "bothering" Ms. Verrier, but Mr. Hutchinson did not question Ms. Golob as to what Mr. Campbell was doing or when the conduct began. DSMF ¶ 31; PRDSMF ¶ 31; PSMF ¶¶ 38, 40-41; DRPSAMF ¶¶ 38, 40-41. Mr. Hutchinson stated that he did not continue the conversation with Ms. Golob and further testified that he assumed that if it was severe, Ms. Verrier would talk to him herself; instead, he

assumed that the problems between Mr. Campbell and Ms. Verrier were just an "immature working relationship." PSAMF ¶¶ 43-44, 47.

However, "shortly" after Ms. Golob made the report, Mr. Hutchinson nonetheless spoke with Mr. Verrier about the situation, although the record is silent as to how long after Ms. Golob's report that this conversation took place. DSMF ¶ 33; PRDSMF ¶ 33; PSAMF ¶¶ 49-50, 55-56; DRPSAMF ¶¶ 49-50, 55-56. At this point Ms. Verrier told Mr. Hutchinson that she had refused to date Mr. Campbell and he had made her feel upset and fearful. PSAMF ¶ 57. In response, Mr. Hutchinson said that he would try to keep Mr. Campbell away from Ms. Verrier, which Ms. Verrier agreed to,[212] and which Mr. Hutchinson managed to do over 50% of the time. PSAMF ¶ 62. Mr. Hutchinson did not end up documenting his plan to keep Mr. Campbell and Ms. Verrier away from each other and did not tell his backup shift supervisors. PSAMF ¶¶ 60-61.

Ultimately, there is a dispute as to what Mr. Hutchinson knew and the appropriateness of his response. First, the record shows that Ms. Golob characterized Mr. Campbell's conduct as "bothering" Ms. Verrier and Ms. Verrier then told Mr. Hutchinson that she had turned down Mr. Campbell's request for a date. The record is silent on whether Ms. Verrier told Mr. Hutchinson that Mr. Campbell repeatedly

---

[212]    BTB points to the fact that Ms. Verrier was "satisfied with Hutchinson's effort to keep them separated," *Def.'s Mot.* at 17, and indeed, the record reflects that Ms. Verrier believed that Mr. Hutchinson wanted to help and that she agreed with his proposal to separate her and Mr. Campbell in March 2019. *See* DSMF ¶ 34; PRDSMF ¶ 34. Although this does show that Ms. Verrier believed the proposed solution to be reasonable as it was proposed to her at the time, that does not negate the fact that Mr. Hutchinson failed to follow BTB's reporting policy and typical disciplinary methods, which tend to suggest this was an inadequate response. Ms. Verrier's testimony is therefore not dispositive on this issue.

asked for a date, and the record is also unclear whether Ms. Verrier informed him of Mr. Campbell's staring and use of the middle finger.  However, a reasonable jury could nonetheless conclude that, because the BTB harassment policy specifically gives "unwelcome advances" as an example of harassing behavior, Mr. Hutchinson could have reasonably known that Ms. Verrier was reporting some type of harassing conduct when she reported that Mr. Campbell had asked her out and that she was fearful and uncomfortable.  This is especially true when viewed alongside Ms. Golob's report that Mr. Campbell was "bothering" Ms. Verrier.

Second, based on this reasonable conclusion, a jury could further find that Mr. Hutchinson did not act reasonably in responding to Ms. Verrier's report.  In particular, BTB's policy requires all supervisors who learn of any form of harassment to immediately report it and consult with HR.  However, there is no indication that Mr. Hutchinson brought the March 2019 allegation to HR for further investigation, nor did Mr. Hutchinson interview or speak with Mr. Campbell.  PSAMF ¶ 52; DRPSAMF ¶ 52.  In fact, the record suggests that Ms. Asquith did not learn of the March incident until Ms. Verrier spoke with her about the June incident.  PSAMF ¶ 98; DRPSAMF ¶ 98.  A reasonable jury could therefore conclude that Mr. Hutchinson's response was inadequate and untimely because he failed to follow BTB's own harassment reporting policy.

Finally, a jury could also conclude that Mr. Hutchinson's response to the report—to separate Ms. Verrier and Mr. Campbell—was not an appropriate response given the nature of the allegations.  BTB has varying degrees of discipline that it

imposes on employees on a case-by-case basis, including counseling, written warnings, final written warnings, and termination.  However, there is no indication that Mr. Hutchinson imposed any discipline on Mr. Campbell, namely corrective counseling; instead, Mr. Hutchinson admitted that he never spoke with Mr. Campbell about this alleged incident.  PSAMF ¶ 52; DRPSAMF ¶ 52.

In determining the adequacy of an employer's response, courts typically consider whether the remedial action was reasonably calculated to end the harassment.  *See Franchina*, 881 F.3d at 50; *Roy*, 914 F.3d at 68, *Wilson*, 691 F. Supp. 2d at 238.  Here, a jury could conclude that any response not involving a discussion with Mr. Campbell failed to address the root of the problem and was therefore not reasonably calculated to end the harassment.  Furthermore, Mr. Hutchinson did not inform his backup shift supervisors, who would also be responsible for line assignments, of his plan to try and keep Mr. Campbell and Ms. Verrier separate, nor did he document his intention to do so.  PSAMF ¶¶ 59-61.  A reasonable factfinder could therefore conclude that Mr. Hutchinson did not act reasonably because he failed to ensure that Mr. Campbell and Ms. Verrier would be separated as much as possible and did not take Ms. Golob's report seriously.

Moreover, Mr. Hutchinson testified he was only able to schedule Mr. Campbell away from Ms. Verrier "over 50% of the time."  PSAMF ¶ 62.  Although the reasonableness of an employer's intervention is determined at the time of implementation, rather than in hindsight, *see Wilson*, 639 F.3d at 8 ("The plaintiff's argument that the sanction must have been inadequate because it was ineffective to

stop the harassment is nothing more than a post hoc rationalization"), it is an issue for the jury whether "over 50% of the time" reflects a reasonable solution and whether Mr. Hutchinson knew at the time that limitations on his ability to schedule Ms. Verrier and Mr. Campbell away from each other called for other ameliorative measures, or referring the situation to a higher decision maker.

Ultimately, a reasonable jury could conclude that BTB's response to Ms. Verrier's and Ms. Golob's March 2019 reports was not appropriate because a report was never made to HR, Mr. Hutchinson never counseled, spoke to, or imposed one of BTB's typical methods of discipline on Mr. Campbell, and his remedy of separating Ms. Verrier and Mr. Campbell was not reasonably calculated to address the issue given Mr. Hutchinson's failure to share his plan with other managers and inability to consistently enact the measure. *Contra id.* (concluding that immediately looking into a complaint, concluding that misconduct occurred, and issuing a strong reprimand was a "swift and appropriate" response); *Rand v. Town of Exeter*, 976 F. Supp. 2d 65, 72-73 (D.N.H. 2013) (explaining that the defendant took prompt remedial action when it prohibited the perpetrator from going to the victim's worksite, interviewed all three witnesses twice within three days, recorded and acknowledged all interviews, and wrote up a report within five days of the victim's report); *Wilson v. Moulison N. Corp.*, 691 F. Supp. 2d 232, 238 (D. Me. 2010), *aff'd* 639 F.3d 1 (1st Cir. 2011) ("Examples of responses that have been deemed appropriate 'have often included prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes or transfers, oral or written warnings, reprimands,

and warnings that future misconduct could result in progressive discipline" (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 675 (10th Cir. 1998)).  Although BTB later transferred Mr. Campbell to the D-Shift, a reasonable jury could conclude that BTB should have done this earlier, or at least investigated Ms. Verrier's initial report to determine whether Mr. Campbell's immediate transfer was necessary.

Although it is true that "[i]n most situations . . . the imposition of employee discipline is not a rote exercise, and an employer must be accorded some flexibility in selecting condign sanctions for particular instances of employee misconduct," *Wilson*, 639 F.3d at 8, it is ultimately for the jury to decide whether Mr. Hutchinson's efforts to separate Mr. Campbell and Ms. Verrier were reasonable under the circumstances, and sufficiently responsive to the complaint.  *See Forrest v. Brinker Int'l Payroll Co.*, 511 F.3d 225, 232 (1st Cir. 2007) ("Determining what constitutes a 'prompt and appropriate' employer response to allegations of sexual harassment often requires the sort of case-specific, fact-intensive analysis best left to a jury"); *Netherland v. Wesco Distrib., Inc.*, No. CV-14-124, 2015 Me. Super. LEXIS 95, at *15-16 (Me. Super. Ct. June 5, 2015) (concluding that there was a genuine issue of material fact as to whether the employer failed to take immediate and appropriate corrective action where the plaintiff complained multiple times about a coworker's conduct, a supervisor witnessed some of the coworker's behavior, and the harassment continued)

### b.    The May 2019 and June 2019 Reports

As to Ms. Verrier's remaining allegations, there are similarly questions of fact as to the promptness and appropriateness of BTB's response.  On May 21, 2019, after Mr. Campbell asked Ms. Verrier "who she was 'fucking'" and said that she should

"grab her coworker's ass," Ms. Verrier immediately reported the conduct to Mr. Hutchinson who apologized and said he would report it to HR, which he did on May 27, 2019, six days later, the day Ms. Verrier was set to work again. *See* DSMF ¶¶ 36, 41, 44; PRDSMF ¶¶ 36, 41, 44; PSAMF ¶¶ 86, 93-95; DRPSAMF ¶¶ 86, 93-95.

In its motion for summary judgment, BTB highlights the proactive nature of its response: Mr. Hutchinson reported Mr. Campbell's May 21 conduct to HR even though Ms. Verrier did not want him to; Ms. Asquith counseled Mr. Campbell on June 4, 2019 and suspended him pending the investigation a second time in June after BTB received Mr. Loranger's letter. Although it is true that employers are given some leeway and that "prompt investigation of the allegations, proactive solicitation of complaints, scheduling changes or transfers, oral or written warnings, reprimands, and warnings that future misconduct could result in progressive discipline" are consistently deemed reasonable and adequate responses, *see Wilson*, 691 F. Supp. 2d at 238 (quoting *Adler*, 144 F.3d at 675), there are still triable issues when viewing the record in the light most favorable to Ms. Verrier.

First, there is a triable issue as to whether BTB's response to Ms. Verrier's complaint on May 21 was prompt. The record shows that Ms. Verrier spoke with Mr. Hutchinson on May 21st, the day of the incident, but Mr. Hutchinson did not report it to HR until six days later on May 27. *See* DSMF ¶¶ 41, 44; PRDSMF ¶¶ 41, 44; PSAMF ¶¶ 86, 93-95; DRPSAMF ¶¶ 86, 93-95. Furthermore, it was not until June 4—eight days after Mr. Hutchinson told Ms. Asquith, and fourteen days after Ms. Verrier made the initial report to Mr. Hutchinson—that HR spoke with and counseled

Mr. Campbell.  Although the record reflects that Ms. Verrier was not working during part of those two weeks, *see* DSMF ¶¶ 43, 47-48; PRDSMF ¶¶ 43, 47-48, a reasonable trier of fact could nonetheless conclude that two weeks was not "prompt" and that the process should have moved more quickly regardless of whether Ms. Verrier was working or not. *Contra Wilson*, 639 F.3d at 8 (concluding that an employer's response was "swift and appropriate" where the alleged perpetrator was counseled the day after the report was made); *Thirkield v. Neary & Hunter OB/GYN, LLC*, 76 F. Supp. 3d 339, 343, 349 (D. Mass. 2015) (concluding that the employer responded promptly where they counseled the alleged harasser two days after the plaintiff reported the conduct).

Similarly, BTB did not suspend Mr. Campbell for the first time until June 12, four days after Ms. Verrier reported that he was making light of the counseling and one day after Ms. Verrier reported he was "floating around" her work area.  PSAMF ¶¶ 116-117; DSMF ¶¶ 52, 59-60.  Although it is well established that employers are entitled to "progressive discipline," *Wilson*, 639 F.3d at 9, a reasonable jury could infer that BTB waited too long to suspend Mr. Campbell and that he should have been suspended pending investigation as soon as Ms. Verrier made her second complaint after the May 21 incident or at least after the June 8 report, and that BTB should not have permitted him to be on the same shift until the time BTB received Mr. Loranger's letter.  *See* DSMF ¶¶ 72-75; PSAMF ¶ 160; *see also Higgins v. TJX Cos., Inc.*, 331 F. Supp. 2d 3, 5 (D. Me. 2004) (the employer took "appropriate corrective action" by suspending a harasser pending investigation immediately

following the initial complaint). Furthermore, BTB did not attempt to move Mr. Campbell from the B-Shift to D-Shift until several months after the initial complaint in March—just before HR wrote up a final written warning. DSMF ¶¶ 87-88, 80-82. *Contra Rand*, 976 F. Supp. 2d at 73 (finding an employer's actions appropriate where it "immediately separate[ed]" the plaintiff and the alleged harasser).

Second, a reasonable factfinder could conclude that HR did not perform an adequate investigation. Ms. Asquith did not interview Ms. Golob regarding Mr. Campbell's comments in the breakroom, although Mr. Hutchinson spoke with her. Additionally, it does not appear from the record that Ms. Asquith discussed with Mr. Campbell his conduct in March of 2019 when she spoke with him about the May 21 incident, nor did she ask Mr. Campbell about the vandalism to Mr. Conway's vehicle. *See* May 27, 2019, *HR Investigation Rep.* at 4-5. This is especially true because during Ms. Verrier's May 27, 2019, meeting with Ms. Asquith, she recounted Mr. Campbell's earlier conduct as part of her concerns that she wanted HR to address. *See id.* at 3; PSAMF ¶ 98; DRPSAMF ¶ 98. A reasonable factfinder could conclude, under the circumstances, that Ms. Asquith failed to perform a proper investigation; this is ultimately an issue for a finder of fact, rather than this Court.

Finally, Mr. Vienneau's conduct, comments, and responses raise questions regarding the adequacy of BTB's response. The record shows that Mr. Vienneau told Ms. Verrier that he just wanted the matter to "go away," that she was "complaining" too much, was inappropriately bringing her personal life into the workplace, and needed to "stop the drama." PSAMF ¶¶ 148-156. Indeed, Mr. Vienneau effectively

warned Ms. Verrier, the victim of Mr. Campbell's harassment, that if Mr. Campbell continued to victimize her, BTB might terminate both of them. PSAMF ¶ 152. A reasonable fact finder could conclude that these types of comments and conduct belie a "blame the victim" attitude at odds with an appropriate response to a report of sexual harassment in the workplace.

### 4.   Conclusion

On balance, a reasonable factfinder could conclude that Mr. Campbell's conduct was severe enough to alter Ms. Verrier's conditions of employment, both objectively and subjectively offensive, and that BTB did not respond promptly or appropriately. Although Mr. Campbell resigned in early August after a series of suspensions and investigations and BTB ultimately ended the harassment by forcing Mr. Campbell out, this resolution does not negate that there are material issues of fact as to the reasonableness, appropriateness, and timeliness of BTB's response. While a factfinder could very well conclude that BTB responded in an appropriate manner or that Mr. Campbell's conduct was not serious or pervasive and/or objectively offensive, it is question of fact best left for a jury. The Court denies BTB's motion for summary judgment on Ms. Verrier's hostile work environment claim but limits Ms. Verrier's claim to the events occurring from March to August 2019.

### C.   Retaliation Claim

The MHRA prohibits an employer from "discriminat[ing] against any individual because that individual has opposed any act or practice that is unlawful under [the MHRA] or because the individual made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under [the

MHRA]." 5 M.R.S. § 4633(1). "To establish a prima facie claim of retaliation, the employee must show that she engaged in statutorily protected activity; her employer made an employment decision that adversely affected her; and that 'there was a causal link between the protected activity and the adverse employment action.'" *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 20, 824 A.2d 48 (quoting *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 154 (Me. 1991)). In this case, BTB argues that Ms. Verrier cannot make out the second and third elements of her prima facie case: an adverse employment action and causation. *See Def.'s Mot.* at 19 ("Here, Plaintiff's retaliation claim fails as a matter of law because she was not subjected to any adverse employment action. As such, her 'protected activity' cannot possibly be deemed the 'but for' cause of any alleged adverse employment action").

Under the MHRA an adverse employment action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 356 (D. Me. 2018) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "An employee has suffered an adverse employment action when the employee has been deprived either of 'something of consequence' as a result of a demotion in responsibility, a pay reduction, or termination, or the employer has withheld "an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [the employee] for promotion after a particular period of service." *LePage*, 2006 ME 130, ¶ 20, 909 A.2d 629 (quoting *Blackie v. State of Maine,* 75 F.3d 716, 725 (1st Cir. 1996)); *see also Higgins*, 331 F. Supp. 2d at 6-7

("Material changes include demotions, disadvantageous transfers or assignments, refusal to promote, unwarranted negative job evaluations, and toleration of harassment by other employees" (citation and internal quotation marks omitted)).

In addition to establishing an adverse employment action, Ms. Verrier must also show that there is a causal connection between her complaints to HR and/or her MHRC complaint and the adverse employment action. "An employee's protected activity is causally connected to the adverse employment action 'when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action.'" *Johnson*, 2019 ME 176, ¶ 23, 222 A.3d 624 (quoting *Brady*, 2015 ME 143, ¶ 14, 126 A.3d at 1153). One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." *Wyatt v. City of Bos.*, 35 F.3d 13, 16 (1st Cir. 1994); *see also Taghavidinani v. Riverview Psychiatric Ctr.*, No. 1:16-cv-00208-JDL, 2018 U.S. Dist. LEXIS 35403, at *17 (D. Me. Mar. 5, 2018) (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, 45 A.3d 722, 728 (Me. 2012)). "[O]n a motion for summary judgment the lack of temporal proximity" between an employee's protected activity and termination "is not, as a matter of law, a dispositive factor." *Brady*, 2015 ME 143, ¶ 23, 126 A.3d at 1154; *see also Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 68 (D. Me. 2010).

Ms. Verrier alleges that the following retaliatory acts: (1) denial of her transfer application; (2) denial of overtime; (3) criticism and ostracization by BTB managers;

(4) being admonished for punching in and out early; (5) denial of a forklift license; and (5) threats of termination.

### 1.    Heather Verrier's Transfer Application

First, Ms. Verrier argues that "[a] trier of fact could reasonably infer that [she] has established a prima facie case of retaliation based on [BTB's] denial of her request to transfer to North Carolina." *Pl.'s Opp'n* at 17.  BTB in turn asserts that she cannot make out a prima facie case because she "sought the transfer months after the alleged harasser resigned and she applied for the position ***after it was filled***." *Def.'s Mot.* at 20 (emphasis in original).

The Court concludes that no reasonable jury could find that BTB's decision not to hire her for the Production Technician position in Charlotte, North Carolina, was an adverse employment action in retaliation for her MHRC complaint.  "[I]n retaliatory failure to hire cases, a plaintiff seeking to pursue an adverse employment action must established that: 1) she applied for a particular position, 2) the position was vacant, and 3) she was qualified for the position." *Pina v. Children's Place*, 740 F.3d 785, 801 (1st Cir. 2014) (quoting *Vélez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006)).

Here, the record shows that BTB hired Terrance Lee, to fill the Production Technician position on October 1, 2019, which Ms. Verrier does not dispute.  DSMF ¶ 96; PRDSMF ¶ 96.  Thus, it was not until after BTB had already hired someone else for the position that Ms. Verrier submitted her application for the position on October 27, 2019, twelve days after BTB offered the job to Mr. Lee.  DSMF ¶ 96. Again, Ms. Verrier does not dispute the timing of when she submitted her application

and when BTB hired Mr. Lee.  Ultimately, no reasonable juror could conclude that Ms. Verrier applied for a vacant position, as it was filled prior to submitting her application.  *See Pina*, 740 F.3d at 801 (concluding summary judgment was appropriate where the plaintiff failed to demonstrate there was an open position); *Sánchez-Rodríguez v. AT&T Mobility P.R., Inc.*, 673 F.3d 1, 14 (1st Cir. 2012) (concluding that "the record is entirely devoid of any information regarding whether [the plaintiff] was qualified for the . . . position or whether there was even an opening for such a position.  Because [the plaintiff] is the party who bears the burden of demonstrating these factors, this lack of evidence weighs against [the plaintiff] even though [the defendant] was the summary judgment movant").

Importantly BTB did not have her application at the time it made its decision to hire Mr. Lee and therefore had no knowledge she was even interested in the position when it made its hiring decision.  *See Velez*, 467 F.3d at 807 ("Put most simply, in the absence of a job application, there cannot be a failure-to-hire").

Additionally, at oral argument, BTB explained that the Maine and Charlotte facilities are run by different HR departments and Charlotte had no knowledge of Ms. Verrier's reports and the record before the Court reflects no evidence to the contrary.  *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 177 (1st Cir. 2015) (explaining that to draw an inference of causal connection between protected activity and an adverse employment action "there must be proof that the decisionmaker knew of the plaintiff's protected conduct when he or she decided to take the adverse employment action" (quoting *Pomales*, 447 F.3d at 85)).  What is

more, there is no information on the record that Ms. Verrier was qualified for this particular position, or that the Production Technician job was comparable to her Production Operation job or required the same or similar skills. *See Sánchez-Rodríguez*, 673 F.3d at 14; *see also Scarborough v. Nestle Waters North Am. Inc.*, No. 07-193-P-S, 2008 U.S. Dist. LEXIS 105815, at *27-28 (D. Me. Oct. 30, 2008) ("In the absence of any indication of what the qualifications for those two positions were, the plaintiff's conclusory assertions that she was qualified for them is insufficient").

Finally, it is undisputed that this was the only position Ms. Verrier applied for and she submitted no additional applications. DSMF ¶ 98; PRDSMF ¶ 98. Ms. Verrier has not demonstrated that denial of her transfer application was an adverse employment action under the MHRA.

### 2.   Denial of Overtime

Second, as to denial of Ms. Verrier's overtime opportunities, the Court concludes that Ms. Verrier has not shown that denial of overtime was an adverse action. In *Morin v. Hannaford Brothers Co., LLC*, No. 1:17-CV-50-GZS, 2018 U.S. Dist. LEXIS 95733 (D. Me. June 7, 2018), another judge in this District resolved, on summary judgment, a plaintiff's retaliation claims brought pursuant to both federal and state law. In that case the plaintiff argued that the defendant retaliated against him by not calling him to work extra shifts on four out of six occasions and that he was forbidden from punching in early despite previously being encouraged to do so. *Id.* at *36-37. The district court rejected the plaintiffs overtime argument because he offered no evidence beyond "bald assertions that he was not asked to cover shifts, but [did] not identif[y] the dates of the shifts, explained why he would have been

otherwise entitled to cover those shifts, or identified the employees, if any, who were called in to cover the shifts instead of him." *Id.* at *39. Relying on First Circuit precedent, the district court concluded that it could not rely on "conjecture to substitute for the evidence necessary to survive summary judgment." *Id.* (quoting *Pina*, 740 F.3d at 802); *see Irobe v. U.S. Dep't of Agric.*, 890 F.3d 371, 381 (1st Cir. 2018) ("A court need not 'take at face value' a party's 'subjective beliefs,' even if offered in the form of testimony, if those subjective beliefs are 'conclusory,' 'self-serving,' and lack factual support in the record").

Here, Ms. Verrier's allegations related to BTB's denial of her overtime are even more conclusory than the plaintiff's allegation in *Morin*. Although Ms. Verrier has alleged that denying her requests for overtime cost her extra earnings, like the plaintiff in *Morin*, Ms. Verrier has not explained how often she was denied overtime, why she would have been entitled to those shifts, and which other employees were granted overtime instead of her. In other words, Ms. Verrier's conclusory statements relating to overtime are insufficient to state an alleged retaliatory act.

### 3.    Manager Criticism and Ostracization

Third, the Court similarly concludes that BTB is entitled to summary judgment as to Ms. Verrier's allegations that management ostracized her and was rude, criticized her, and stopped checking on her machine. First, Ms. Verrier does not provide additional details as to when and how often this conduct occurred. Second, courts have consistently held that the type of conduct Ms. Verrier alleges does not rise to the level of adverse employment action. *See Billings*, 515 F.3d at 54 ("We agree that some of Connor's behavior—upbraiding Billings for her question at

the Board of Selectmen meeting criticizing her by written memoranda, and allegedly becoming aloof toward her—amounts to the kind of 'petty slights or minor annoyances that often take place at work and that all employees experience' and that, consequently, fall outside the scope of the anti-discrimination laws" (quoting *Burlington N.*, 126 S. Ct. at 2415)).[213]

To the extent that Ms. Verrier alleges that criticism of her work is an adverse employment action, the Court rejects this notion because even if she was criticized, it is undisputed that she received positive Annual Performance Evaluations, and Ms. Verrier herself testified that Mr. Hutchinson was always pleased with her work. DSMF ¶ 112; PRDSMF ¶ 112. *See Hernandez-Torres v. Intercontinental Trading*, 158 F.3d 43, 47 (1st Cir. 1998) (rejecting plaintiff's contention that increased onerous assignments and critical reports on productivity constitute an adverse employment action where the plaintiff received favorable performance evaluations from his supervisors). Given the scant record on this issue and First Circuit precedent, the Court concludes that no reasonable jury could conclude that the alleged criticism and ostracization was an adverse employment action.

### 4.   Admonition for Punching In and Out Early

Third, regarding Ms. Verrier's allegation relating to punching in early, the Court concludes that Ms. Verrier has failed to establish a causal connection between

---

[213]     In her opposition, Ms. Verrier cites *Billings* for the proposition that "[e]xtreme supervision, snubbing, and increased criticism, when considered collectively with other retaliatory acts, may be materially adverse." *Pl.'s Opp'n* at 19 (citing *Billings*, 515 F.3d at 45). Ms. Verrier's statement is a mischaracterization of *Billings* which in turn cited *Marrero*, 304 F.3d at 25 for the proposition that "extreme supervisor" and "snubbing" is *NOT* an adverse action. Similarly, *Billings* cites *Hernandez-Torres*, 158 F.3d at 47 for the proposition that increased criticism is *NOT* adverse.

her harassment reports and admonishment for punching and out.  In *Morin* the court concluded that the plaintiff's claims related to punching in early could survive summary judgment because it had the effect of reducing pay the plaintiff was entitled to, which a reasonable jury could conclude would dissuade a reasonable employee from pursuing a MHRA claim.  *Morin*, 2018 U.S. Dist. LEXIS 95733, at *40.

As in *Morin* Ms. Verrier established that it was generally common practice to clock in early, and also demonstrated that others continued to be allowed to do so, but she was reprimanded.  A reasonable jury could therefore conclude that BTB was, in essence, docking Ms. Verrier's pay, which would constitute an adverse employment action.  Moreover, Ms. Verrier suggests that other employees were not reprimanded or told to stop clocking in and out, which is suggestive of retaliation for protected conduct.  *See id.* at *41 (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002) ("An employee can prove pretext by showing the employer meted out more lenient treatment to similarly situated employees . . . who did not engage in protected activity")).

However, Ms. Verrier has not established prima facie evidence of a causal link between those occurrences and her protected activity.  There is no evidence on the record explaining when Ms. Verrier was reprimanded regarding punching in and out too early, and when this occurred in relationship to her complaints.  "Because there is no evidence in the record from which a reasonable factfinder could conclude the alleged [admonition for punching in early] resulted from . . . retaliatory behavior, [Ms. Verrier's] claim as to th[ese] alleged retaliatory act[s] fails."  *Colon-Fontanez v. Mun.*

*of San Juan*, 660 F.3d 17, 39 (1st Cir. 2011) (rejecting the plaintiffs retaliation claim that the employer withheld paychecks in retaliation for a parking spot request where "[t]he most [the employee] offer[ed] [was] the unsupported assertion that in all years prior to her 2006 parking spot request she never went several pay periods without payment, whereas months after her accommodation request, she did"); *see also Scarborough*, 2008 U.S. Dist. LEXIS 105815, at *31 (concluding that a plaintiff's allegations that she applied for a position 'shortly before' making a complaint but without stating more specific timing was insufficient to establish temporal proximity).  In the absence of a causal link, no reasonable jury could conclude that BTB retaliated against Ms. Verrier by admonishing for punching in and out early.

### 5.    Denial of Forklift License

Fifth, the Court determines that there is no triable issue of fact on Ms. Verrier's claim that BTB retaliated against her by denying her a forklift license.  Ms. Verrier alleges that BTB denied her request for a forklift license, which she alleges hurt her chances for advancement in the company.  PSAMF ¶ 184.  BTB offers a non-discriminatory rational for its action: Mr. Hutchinson testified that BTB did not provide forklift training for Ms. Verrier because she "was at a skill set that was beyond the need for forklift training.  It didn't impact her job at all.  She was – she at this point had been assigned to line one filler, which was our most advanced line, so her skill set –she just didn't need it and it didn't make sense for the business needs at that point." *Hutchinson Dep.* 46:1-11.  Ms. Verrier does not refute this statement or provide any evidence to support her claim that the forklift license would have improved her chances for advancing at BTB.

Even assuming that a reasonable jury could conclude that Ms. Verrier was denied an opportunity for advancement within the company, Ms. Verrier has not made out a causal link between her protected activity and denial of the forklift license. The record is silent on when Ms. Verrier applied for a forklift license, when she was denied the license, and when this occurred in relation to her complaints. Ms. Verrier's additional statement of material fact states only that she was denied the license "after" she complained to HR. But the mere fact that denial occurred after the complaint is not sufficient to establish a causal connection, as "after," could mean anything from days, to weeks, to months. *See Scarborough*, 2008 U.S. Dist. LEXIS 105815, at *31.

### 6.   Threats to Terminate

Finally, Ms. Verrier argues that she was retaliated against on July 24, 2019, when Mr. Vienneau "explained [that] the expectations have been made very clear . . . that personal interactions should not be taking place between [employees] and if they need to interact then it should only be business related regarding performing their jobs." June 28, 2019, *HR Investigation Rep.* at NWNA000152. It was at this point that Mr. Vienneau explained that "[s]hould this be violated then [BTB] would need to separate them or depending on the situation termination would take place." *Id.* In the light most favorable to Ms. Verrier, a reasonable jury could conclude that Mr. Vienneau's admonition was a warning that Ms. Verrier could be terminated if she had personal relationships that interfered with her work, which could be interpreted as a threat. *See Charette*, 332 F. Supp. 3d at 356 ("[T]hreats by an employer against the employee's status of employment, whether or not the threats are actually acted

upon, can constitute adverse employment actions" (quoting *Donato v. Granite Bay Care, Inc.*, No. 2:17-CV-145-NT, 2017 U.S. Dist. LEXIS 128481, at *5 (D. Me. Aug. 14, 2017))); *see also Ramsdell v. Huhtamaki, Inc.*, 992 F. Supp. 2d 1, 16-17 (D. Me. 2014) (explaining that threats of termination are discrete retaliatory acts).

However, "'the larger picture undercuts any claim of causation,' since subsequent events [and the overall context] contradict [Ms. Verrier's] claim of a continuing animus." *Osher*, 703 F. Supp. 2d at 72 (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003); *see also Vera*, 622 F.3d at 34 ("[t]iming may bear on the question of causation in a retaliation claim, but . . . a 'narrow focus [on timing may] ignore [] the larger sequence of events and also the larger truth'" (alterations in *Vera*) (quoting *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 100-01 (1st Cir. 2007))).

Courts have rejected retaliation claims even when there is a close timing relationship between the adverse employment action and the protected activity where the record shows favorable acts by the employer to the plaintiff or efforts to accommodate or remediate issues related to the plaintiff's protected activity. In *Freadman v. Metropolitan Property and Casualty Insurance*, the First Circuit concluded that "the timing between [a June 2 alleged adverse action] and [a] June 26 job rotation [which the plaintiff argued was retaliatory] [did] not support a finding of pretext" in light of the larger context of events. 484 F.3d at 101. The First Circuit concluded that "the larger sequence of events" demonstrated that the company accommodated the plaintiff's request, permitted her to work part time and hire a

replacement, gave her high performance ratings, and that her transfer was motivated by other factors. *Id.*; *see also Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 32 (1st Cir. 2007) (concluding that, in addition to a sixteen-month gap in time the record showed that the plaintiff received subsequent favorable performance evaluations and a raise, all of which indicated an insufficient causal connection).

Similarly, in *Osher v. University of Maine System*, the district court for the District of Maine rejected the plaintiff's causation argument based on the larger context of the alleged retaliation. 703 F. Supp. 2d at 72. The Court noted that "[t]he University actually accommodated [the plaintiff] following her complaint to HR, and the accommodations were effective." *Id.* The *Osher* Court noted that the complained of issue did not persist, the plaintiff made no other complaints, she continued to be reappointed annually, and generally continued, "by her own account," to perform well at work. *Id.*

Here, the record shows that Mr. Vienneau allegedly threatened Ms. Verrier on June 24, 2019, when he told her that BTB just wanted the matter to go away and that she might face termination if the controversy persisted. PSAMF ¶¶ 145-156. On June 28, 2019, however, BTB received Mr. Loranger's letter and immediately suspended Mr. Campbell a second time. DSMF ¶ 80; PSAMF ¶¶ 163, 166. Ms. Asquith performed additional investigation and on July 23, 2019, approximately one month later, BTB prepared a final written warning for Mr. Campbell. DSMF ¶ 88; PSAMF ¶ 175. Mr. Campbell thereafter resigned on August 1, 2019. DSMF ¶ 89.

Based on this context, no reasonable jury could conclude that BTB was treating Ms. Verrier with continued animus and that Mr. Vienneau's statements would reasonably dissuade Ms. Verrier from making further complaints. Four days after Mr. Vienneau made the alleged threat, BTB suspended Mr. Campbell a second time and in one month had forced Mr. Campbell from the company. Although there are questions of fact as to BTB's response in terms of Ms. Verrier's hostile work environment claim, the undisputed record shows that BTB responded to Ms. Verrier's complaint and ultimately remedied Mr. Campbell's conduct by effectively forcing him out. Ms. Verrier's subsequent complaint in December 2019 regarding Mr. Cox was entirely unrelated from her complaints regarding Mr. Campbell's conduct. No reasonable juror could infer ongoing animus toward Ms. Verrier when BTB immediately suspended Mr. Campbell upon receiving Mr. Loranger's letter.

In addition to BTB's actions around the same time that Mr. Vienneau allegedly threatened Ms. Verrier, Ms. Verrier's Performance Evaluations from her date of hire through her resignation show that she performed well in her role and Ms. Verrier testified that Mr. Hutchinson was always pleased with her performance. DSAMF ¶ 112; PRDSMF ¶ 112. The record does not reflect that Ms. Verrier's performance evaluations changed in any way after the report was made or that she was given formal discipline or warnings on her employment record. Second, when Ms. Asquith learned that Ms. Verrier wanted to transfer, Ms. Asquith contacted HR and management at the McBee facility in South Carolina to recommend Ms. Verrier for the position. DSMF ¶ 93; PRDSMF ¶ 93. Mr. Hutchinson also wrote a letter of

137

recommendation for Ms. Verrier, and when Ms. Verrier resigned, Mr. Hutchinson told her that he was sorry that she resigned and that he did not want to see her leave. DSMF ¶¶ 95, 117; PRDSMF ¶¶ 95, 117.

In sum, within this larger context of positive performance evaluations and feedback and given the absence of formal disciplinary actions against Ms. Verrier, no reasonable jury could find a causal connection between Ms. Verrier's complaint and Mr. Vienneau's comments, especially when BTB ultimately forced Mr. Campbell out of the company.

The Court grants BTB's motion for summary judgment as to Ms. Verrier's retaliation claim.

### D.    Constructive Discharge

Finally, Ms. Verrier alleges constructive discharge. "Constructive discharge may be found when, due to the actions of the employer, an employee's 'working conditions were so difficult or unpleasant that a reasonable person in [the employee's] shoes would have felt compelled to resign.'" *Sullivan v. St. Joseph's Rehab. & Residence*, 2016 ME 107, ¶ 15, 143 A.3d 1283 (quoting *Lee-Crespo*, 354 F.3d at 45). To proceed on a constructive discharge claim the employee must show protected activity, an adverse employment action and a causal connection, but must also "prove that (1) the employer engaged in unlawful retaliatory conduct that created working conditions so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign, and (2) that the unlawful retaliatory conduct in fact caused the employee's resignation." *Id.* ¶ 17. "In order to prove a constructive discharge, a plaintiff must show that the work environment triggering the departure

138

was more severe and pervasive than the minimum required to prove a hostile work environment." *Paquin*, 233 F. Supp. 2d at 68; *see also Lee-Crespo*, 354 F.3d at 45; *Marrero*, 304 F.3d at 28 ("To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment") (quotation marks omitted).

"[T]imeliness . . . [is] an important factor in the constructive discharge equation" and the First Circuit has stated that failure to "leave [employment] within a reasonable time after last being the subject of discrimination" means the plaintiff "cannot prevail under a constructive discharge theory." *Smith v. Bath Iron Works Corp.*, 943 F.2d 164, 167 (1st Cir. 1991). Although Ms. Verrier alleges that her working conditions caused her stress and anxiety, she was ostracized and managers were rude, and she was denied overtime and a forklift license, no reasonable jury could conclude that Ms. Verrier was constructively discharged and left employment because of her working conditions. Based on the facts presented to the Court, the last incident reported to HR occurred in December 2019 when Mr. Cox insinuated that Ms. Verrier was sleeping with a new co-worker. PSAMF ¶¶ 196-197.

However, Ms. Verrier did not resign from BTB until March 15, 2021, more than one year after that final incident. Further, when asked at oral argument whether there were any incidents that occurred after December 2019, Ms. Verrier's attorney pointed only to general ostracism and rudeness, but such generalities are insufficient to meet the high bar of constructive discharge. Courts have routinely held that a resignation six months after an alleged incidence of harassment or discrimination is

too remote to establish constructive discharge, as a prolonged delay undermines the required causal relationship. *See Gerald*, 707 F.3d at 26 (concluding that resignation "a little over a year after the final act of harassment and eight months after she was transferred . . . [was] too late after the offensive conduct and reassignment to be labeled a constructive discharge"); *Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 613 (1st Cir. 2000) (concluding that a seven month period between resignation and the alleged harassment was too long to support constructive discharge); *Smith*, 943 F.2d at 167 (explaining that resignation six months after an alleged incident was too remote) (collecting cases).

The record shows that Ms. Verrier was admonished for bottle contamination in December 2020, only a few months before she resigned.  However, no reasonable jury could conclude that one incident of being reprimanded by a supervisor for a supposed failure to follow required cleaning protocols would be so intolerable such that the employee had no choice but to resign.  Furthermore, the record supports the conclusion that Ms. Verrier left BTB for other reasons besides the alleged harassment.  The record reflects that Ms. Verrier began working as a CNA when she left BTB and she testified that she returned to that role because she missed working as a nurse's aid.  DSMF ¶¶ 115-116; PRDSMF ¶¶ 115-116.  Because the record establishes that Ms. Verrier's motivation in leaving BTB was for her own professional reasons, no reasonable jury could conclude that she was constructively discharged or that the working environment was so hostile or intolerable that she had no choice but

to resign.  The Court grants summary judgment as to Ms. Verrier's constructive discharge claim.

## VI.   CONCLUSION

The Court GRANTS in part and DENIES in part BlueTriton Brands' Motion for Summary Judgment (ECF No. 74).  The Court GRANTS summary judgment on Ms. Verrier's retaliation and constructive discharge claims and DENIES summary judgment as to Ms. Verrier's hostile work environment claims, but limits Ms. Verrier's claims to the period of March to August 2019 as no reasonable jury could conclude that Ms. Verrier was subject to a hostile work environment after Mr. Campbell resigned from BTB on August 1, 2019.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 12th day of August, 2022